# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | Case No.: 20-42492 |
| *et al.* | § | |
| | § | Jointly Administered |
| Debtors. | | |

---

| | | |
|---|---|---|
| **SPHERATURE INVESTMENTS LLC,** | § | |
| *et al.* **d/b/a WorldVentures Holdings, LLC,**[1] | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Adversary No. [_____]** |
| **vs.** | § | |
| | § | |
| **SEACRET DIRECT LLC,** | § | |
| | § | |
| **Defendant.** | | |

## ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION

Plaintiffs Spherature Investments LLC d/b/a WorldVentures Holdings, LLC ("**WorldVentures**") and its affiliated Debtors (collectively, "**Plaintiffs**") bring this *Original Complaint and Request for Preliminary Injunction* against Defendant Seacret Direct LLC ("**Seacret**") pursuant to Federal Rules of Bankruptcy Procedure 7001(1), (7), (9) (the "**Complaint**"). In support of the Complaint, Plaintiffs show the Court as follows:

---

[1] The "**Debtors**" and "**Plaintiffs**" in the above-captioned cases are: Spherature Investments LLC ("**Spherature**") EIN#5471; Rovia, LLC ("**Rovia**") EIN#7705; WorldVentures Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846; WorldVentures Marketplace, LLC ("**WV Marketplace**") EIN#6264; WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255; WorldVentures Services, LLC ("**WV Services**") EIN#2220.

# I. <u>NATURE OF THE ACTION</u>

1.      This case concerns a scheme by Seacret to infiltrate and steal Plaintiffs' downline organization—its most valuable asset—and its intellectual property to gain an unfair competitive advantage over Plaintiffs in the multi-level marketing travel industry and to profit at the expense of Plaintiffs' creditors.

2.      WorldVentures is a multi-level marketing company that markets and sells lifestyle membership-based travel products and services through its network of sales representatives.

3.      Prior to filing the bankruptcy cases, Plaintiffs explored various options to improve their financial viability and avoid filing for Chapter 11 relief. One such option—aimed at improving Plaintiffs' liquidity and elevating the income and morale of Plaintiffs' sales representatives—involved negotiations with Seacret regarding possible business arrangements.

4.      On July 22, 2020, purportedly to drive additional value for its sales representatives and influenced by pressure from Plaintiffs' former President and Chief Strategy Officer, Kenneth E. Head ("**Head**"), Plaintiffs entered into a co-marketing agreement with Seacret, wherein Plaintiffs made Seacret's non-travel products available to its sales representatives to sell and supplement their income. When it entered into the co-marketing agreement, Seacret only marketed and sold dietary, nutritional, and skincare products—Seacret did not market or sell any membership-based travel products and services. Indeed, until such time as Seacret surreptitiously gained access to Plaintiffs' confidential information and trade secrets, Seacret was unlikely to replicate the success of WorldVentures' membership-based travel services through direct sales.

5.      By allowing Seacret an expanded sales force to promote its products and, in turn, affording WorldVentures' sales representatives additional products to sell, the parties' relationship appeared to be mutually aligned. Therefore, on November 10, 2020, Plaintiffs and Seacret entered

into a letter of intent agreement to outline Seacret's proposed purchase of certain assets of Plaintiffs.

6. The next day—disguised as a way to add additional value to Plaintiffs, to "protect and maintain [Plaintiff's] salesforce" and as a prelude to the asset sale—Seacret manipulated Plaintiffs into replacing the co-marketing agreement with a limited solicitation agreement on far less favorable terms. Through that agreement, Seacret obtained limited access to Plaintiffs' confidential and proprietary information related to its travel program, including Plaintiffs' sales network and information database. Shortly after tapping into Plaintiffs' database, there was a chilling effect on asset purchase negotiations with Seacret.

7. Significantly, the limited solicitation agreement never authorized Seacret to solicit or to sell Seacret products directly to WorldVentures' **customers**, which are defined in the agreement as its "Members." In fact, Section 1 (located on page 1) of the limited solicitation agreement is titled "Right to Solicit [Plaintiffs'] Sales Representatives **Only**" (emphasis added). In spite of that express limitation, Seacret has solicited Plaintiffs' Members that are not now, nor have they ever been, sales representatives of Plaintiffs.

8. Even more significantly, nothing in the limited solicitation agreement (or any other agreement) authorizes or contemplates that Seacret would be starting its own membership-based travel services business offered through direct sales or marketing these services at all, and certainly not using Plaintiffs' intellectual property and trademarks. Indeed, Seacret expressly agreed that the limited solicitation agreement "shall have no impact upon [WorldVentures'] sale of travel products to its Members or through the [WorldVentures] Sales Representatives, **and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement**." In other words, the limited solicitation agreement prohibits Seacret from offering its own travel

products to any of Plaintiffs' sales representatives or Members without a separately negotiated contract. No such contract exists, and indeed, it has never been discussed.

9.     However, Seacret has begun marketing its own membership based travel services through direct sales to Plaintiffs' sales representatives and, upon information and belief, plans to begin selling those memberships to Plaintiffs' Members within a matter of a few short weeks.

10.     In short, although Seacret had no historical presence in the travel industry, that all changed upon acquiring Plaintiffs' confidential and proprietary information. Soon thereafter, Seacret announced publicly its own competing "lifestyle" brand, which now will include a membership-based travel business. Seacret's agents have proclaimed publically that "Seacret can move forward aggressively and very quickly on rolling out [Seacret's] own travel products," referring to the product as a "rebranding" of Plaintiffs' product that is "introducing the world of travel" to Seacret.

11.     It is beyond refute that Seacret's new foray into the travel industry is a carbon copy of Plaintiffs' travel program. As Seacret's founder admitted in a video with Head—Seacret's new president—by his side: Seacret is "tak[ing] one of the unique travel experiences in the world [i.e., WorldVentures' travel experience] and implement[ing] the program over here at Seacret." It is not a coincidence that several of Plaintiffs' former key employees have recently been hired by Seacret. Seacret is also targeting Plaintiffs' Members and utilizing their travel vendors, some of which have exclusivity agreements with the Plaintiffs.

12.     Importantly, Seacret never disclosed it was planning to use Plaintiffs' confidential and proprietary information to steal Plaintiffs' key assets (e.g., its downline organization) and open a competing business with that downline. In addition, the agreements never gave Seacret the right to use Plaintiffs' database to recruit and solicit Plaintiffs' Members or the right to conduct business

with Plaintiffs' vendors and suppliers. And of course, no agreement authorized Seacret to use Plaintiffs' trademarks or trade secrets to market and sell any travel products at all, much less its own travel products and services.

13.     In short, the limited solicitation agreement was procured by subterfuge and without a fair exchange of value, at a time when Plaintiffs' precarious financial condition was exploited under false pretenses by Seacret.

14.     Simply stated, had Seacret revealed its true motivation for the agreements between the parties, Plaintiffs would never have signed them. By improperly using Plaintiffs' intellectual property and confidential information, Seacret has converted that information to create its competing multilevel marketing "lifestyle" travel brand and platform, and is guilty of harmful access by computer. Through its subterfuge, Seacret perpetrated the fraudulent transfer of Plaintiffs' most valuable assets without providing reasonably equivalent value. The agreements enabling this fraud should be set aside. Alternatively, by soliciting Plaintiffs' customers using such information and soliciting employees and sales representatives into a competing business, Seacret has breached the parties' agreement and is tortiously interfering with contractual non-compete restrictions, prospective business relationships, and non-disclosure provisions.

15.     Seacret procured these agreements by and through heavy influence exerted by Head, who Seacret has now hired to lead its competing travel business. By cavorting with Head, Seacret knowingly aided and abetted Head's breach of fiduciary duties and double-dealing. Further, by hiring Head to lead Seacret's membership-based travel program through direct sales, Seacret tortiously interfered with Head's unambiguous non-compete obligations in Head's employment agreement.

16.     And, by promoting its travel program using Plaintiffs' DreamTrips™, Rovia™, Anytime Escapes™ and WorldVentures™ marks, Seacret is guilty of trademark violations. Seacret not only abused Plaintiffs' trust, but also used the bankruptcy process itself as a vehicle to defraud Plaintiffs and their creditors at a time in which they were most vulnerable. Seacret's theft of assets and intellectual property and its unfair competition should be enjoined. Plainly, Seacret should pay the estate for the substantial damages caused by its misconduct.

## II. <u>JURISDICTION</u>

17.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

18.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(2)(A), and (O).

19.     This Complaint relates to the Spherature Investments LLC, et al. bankruptcy cases, jointly administered under case number 20-42492, filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Texas (Sherman Division). Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1409(a).

## III. <u>PARTIES</u>

20.     Debtors are each limited liability companies organized under the laws of the State of Nevada.

21.     Defendant Seacret Direct LLC is an Arizona limited liability company, and can be served at its primary place of business located at 8125 N. 86th Place, Scottsdale, AZ 85258.

# IV. <u>FACTS</u>

**A. Plaintiffs' Membership-Based, Direct Sales Travel Services Business**

22.      Plaintiffs are a multi-level marketing company that market and sell travel-related products and services. Since 2005, Plaintiffs have specialized in and provided membership-based travel products and services through direct sales ("**Services**").

23.      Combining the power of the internet with the time-tested strength of word-of-mouth marketing, Plaintiffs market a specifically curated travel program known as DreamTrips, DreamBreaks and Anytime Escapes. All DreamTrips, DreamBreaks and Anytime Escapes travel is booked through Rovia. Notably, DreamTrips™, DreamBreaks™, Anytime Escapes™, WorldVentures™, Rovia™, and all associated logos are trademarks of the Plaintiffs.

24.      In response to its business needs, Plaintiffs designed, developed and maintained confidential and proprietary information and intellectual property, including the Rovia, DreamTrips, DreamBreaks and Anytime Escapes travel products and services; methodologies and processes to fit customers' needs, software applications, travel booking platforms, vendor/supplier relationships and lists, sales representative relationships and lists, customer relationships and lists; sources of supply, pricing, costing, and other financial information; trade secrets, tradenames, trademarks, brands, logos, and other names used in connection with Plaintiffs' business; business know-how, specific plans and project requirements, business processes, techniques, and opportunities; computer programs and systems developed or used by Plaintiffs; and sensitive information concerning compensation and benefits paid to officers, managers, employees, independent contractors, and other representatives of the Plaintiffs (collectively, "**Confidential Information**"). Plaintiffs have spent a substantial amount of time, money, and effort creating, establishing, maintaining, and protecting this Confidential Information.

25.     Plaintiffs have active sale representatives that are authorized to market and sell Plaintiffs' Services ("**Sales Representatives**") to individual and group leisure and corporate travelers in all 50 states in the United States, as well as internationally in Australia, Austria, Botswana, Brazil, Canada, Colombia, Cyprus, Czech Republic, France, Germany, Greece, Guam, Hong Kong, Hungary, Iceland, Ireland, Israel, Jamaica, Kenya, Latvia, Malaysia, Malta, Mexico, Namibia, Netherlands, New Zealand, Philippines, Poland, Puerto Rico, Romania, Russia, Serbia, Singapore, Slovenia, South Africa, Sweden, Taiwan, Uganda, United Kingdom, Zambia and Zimbabwe ("**Territory**").

26.     To become a Sales Representative, a person is required to sign a WorldVentures Representative Agreement (the "**Representative Agreement**") and agree to Plaintiffs' Policies and Procedures ("**Policies**").[2] As set forth in the Policies, the purpose of these Policies "is to define the relationship between WorldVentures and its Representatives, to set standards of permissible business conduct and practices, to protect the business relationships, good will, trade secrets, confidential information, including the WorldVentures business methods and strategies . . . ."[3] Plaintiffs allowed their Sales Representatives to use Plaintiffs' confidential and proprietary information and trade secrets, but only in connection with Plaintiffs' business operations.[4] Indeed, each Sales Representative agrees not to (i) disclose or disseminate Plaintiffs' confidential and proprietary information and trade secrets to any other person or entity, (ii) use Plaintiffs' trade names, trademarks, designs, symbols, copyrighted material, or any derivative thereof, except in connection with Plaintiffs' business operations and only with Plaintiffs' prior written approval.[5]

---

[2] True and correct copies of Plaintiffs' Representative Agreement and Plaintiffs' Policies are attached hereto as Exhibit 1. The Policies are incorporated into and made a part of the Representative Agreement. *See* Policies, Ex. 1, ¶4.
[3] *Id.*, ¶1.2.
[4] *See id.* at ¶5.12.
[5] *See id.* at ¶¶ 3.2.1, 6.3, and Appx. I.

27.     Through Plaintiffs' Services, Sales Representatives sell Plaintiffs' curated travel products to customers who purchase membership travel products for a monthly fee. By purchasing Plaintiff's products, these members have access to a monthly travel membership subscription. Each new customer, or "member," fills out and signs a WorldVentures Membership Application Form ("**Membership Agreement**"), which contains specific membership terms and conditions.[6] Each customer-member expressly agrees that "[a]ny software that is made available to download from the Web Site (the "Software") is the copyrighted work of WorldVentures, its subsidiary, associate or affiliated entities and/or its Affiliates and/or their suppliers or licensors. Use of the Software is governed by the terms of the use of the Website",[7] and "copying or reproduction of the Software or of the Web Site content to any other server or location for further reproduction or redistribution is expressly prohibited."[8] Further, they agree not to:

> [U]se, disseminate or reproduce any WorldVentures trademarks, copyrights or other intellectual property in marketing materials, advertising on social media . . . or any other advertising and or marketing outlet without the expressed written consent from the WorldVentures Compliance department.[9]

**B.     Plaintiffs' Former President – Eddie Head**

28.     From 2017 through January 14, 2021, Head served as Plaintiffs' President and Chief Strategy Officer ("**CSO**").[10] As President and CSO, Head had unrestricted access to Plaintiffs' Confidential Information, including information and reports in its database managed by the direct selling software platform Exigo Office Inc. ("**Exigo**"), which contains detailed

---

[6] A true and correct copy of the Membership Agreement is attached hereto as Exhibit 2.
[7] *See* Ex. 2, ¶ 18.
[8] *Id.* at ¶ 19.
[9] *Id.* at ¶ 20 – 21.
[10] A true and correct copy of Head's Executive Employment Agreement ("Employment Agreement") is attached hereto as Exhibit 3.

information regarding Plaintiffs' Sales Representatives and information regarding their respective downlines.

29. Under his Employment Agreement and the WorldVentures' Confidentiality and Proprietary Rights Agreement ("**Confidentiality Agreement**"), Head agreed to, among other things, protect Plaintiffs' Confidential Information.[11] Specifically, Head agreed "not to directly or indirectly disclose, publish, communicate or make available, in whole or in part," any Confidential Information "to any entity or person" both during and after his employment.[12]

30. Article III of his Employment Agreement prohibits Head from engaging in certain activities for a twenty-four (24) month period following termination of Head's employment (the "**Non-Compete Period**").[13] During the Non-Compete Period, Head expressly agreed not to (i) solicit and interfere with Plaintiffs' Sales Representatives, customers, members, employees, vendors, and suppliers, and (ii) unfairly compete with the Plaintiffs (collectively, the "**Non-Compete Provisions**").[14] Head "further acknowledge[d] and agree[d] that the competitive use of [WorldVentures'] confidential information would cause grievous damage to [WorldVentures], and [WorldVentures] would not hire [him] and disclose confidential information to him in the absence of the protections afforded by the confidentiality and non-compete provisions in . . . Article III."[15] And, Section 2.08 of his Employment Agreement provides that the Non-Compete Provisions survive after Head's employment with the Plaintiffs terminates.[16]

---

[11] A true and correct copy of Head's Confidentiality Agreement is attached hereto as Exhibit [4].
[12] *See* Ex. 4, § 1b.
[13] *See* Ex. 3, ¶ 3.01.
[14] *See* Ex. 3, Article III.
[15] *See id.*, ¶ 3.07.
[16] *See id.* at ¶ 2.08.

**D. Seacret's Limited Access to Plaintiffs' Confidential Information**

31.     Like the Plaintiffs, Seacret is a multi-level marketing company. Unlike Plaintiffs, however, Seacret historically did not market or sell any membership-based travel services. Rather, Seacret engaged in membership-based, direct sales and marketing of dietary, nutritional and skin care products ("**Seacret's Legacy Business**").

32.     On July 22, 2020, Plaintiffs and Seacret executed a co-marketing agreement ("**Co-Marketing Agreement**"), through which Seacret agreed to make its products available to Plaintiffs' Sales Representatives to sell such products.[17] On November 10, 2020, Plaintiffs and Seacret entered into a letter of intent for an asset purchase agreement ("**LOI**" or "**Letter of Intent**"), evidencing Seacret's intent to purchase certain asset of Plaintiffs.[18] Accordingly, the LOI was attached to the Limited Solicitation Agreement executed the following day between Plaintiffs and Seacret ("**LSA**").[19] Under the LSA, "[a]s additional consideration to [Plaintiffs], Seacret agrees to make and diligently pursue the offer to purchase certain of [Plaintiffs'] assets as outlined in the attached Letter of Intent."

33.     The LSA and LOI effectively terminated the Co-Marketing Agreement. However, certain provisions in the Co-Marketing Agreement continue to apply in full force and effect, including Seacret's express agreement (i) not to disclose Plaintiffs' Confidential Information, and (ii) that a joint venture or partnership would not be established between the parties.[20] Likewise, Seacret's confidentiality obligations under the LOI remain in effect.[21]

34.     The Recitals of the LSA provide the purpose and intent of the agreement:

---

[17] A true and correct copy of the Co-Marketing Agreement is attached hereto as Exhibit 5.
[18] A true and correct copy of the LOI is attached hereto as Exhibit 6.
[19] A true and correct copy of the LSA is attached hereto as Exhibit 7.

[20] *See* Ex. 7 (LSA), ¶ 2.1; see also Ex. 5 (Co-Marketing Agreement), ¶¶ 7.1-7.2, 13.1.
[21] *See* Ex. 6 (LOI), § 2.

Whereas, due to its current financial situation, [WorldVentures] has requested that Seacret assist it in protecting and maintaining its sales force, including all members of [WorldVentures]'s downline organization . . . by allowing [WorldVentures] Sales Representatives to join Seacret's downline organization in order to sell, and directly receive a commission for selling Seacret products.[22]

35.     Seacret's intent was purportedly "to assist [WorldVentures] with its current financial situation."[23] Further, as Seacret acknowledged in discussions with Plaintiffs, the LSA was only supposed to be an "interim" agreement while the parties finalized the sale of certain of Plaintiffs' assets to Seacret.

36.     In accordance with the LSA, Plaintiffs granted Seacret certain rights to (a) solicit Plaintiffs' exclusive network of Sales Representatives to sell Seacret's line of dietary, nutritional, and skincare products, (b) access certain Confidential Information, including one of Plaintiffs' most critical revenue-generating asset: the Exigo database containing the entirety of Plaintiffs' downline sales network, and (c) allegedly waive Plaintiffs' non-compete provisions with its Sales Representatives solicited by Seacret ("**Fraudulent Obligations**"). In exchange for the Fraudulent Obligations, Seacret agreed to pay Plaintiffs a future product-sales royalty—in an amount not to exceed $12 million—based on the amount of Seacret products sold by Plaintiffs' Sales Representatives. To date, Seacret has paid less than 5% of that promised consideration. Notably, the LSA did not permit Seacret to solicit or recruit Plaintiffs' members (i.e. customers), employees, suppliers, or vendors.[24] Nor did the LSA "establish a joint venture or partnership between the Parties."[25] Significantly, the LSA never authorized Seacret to solicit or to sell Seacret products directly to WorldVentures' customers, which are defined in the LSA as its "Members," as opposed

---

[22] See Ex. 7 (LSA), at p. 1.
[23] *See id.*
[24] *See id.*, at ¶1.5.
[25] *Id.* at ¶13.1.

to Sales Representatives.[26] In fact, Section 1 (located on page 1) of the limited solicitation agreement is titled "Right to Solicit [Plaintiffs'] Sales Representatives ***Only***" (emphasis added).

37. Even more significantly, nothing in the LSA authorizes or contemplates that Seacret would be starting its own membership-based travel services business offered through direct sales. Indeed, the LSA specifically defines "Products" of Seacret as "dietary supplements, nutritional and skincare…through its network of sales representatives."[27] Further, ¶ 1.1 provides that Sales Representatives may continue to sell WorldVentures' products and services while also selling Seacret products and services."[28] More to the point, Seacret agreed that the LSA "shall have no impact upon [WorldVentures'] sale of travel products to its Members or through the [WorldVentures] Sales Representatives, ***and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement***."[29] In other words, the LSA prohibits Seacret from offering its own travel products to any Sales Representatives or Members without a separately negotiated contract. No such contract exists, and indeed, it has never been discussed.

38. Despite these LSA prohibitions, Seacret has directly solicited Members.[30] And, Seacret announced its intent to launch its own membership-based travel services through direct sales with Head at the helm.[31] To advance that effort, Seacret has opened a portal to its agents to allow them to start signing up for travel.[32] This conduct clearly violates the LSA. Upon

---

[26] *Id.* at Recitals and ¶ 1.
[27] *Id.* at Recitals.
[28] *Id.* at ¶ 1.1.
[29] *Id.* at ¶ 4.1.4 (Emphasis added).
[30] *See, e.g.*, Seacret HQ Email Re: "2 Days Until Blue Friday," to Paul Jenkins (Dec. 17, 2021) (explaining that "Seacret is expanding our global footprint with . . . Global Access!"); Seacret HQ Email Re: "SPECIAL MESSAGE FROM IZHAK BEN SHABAT 10th anniversary Breakaway Trip Announcement," to Paul Jenkins (Jan. 31, 2021) (announcing the 10th anniversary Breakaway trips); Seacret HQ Email Re: "ACCELERATE your business in 2021," to Paul Jenkins (Feb. 1, 2021) (promoting a "carefully curated travel experience"); Seacret HQ Email Re: "Message to Our Seacret Family," to Paul Jenkins (Feb. 5, 2021) (addressing relationship with WorldVentures).
[31] *See* Section D below.
[32] *Club Seacret*, YOUTUBE (February 27, 2021) https://www.youtube.com/watch?v=qtEOP6qv9Uw .

information and belief, Seacret intends to offer this travel program to WorldVentures' Members as well, whose contact information they have already improperly accessed in violation of the parties' respective confidentiality obligations discussed below.

39.    Circumstantial evidence suggests that Seacret never intended to perform the LSA and in fact intended to start its own competing travel business and to solicit Plaintiffs' Sales Representatives and Members to that travel business long ago. Indeed, in Zoom calls as early as November 26,  Seacret's managing member and Chief Executive Officer, Izhak Ben Shabat, declares to what appears to be a large group that includes Plaintiffs' Sales Representatives  that Plaintiffs will be in bankruptcy and that, "while we are awaiting the travel membership to be implemented…",  sales representatives will be able to sell Seacret products.[33]  In that same video, Mr. Shabat criticizes Plaintiffs' management and outstanding commissions issues, and declares that distributors will no longer be distributors of WorldVentures following the bankruptcy. On or about December 11. 2021, Shabat declares in another call that whether the "deal" with Plaintiffs goes through or not, Seacret will move forward, as "no one can stop this train." Upon information and belief, that "train" was Seacret's own competing travel business, access to which has been provided to Plaintiffs Sales Representatives already.[34] Whether statements like these were intended to drive down the value of the deal and/or evidence that Seacret never intended to honor the LSA, Seacret clearly has not provided reasonably equivalent value for the assets it

---

[33] *WorldVentures' Sales Representative Call with Izhak Ben Shabat*, ZOOM (Nov. 26, 2020) https://wvholdings-my.sharepoint.com/:v:/p/pjenkins/EUlUpq6AA0ZChHb2ehs10kQBol69Mat_ADuBbtOYDCAAHA .

[34] *See, e.g.*, *Club Seacret*, YOUTUBE (February 27, 2021) https://www.youtube.com/watch?v=qtEOP6qv9Uw ; *WW SEACRET Single Buddies*, FACEBOOK, https://www.facebook.com/groups/WV.Single.Buddies ; *WW SEACRET Travel Buddy*, FACEBOOK, https://www.facebook.com/groups/WV.Travel.Buddy

surreptitiously acquired—all when it knew Plaintiffs were insolvent.  For that reason, the LSA should be avoided.

40.      If not set aside, however, Seacret has breached the LSA. Namely, Seacret has directly solicited Members.[35]  And, as discussed below, Seacret announced its intent to launch its own membership-based travel services through direct sales with Head at the helm. *See* Section D below. To advance that effort, Seacret has opened a portal to its agents to allow them to start signing up for travel.[36]  This conduct clearly violates the LSA. Upon information and belief, Seacret intends to offer this travel program to WorldVentures' Members as well, whose contact information they have already improperly accessed in violation of the parties' respective confidentiality obligations discussed below.

41.      Under the LSA, Seacret acknowledged that information concerning Plaintiffs' business, including its trade secrets, sources of supply, pricing, customer information, and information related to its downline organization (i.e., names, addresses, and other personally identifiable information used to identify customers, members, agents, and representatives) shall constitute Plaintiffs' proprietary and confidential information.[37] Seacret agreed that it would maintain this information in "strict confidence" and further agreed not to disclose WorldVentures' Confidential Information.[38]

42.      Equally important, Seacret expressly acknowledged and agreed that it shall not:

---

[35] *See, e.g.*, Seacret HQ Email Re: "2 Days Until Blue Friday," to Paul Jenkins (Dec. 17, 2021) (explaining that "Seacret is expanding our global footprint with . . . Global Access!"); Seacret HQ Email Re: "SPECIAL MESSAGE FROM IZHAK BEN SHABAT 10th anniversary Breakaway Trip Announcement," to Paul Jenkins (Jan. 31, 2021) (announcing the 10th anniversary Breakaway trips); Seacret HQ Email Re: "ACCELERATE your business in 2021," to Paul Jenkins (Feb. 1, 2021) (promoting a "carefully curated travel experience"); Seacret HQ Email Re: "Message to Our Seacret Family," to Paul Jenkins (Feb. 5, 2021) (addressing relationship with WorldVentures).
[36] *Club Seacret*, YOUTUBE (February 27, 2021) https://www.youtube.com/watch?v=qtEOP6qv9Uw .
[37] *See* Ex. 7 (LSA), ¶¶ 1.3, 7.1, 7.3.
[38] *See id.* at ¶ 7.2.

directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how, travel booking platforms, software, patents, formulas, or processes or permit or encourage any third-party to do so. . . . [T]his [LSA] does not confer to Seacret any intellectual property or other rights with respect to [WorldVentures'] travel booking platforms, software, patents, formulas, brand, packaging, or any names or logos used in connection with the [WorldVentures'] business. As between Seacret and [WorldVentures], [WorldVentures] owns and shall continue to own all such intellectual property rights.[39]

43.     Similarly, Seacret agreed that Plaintiffs' respective trademarks or tradenames "are valuable and that all goodwill associated with use of such names and marks shall inure to the benefit of [WorldVentures]."[40] Similar restrictions exist in the Co-Marketing Agreement.

44.     Plaintiffs believed the Co-Marketing Agreement and the LSA would help its sales network overcome a reduction in sales revenue, providing temporary liquidity and allowing its Sales Representatives to generate additional income through sales relating to Seacret's Legacy Business. Prior to executing these agreements, Seacret was never involved in the travel business.

45.     Thus, Plaintiffs reasonably believed that the LSA would not be used as subterfuge to facilitate a permanent migration of Sales Representatives from Plaintiffs to Seacret so that Seacaret could implement its own strikingly similar competing travel business. Nor did Plaintiffs believe that the LSA would be used to solicit and poach Plaintiffs' Sales Representatives, employees, members, suppliers, or vendors for the sale of travel services and products in a competing business. And, of course, Plaintiffs expected to receive reasonably equivalent value for the access to its most valuable assets procured through the Fraudulent Obligations. Had Seacret's true intentions been disclosed, Plaintiffs would not have signed the LSA.

**D.      Seacret Hires Plaintiffs' Employees and Representatives to Copy its Travel Business.**

---

[39] *Id.* at ¶ 10.2.
[40] *Id.* at ¶ 11.1.

46.     A precipitous revenue decline in 2020 due to factors that include the global pandemic led Plaintiffs to seek viable business alternatives. Plaintiffs brought in an independent restructuring officer, and on December 21, 2020, Plaintiffs, as debtors in possession, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned bankruptcy cases (the "**Chapter 11 Cases**") in which this adversary proceeding is filed.[41] Front and center in the Chapter 11 Cases is the pending sale of Plaintiffs' assets, including its main downline sales network structure.

47.     Days after the bankruptcy filing, Head resigned his position with Plaintiffs on December 31, 2020. In mid-to-late January, Head resurfaced as the President and Chief Business Development Officer of Seacret.[42]

48.     In late January, Head and numerous former WorldVentures' Sales Representatives participated in campaign videos to promote Seacret's new "lifestyle" company. In fact, dozens of videos referencing Seacret's new travel program have surfaced.

49.     Notably, Head appears in a video on January 29, 2021 sitting next to Seacret's managing member and Chief Executive Officer, Izhak Ben Shabat, who announced Head's position with Seacret and a "partnership" to create a new membership-based travel business within

---

[41] Pursuant to the Chapter 11 Cases, the debtor-Plaintiffs intends to effectuate a sale of substantially all of their assets to the highest bidder. As such, on January 21, 2021, Debtors filed the *Motion for Entry of Order Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bigger and Bid Protections' and (C) Form and Manner of Notices' (II) Scheduling an Auction and Sale Hearing' (III) Approving the Sale of Substantially all the Assets of the Debtors, Free and Clear of All Liens, Claims, Encumbrances and Interests; (IV) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 92] (the "**Sale Motion**"), which is set for hearing on March 2, 2021 [Docket No. 99]. Through the Sale Motion, the debtor-Plaintiffs seek an orderly sale of substantially all of their going-concern assets under section 363(b) of the Bankruptcy Code—namely, its travel sales platform. The proposed sale is the result of extensive, arms-length negotiations between Debtors and WV Holdings Co. LLC ("**WHC**") as the stalking-horse bidder.

[42] *See Team Synergy Agents*, YOUTUBE (Jan 29, 2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc ("introducing Head as new President of Seacret); *Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

Seacret. Shabat announced Seacret is "tak[ing] one of the most unique travel experiences in the world [i.e., WorldVentures' travel experience] and implement[ing] the program over here at Seacret."[43]

50.    Similarly, a Seacret agent appears in a YouTube video explaining that at WorldVentures: "The two pieces . . . were the most valuable . . . were Marc Accetta's leadership development and training program and these specific curated trips [upon information and belief, referring to DreamTrips]. . .Those are the two things that created the magic."[44] And another representative announced that "[Seacret is] selling a membership that gives people access to wholesale travel."[45]

51.    It is beyond refute that Plaintiffs' former key employees are leading Seacret's implementation of Plaintiffs' travel platform. By way of example, Seacret's founder publicly commended "what Eddie [Head] has done putting together this [travel] program with [Seacret's] vendors."[46] And in reference to a travel promotional for Seacret, Seacret's founder stated that "what we were able to do was to use the community leverage power that we have" to get "a deeply discounted price."[47] Such community leverage power, upon in formation and belief, is through Plaintiffs' connections and business relationships established and maintained for several years.

52.    Another recent promotional campaign video is telling. In it—alongside Seacret's founder—Head specifically admits; (a) "we have been grooming a global team, and we brought in

---

[43] *See Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

[44] *Synergy Daily Huddle – Travel is Here! With Jesse Macpherson,* YOUTUBE (Feb. 3, 2021) https://www.youtube.com/watch?v=TCnE6oJ13P8 .

[45] *Team Synergy Agents M2W Friday Huddle,* YOUTUBE (Feb. 5, 2021), *https://www.youtube.com/watch?app=desktop&v=G0O5Kc40lto* .

[46] *See id.*

[47] *See id.*

some of the best talent we could;" (b) "we want to make sure that we partner with the very best suppliers and vendors around the planet;" (c) "we have a duty to uphold this brand and to protect this brand;" (d) "you are going to be able to take advantage of this membership all over the world; and (e) "we're taking the knowledge of all of our wins . . . and all of our victories at the same time" and will "apply everything we've learned" to provide a "membership experience and lifestyle company" for Seacret.[48] Upon information and belief, "this brand" is Plaintiffs' DreamTrips brand including DreamBreaks and Anytime Escapes, and the "global team" consists of Plaintiffs' Sales Representatives, recruited in part through Seacret's access to Plaintiffs' Confidential Information.

53.     Indeed, in a recent promotional video by one of Seacret's top sales representatives, Jesse Macpherson, he (on behalf of Seacret) promotes the upcoming launch of Seacret's membership-based travel program while displaying a PowerPoint presentation that specifically promotes Plaintiffs' trips and intellectual property, including Plaintiffs' trademarked "DreamTrips" brand. Macpherson brazenly characterizes the key components to the travel program that Plaintiffs achieved, and he makes clear that Seacret is copying this travel program and implementing Plaintiffs' training programs.

54.     Other videos have recently published that open with images of "Seacret™" followed by promotion of DreamTrips™ mark and travel images from what may be past WorldVentures trips, and in some images the DreaTrips™ mark appears side-by-side with the Seacret™ mark. Seacret has no valid license to promote travel using Plaintiffs' marks.[49]

---

[48]     *See id.*; *Team Synergy Agents*, YOUTUBE (Jan 29, 2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc ("introducing Head as new President of Seacret); *Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

[49]     *See Pre-Launch-Seacret-DT-Pres-Jan-2021*, YOUTUBE (Jan. 8, 2021), https://www.youtube.com/watch?fbclid=IwAR1Vkm4QGhOmcFBjMDUV3gkXFq6_uSzzsTs7cTBxt6tcAoDJ9R48

55.     Additional videos show Plaintiffs' former director of training Marc Accetta now working for Seacret and implementing Plaintiffs' training program at Seacret.[50] Accetta's contributions to Seacret have already been recognized. Specifically, Macpherson acknowledges that the "the two things that created the magic" at WorldVentures, the two "most valuable . . . were Marc Accetta's leadership development and training program and [the] specific curated trips."[51] These "trips" are specifically curated trip packages for Plaintiffs' customers and members.

56.     Equally significant, emails show that Head encouraged Seacret to retain Accetta and disclosed certain information regarding the terms of Mr. Accetta's relationship with WorldVentures to Mr. Shabat in October 2020, despite fiduciary obligations to Plaintiffs.

57.     The promotional campaigns also encourage Plaintiffs' current Sales Representatives to cease selling Plaintiffs' travel products and services, ending their affiliation with the Plaintiffs, and, instead, sell Seacret's products and "newly acquired" travel services. Seacret's campaign appears to be working, as other former Sales Representatives for Plaintiffs have also publicly appeared stating "Seacret can move forward aggressively and very quickly on rolling out our own travel product . . . whether that's called Seacret Escapes . . . or Seacret Getaways, they are working on the branding for that, but we are fast-tracking our own travel product, which will be very similar to what many of us are used to [meaning WorldVentures], [with] group trips, wholesale pricing, . . . [and] a wholesale booking engine."[52]

---

9_ozKHs&v=1NnIPOIc8yk&feature=youtu.be ; *Seacret Lifestyle Club*, VIMEO (Feb. 10, 2021), https://vimeo.com/510913397 .

[50] *Synydergy Daily Huddle – New Director of Training for Seacret Marc Accetta,* Youtube (Jan. 13, 2021) https://www.youtube.com/watch?v=qamBvXSYi60; *Special Message from our New Director of Training to our Seacret Family*, Youtube (Jan. 10, 2021) https://www.youtube.com/watch?app=desktop&v=DpQ1Neu5Pfo

[51] *Synydergy Daily Huddle – New Director of Training for Seacret Marc Accetta,* YOUTUBE (Jan. 13, 2021) https://www.youtube.com/watch?v=qamBvXSYi60;

[52] *See Leadership Zoom*, VACATIONLEADER (Jan. 26, 2021), https://vacationleader.wistia.com/medias/ztuypgg23g?wtime=0

58.     One of Seacret's travel providers is Grouply Ventures, LLC ("**Grouply**"), a newly-formed company owned by Virginia (Gini) Trask ("**Trask**"). Grouply appears to provide travel packages that are substantially similar to travel opportunities offered by Top Tier Travel, Inc. ("**Top Tier**") to Plaintiffs pursuant an exclusivity agreement. Notably, Trask is also the President of Top Tier and signed the exclusivity agreement on Top Tier's behalf.

59.     In yet another promotional video, a Seacret agent admits that "one of the largest travel clubs in the entire world [will be] coming soon to a Seacret near you."[53] And that travel program is "being developed by some of the greatest minds that have put together programs that have the experience that have . . . done it for 10 years, done it for 15 years."[54] In other words, Seacret is using the "greatest minds" it poached from the Plaintiffs.

60.     Given the timing of Plaintiffs' former employees and Sales Representatives resignations from Plaintiffs and the immediate employment with Seacret, it appears that Seacret had been orchestrating this effort while these key employees and representatives were still working for Plaintiffs. Particularly revealing, within a few weeks of Head's announcement as its president, Seacret is bringing its "unique travel experiences in the world" to market.[55] Indeed, the Shabat video and audio communications support the same.

61.     Seacret has and continues to tortiously interfere with WorldVentures' contractual rights under the Employment Agreement and other agreements, in addition to stealing WorldVentures' intellectual property and orchestrating a fraudulent transfer of WorldVentures' most valuable assets.

---

[53]     *See Team Synergy Agents M2W Friday Huddle,* Youtube (Feb. 5, 2021), *https://www.youtube.com/watch?app=desktop&v=G0O5Kc40lto*
[54] *See id.*
[55] *See Izhak 2021* Update, Vɪᴍᴇᴏ (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

**D.      Seacret's Unlawful Use and Access of Plaintiffs' Confidential Information**

62.      Seacret also interfered with Plaintiffs' rights under other contracts. For example, Seacret surreptitiously engaged at least one of Rovia's vendors to support Seacret's venture into the travel services business.

63.      In connection with its effort to duplicate WorldVentures' travel services business, Seacret also traded off of WorldVentures trademarks without any legal right or authorization. For example, to market its travel services program to its members and agents, Seacret, either directly or through proxies, used Plaintiffs' trademarks, including DreamTrips™, Anytime Escapes™ and Rovia™.

64.      Finally, Seacret exploited the Fraudulent Obligations by accessing and using far more Confidential Information than it was purportedly authorized to do, including as evidenced by Seacret's targeted solicitation of Plaintiffs' employees and Members. For example, Seacret has sent emails directly to Plaintiffs' employees and Members to advertise that "Seacret is expanding [its] global footprint" and to solicit their participation in Seacret's "plan to bring our Seacret lifestyle membership with WOW-inspiring travel benefits," while promoting a "best-in-class" membership experience "at an incomparable value."

## V.  CAUSES OF ACTION

### COUNT ONE

### Tortious Interference with Existing Contracts

65.      Plaintiffs re-allege and incorporate all allegations set forth herein.

66.      As detailed herein, Seacret's actions constitute tortious interference with Plaintiffs' existing contractual relationships. Plaintiffs have valid and enforceable contracts with its employees, vendors/suppliers, Sales Representatives, and members/customers.

67.     Seacret knew of or had knowledge of facts that would lead a reasonable person to believe that Plaintiffs contracts with its employees, members, vendors, and Sales Representatives, including Head's Employment Agreement, the Membership Agreement, the Policies, along with the restrictive covenants and confidential obligations therein, existed. By way of example, Seacret specifically referenced non-compete provisions in the LOI and the LSA.[56] Seacret, therefore, willfully interfered with Plaintiffs' rights under the Employment Agreement, including the Non-Compete Provisions. Likewise, Seacret interfered with Plaintiffs' contracts with its members and employees by sending solicitation emails regarding Seacret's expanding global business and new travel platform. Indeed, Plaintiffs have recently lost travel members due to Seacret's interference and solicitation efforts in violation of the LSA.

68.     Through Plaintiffs' former employees and Sales Representatives, Seacret is posting, both directly and through proxies, public announcements and videos, using Plaintiffs' Confidential Information, to promote Seacret's new travel platform. Further, Seacret is now leveraging off of exclusive travel vendors of Plaintiffs.

69.     By interfering with Plaintiffs' existing contractual relations with its employees, members, Sales Representatives, and vendors, and by inducing and continuing to induce Head to violate his Employment Agreement by entering into (and helping to launch) a Competing Business, Seacret willfully and intentionally interfered with Plaintiffs' existing contracts with the purpose of harming the Plaintiffs.

70.     Seacret's tortious interference with Plaintiffs' business and contractual relations proximately caused damage to Plaintiffs, including lost profits and the impairment of future

---

[56] *See, e.g.*, Ex. 6 (LOI), pp 1-2, 4; Ex. 7 (LSA), ¶1.1.

earning capacity and goodwill, in an amount to be determined at trial. Moreover, because of its conduct, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from Plaintiffs.

71.     As a result of Seacret's interference, Plaintiffs have suffered, and will continue to suffer, irreparable and permanent harm, incalculable devaluation of its assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and loss of members, customers, employees, Sales Representatives, and vendors. While damages may be calculated for a portion of the harm caused by Seacret, recovery of damages cannot provide Plaintiffs complete relief unless the Court enjoins Seacret's ongoing conduct as described herein. Thus, Plaintiffs have no adequate remedy at law and seek equitable and injunctive relief to enjoin Seacret's tortious interference with Plaintiffs' existing contractual relations.

72.     Further, as a result of Seacret's intentional and malicious interference with Plaintiffs' existing contractual relations, Seacret is also liable to Plaintiffs for exemplary damages in an amount to be ascertained at trial.

## COUNT TWO

### Knowing Participation / Aiding and Abetting Fiduciary Breach

73.     Plaintiffs re-allege and incorporate all allegations set forth herein.

74.     Based on the nature of the transactions, circumstances of their relationship and course of dealing, Head owed Plaintiffs fiduciary obligations to act in the best interests of Plaintiffs, including full disclosure about the transactions involving Seacret, and not usurping Plaintiffs' Confidential Information, business opportunities and relationships with Members, Sales Representatives, suppliers and vendors.

75.     Upon information and belief, Seacret knew of and knowingly participated in, and benefitted from, each of Head's fiduciary breaches, respectively, as described above. Because Seacret induced or aided Head in his breach of fiduciary duties to Plaintiffs, Seacret, as conspirator with Head, is liable as a joint tortfeasor.

76.     As a direct and proximate result of the Seacret's aforementioned knowing participation in Head's fiduciary breaches, Plaintiffs have been injured in an amount not less than $100,000,000.00 in damages. Accordingly, Plaintiffs are entitled to recover compensatory damages against Seacret in an amount to be determined at trial.

77.     Moreover, Plaintiffs seek equitable relief in the form of forfeiture of compensation, forfeiture of contractual consideration, an accounting, a constructive trust of proceeds and property, and/or Seacret's disgorgement of all wrongfully obtained consideration, profits, charges, commissions, revenues, and other monies obtained by Seacret.

78.     In addition, because of its participation in Head's breach of fiduciary duties and responsibilities by Seacret were intentional, with the intent to gain an additional, unwarranted benefit, Plaintiffs are entitled to an award of punitive damages against the Seacret in an amount to be ascertained at trial.

**COUNT THREE**

**Trademark Infringement**

79.     Plaintiffs re-allege and incorporate all allegations set forth herein.

80.     Seacret's activities constitute infringement of Plaintiffs' rights in federally registered trademarks in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114(1).

81.     Because Plaintiffs advertise, market, distribute, and license products under the trademarks described in this Complaint, these trademarks are the means by which Plaintiffs' products are distinguished from the products and related items of others in the same or related fields.

82.     Because of Plaintiffs' long, continuous, and exclusive use of their respective trademarks, they have come to mean, and are understood by customers and the public to signify, products of Plaintiffs.

83.     Seacret's wrongful conduct includes the use of Plaintiffs' marks, name, and/or imitation visual designs, including displays, logos, and/or packaging design.

84.     Seacret's infringing materials are likely to cause confusion, mistake, or deception as to their source, origin, or authenticity.

85.     Upon information and belief, Seacret copied and produced infringing materials with the purpose of misleading the public for Seacret's financial gain.

86.     Upon information and belief, if Seacret is allowed to continue infringing upon Plaintiffs' trademarks, Seacret will use the infringing materials with the purpose of misleading or confusing customers and the public as to the origin and authenticity of the infringing materials. Thus, Plaintiffs seek injunctive relief to prevent Seacret from continuing to violate Plaintiffs' trademarks. 15 U.S.C. § 1116.

87.     In addition to injunctive relief, Seacret is liable to Plaintiffs for direct, contributory, and/or vicarious trademark infringement. 15 U.S.C. § 1114(1).

88.     Plaintiffs are also entitled to recover reasonable attorneys' fees and costs of the action. 15 U.S.C. § 1117.

## COUNT FOUR

### Harmful Access by Computer

89.     Plaintiffs re-allege and incorporate all allegations set forth herein.

90.     The Texas Civil Practices and Remedies Code § 143.001(a) creates a civil cause of action for "a person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code . . . if the conduct constituting the violation was committed knowingly or intentionally." Pursuant to Section 33.02 of the Texas Penal Code, "[a] person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."

91.     Seacret knowingly—without Plaintiffs' effective consent—accessed, retrieved, and/or used non-copyrightable data, including Confidential Information, from Plaintiffs' computer, computer network, or computer system in violation of Section 33.02 of the Texas Penal Code. Specifically, Seacret accessed Plaintiffs' non-copyrightable data using unauthorized electronic media to copy the non-copyrightable information, including Confidential Information, without Plaintiffs' effective consent.

92.     As a result of Seacret's unlawful access of Plaintiffs' computer, computer network, or computer system, Plaintiffs have suffered damages. Pursuant to TEX. CIV. PRAC &. REM CODE § 143.002, Plaintiffs are entitled to recover actual damages resulting from Seacret's unlawful access of Plaintiffs' computer, computer network, or computer system as described above and, in addition to actual damages, reasonable attorney's fees and costs. While damages may be calculated for a portion of the harm caused by Seacret, recovery of damages cannot provide Plaintiffs complete relief unless the Court enjoins Seacret's ongoing conduct as described herein. Thus,

Plaintiffs have no adequate remedy at law and seek equitable and injunctive relief to enjoin Seacret's harmful access by computer.

## COUNT FIVE

### Conversion

93. Plaintiffs re-allege and incorporate all allegations set forth herein.

94. As more fully described herein, Seacret has knowingly or intentionally, exercised unauthorized dominion and control over Plaintiffs' property, including non-copyrightable business information, customer relationships and lists, vendor/supplier relationships and lists, pricing data, financial information, and other confidential and proprietary information pertaining to the WV Travel Platform (defined ¶ 100 below) and business operations of the Plaintiffs, and has thereby converted Plaintiffs' property for Seacret's own use in launching its competing "lifestyle" travel platform.

95. Plaintiffs have an immediate right to possession of such property to the exclusion of Seacret.

96. As a proximate result of Seacret's wrongful conduct and conversion of WorldVentures' and its affiliated Debtors' confidential and proprietary information, WorldVentures and its affiliated Debtors have suffered and will continue to suffer injury, including the value of the converted information, lost profits, loss of goodwill, loss of customers, employees, Sales Representatives, and vendors, and the impairment of future earning capacity, in an amount to be proved at trial.

97. Plaintiffs have suffered irreparable harm as a result of Seacret's actions, and Plaintiffs are entitled to injunctive relief. Indeed, Seacret's conversion of Plaintiffs' property is

causing irreparable injury to the Plaintiffs, including damage to its customers, employees, Sales Representatives, and supplier/vendor relationships.

98. Seacret is liable for actual damages caused by its conversion of Plaintiffs' property in an amount to be determined at trial. Moreover, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from Plaintiffs.

99. Seacret is also liable to Plaintiffs for exemplary damages in an amount to be determined at trial.

## COUNT SIX

### Misappropriation of Effort

Plaintiffs re-allege and incorporate all allegations set forth herein.

100. Through extensive time, labor, skill, and money, as described above, Plaintiffs created and improved the Services, including the Confidential Information ("**WV Travel Platform**"). Seacret misappropriated WorldVentures' efforts and non-copyrightable products, materials, and information relating to the WV Travel Platform. As a result, Seacret, in record time, created a virtually identical membership-based, direct sales travel services business to the WV Travel Platform. Seacret is by virtue of its unlawful conduct currently operating in a line of business that directly competes with WorldVentures and its affiliated Debtors in the membership-based, direct sales travel services industry using virtually identical non-copyrightable information, concepts, vendors, Sales Representatives, and business processes. Seacret has gained a special advantage over WorldVentures because it was burdened with little or none of the expenses incurred by WorldVentures.

101.     Through the use of confidentiality and non-disclosure agreements, Plaintiffs actively seek to protect and maintain its Confidential Information.[57] Seacret entered into the LSA with WorldVentures, and specifically agreed that it, directly or indirectly, shall not, (i) disclose WorldVentures' Confidential Information except to the extent expressly permitted in the LSA, and (ii) modify, copy, decompile, attempt to reverse engineer and/or derive techniques, know-how, travel booking platforms, software, or processes with respect to WorldVentures' business.[58] Indeed, Seacret agreed that the LSA "does not confer to Seacret any intellectual property or other rights with respect to [WorldVentures'] travel booking platforms, software, patents, formulas, brand, packaging, or any names or logos used in connection with the [WorldVentures'] business."[59]

102.     Seacret's misappropriation of effort proximately caused actual damages to WorldVentures and its affiliated Debtors, including the value of the misappropriated information, lost profits, and the impairment of future earning capacity and goodwill, in an amount to be proved at trial.

103.     Moreover, because of its conduct, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from WorldVentures and its affiliated Debtors.

104.     Further, Plaintiffs have suffered and continue to suffer irreparable harm as a result of Seacret's unlawful misappropriation, and thus, Plaintiffs are entitled to injunctive relief to protect Plaintiffs' Confidential Information.

---

[57] *See, e.g.*, Exs. 1-7.
[58] *See* Ex. 7 (LSA), ¶¶ 7.1-7.3, 10.2.
[59] *Id.* at ¶ 10.2.

## COUNT SEVEN

### Request for Declaratory Relief under 28 U.S.C. §§ 2201 *et seq.*

105.    Plaintiffs re-allege and incorporate all allegations set forth herein.

106.    Plaintiffs petition the Court, pursuant to 28 U.S.C. §§ 2201 *et seq.*, for a declaration of the parties' rights, duties, and legal relations under the LSA.

107.    Plaintiffs petition the Court for a declaration that (i) the LSA, including the Fraudulent Obligations, is a disguised transfer of WorldVentures' Confidential Information and other valuable assets to Seacret, and (ii) the financial obligations of Seacret created by the LSA are not based on the value of the Fraudulent Obligations transferred to Seacret.

108.    A judicial declaration of the parties' rights is necessary to determine the extent of the estates' assets and liabilities.

## COUNT EIGHT

### Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 548(a)(1)(B)

109.    Plaintiffs re-allege and incorporate all allegations set forth herein.

110.    The Debtors were (a) insolvent when the Fraudulent Obligations were incurred, or in the alternative, became insolvent as a result of the Fraudulent Obligations, (b) engaged in a business or a transaction, or were about to engage in a business or transaction, for which the property remaining with the Debtors was unreasonably small capital when the Fraudulent Obligations were incurred, or alternatively, (c) at the time the Fraudulent Obligations were incurred, the Debtors intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as they matured.

111.    The Debtors received less than reasonably equivalent value in exchange for the Fraudulent Obligations.

112.     The Debtors had at least one creditor when each Fraudulent Obligation was incurred who could have avoided each Fraudulent Obligation under non-bankruptcy law.

113.     The Fraudulent Obligations are fraudulent obligations in violation of 11 U.S.C. § 548(a)(1)(B).

114.     Seacret is the initial transferee of the obligations incurred and the transfers made in connection with the LSA.  Seacret is also a person for whose benefit the transfers were made in connection with the LSA.

115.     The Fraudulent Obligations were incurred within 2 years before the date of the filing of the bankruptcy petition for each of the Debtors.

116.     Seacret did not participate in and/or receive the obligations incurred and transfers made under the LSA in good faith and without knowledge of the voidability of such obligations and transfers.

117.     As a result of the foregoing, pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiffs are entitled to judgment (a) avoiding the Fraudulent Obligations, (b) directing that the LSA, including the Fraudulent Obligations, be set aside, and (c) awarding the Debtor estates such other and further relief that is just and proper.

118.     Additionally, Plaintiffs have suffered irreparable harm as a result of Seacret's actions, and Plaintiffs are entitled to injunctive relief. Indeed, the Fraudulent Obligations and Seacret's actions described above are causing irreparable injury to the Plaintiffs, including devaluation of estate assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to its customers, employees, Sales Representatives, supplier/vendor relationships.

**COUNT NINE**

**Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 544 and §§ 24.001 – 24.013 of the Texas Uniform Fraudulent Transfer Act ("TUFTA")**

119.    Plaintiffs re-allege and incorporate all allegations set forth herein.

120.    The LSA, including the Fraudulent Obligations, is a fraudulent transfer in violation of 11 U.S.C. § 544 and §§ 24.005(a)(2), 24.006 of the TUFTA.

121.    The Fraudulent Obligations constitute a transfer of an interest of WorldVentures and its affiliated Debtors assets for purposes of the TUFTA.

122.    The Fraudulent Obligations were to or for the benefit of Seacret for purposes of the TUFTA.

123.    The Fraudulent Obligations occurred within the four (4) years prior to the Petition Date.

124.    WorldVentures and its affiliated Debtors were (a) insolvent when the Fraudulent Obligations were transferred, or in the alternative, became insolvent as a result of the Fraudulent Obligations, (b) engaged in a business or a transaction, or was about to engage in a business or transaction, for which the property remaining with WorldVentures and its affiliated Debtors was unreasonably small capital when the Fraudulent Obligations were transferred, or alternatively, (c) at the time the Fraudulent Obligations were transferred, WorldVentures and its affiliated Debtors intended to incur, or believed that it would incur, debts that would be beyond their ability to pay as they matured.

125.    Aside from the LSA, no Debtor, including WorldVentures, is obligated to Seacret in any way.

126.    Seacret had no and has no claim against WorldVentures or its affiliated Debtors.

127.     Neither WorldVentures nor its affiliated Debtors owe or owed any debt to Seacret.

128.     Seacret did not provide any immediate value to WorldVentures or its affiliated Debtors in exchange for the Fraudulent Obligations.

129.     WorldVentures and its affiliated Debtors received less than reasonably equivalent value in exchange for the Fraudulent Obligations.

130.     WorldVentures and its affiliated Debtors had at least one creditor when transfer of the Fraudulent Obligations occurred who could have avoided the Fraudulent Obligations under non-bankruptcy law.

131.     Seacret is the initial transferee of the Fraudulent Obligations.  Seacret is also a person for whose benefit the Fraudulent Obligations were made.

132.     Seacret did not participate in and/or receive the Fraudulent Obligations in good faith and without knowledge of the voidability of such transfer.

133.     As a result of the foregoing, pursuant to 11 U.S.C. § 544 and §§ 24.005(a)(2), 24.006 of the TUFTA, WorldVentures is entitled to judgment (a) avoiding the Fraudulent Obligations, (b) directing that the LSA, including the Fraudulent Obligations, be set aside, and (c) awarding the Debtor estates such other and further relief that is just and proper.

134.     Additionally, Plaintiffs have suffered irreparable harm as a result of Seacret's actions, and Plaintiffs are entitled to injunctive relief. Indeed, the Fraudulent Obligations and Seacret's actions described above are causing irreparable injury to the Plaintiffs, including devaluation of estate assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to its customers, employees, Sales Representatives, supplier/vendor relationships.

## COUNT TEN

### Preservation, Recovery and Return of Avoided Conveyances — 11 U.S.C. §§ 550, 551

135.    Plaintiffs re-allege and incorporate all allegations set forth herein.

136.    Plaintiffs are entitled to avoid the LSA, including the Fraudulent Obligations, under 11 U.S.C. § 544, 548 and §§ 24.005(a)(2), 24.006 of the TUFTA (collectively, the "Avoidable Transfers").

137.    Seacret was the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

138.    Pursuant to 11 U.S.C. § 550(a), Plaintiffs are entitled to recover from Seacret the Confidential Information of WorldVentures and its affiliated Debtors and an amount not less than the total aggregate value Seacret received as a result of the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

139.    Additionally, Plaintiffs have suffered irreparable harm as a result of Seacret's actions, and Plaintiffs are entitled to injunctive relief. Indeed, the Avoidable Transfers and Seacret's actions described above are causing irreparable injury to the Plaintiffs, including devaluation of estate assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to its customers, employees, Sales Representatives, supplier/vendor relationships.

140.    Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of Debtors' bankruptcy estates.

# COUNT ELEVEN

## Breach of Contract

141.     Plaintiffs re-allege and incorporate all allegations set forth herein.

142.     In the alternative, if the factfinder does not find the Fraudulent Obligations and Avoidable Transfers avoidable, the contracts and agreements, including the conditions and covenants therein, entered into by Seacret are valid and enforceable contracts.[60] Plaintiffs have fulfilled all obligations under the terms of these agreements.

143.     As outlined above, Seacret was prohibited from soliciting WorldVentures' Members and from offering any membership-based travel services business offered through direct sales to WorldVentures' Members or Sales Representatives.   By soliciting WorldVentures Members and offering travel to (at least) Sales Representatives, Seacret has breached the LSA.

144.     As outlined above, under the Co-Marketing Agreement, LOI, and LSA, Seacret owed contractual duties to Plaintiffs regarding Plaintiffs' Confidential Information. Seacret has breached the contractual limitations regarding its limited access and use of Plaintiffs' Confidential Information. Accordingly, Seacret breached its agreements to maintain the confidentiality of Plaintiffs' trade secrets and other proprietary information by, *inter alia*, improperly and impermissibly using WorldVentures' Confidential Information to (i) solicit and recruit WorldVentures' Members, employees, suppliers, and vendors, and (ii) launch its competing "lifestyle" travel membership program.

145.     Seacrets' breaches of contract and agreements described herein have caused injury to Plaintiffs, which is a natural, probable and foreseeable consequence of Seacret's breaches of the

---

[60] *See* Exs. 5-7.

contracts and agreements. As a direct and proximate result of Seacret's breaches of contract and agreements, Plaintiffs have suffered damages, including, lost profits, loss of goodwill, and damage to customers, employees, Sales Representatives, and vendor/supplier relationships in amounts to be determined at trial. Moreover, because of its conduct, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from Plaintiffs.

146.     Seacret's breaches of contracts and agreements described herein have caused and are continuing to cause irreparable harm to Plaintiffs' business. Accordingly, Plaintiffs suffered and will continue to suffer irreparable injury if Seacret continues to violate its contractual and confidential obligations. Unless Seacret is immediately enjoined and restrained from its unlawful activities, Plaintiffs will suffer immediate and irreparable harm, including incalculable devaluation of its assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to members, customers, employees, Sales Representatives, and vendor relationships, for which there is no adequate remedy at law. Thus, Plaintiffs are entitled to injunctive relief.

### Injunctive Relief Requested

147.     Plaintiffs re-allege and incorporate all allegations set forth herein.

148.     Seacret has engaged in a systematic campaign to recruit and solicit Plaintiffs' customers, employees, Sales Representatives, and vendors/suppliers to use Plaintiffs' Confidential Information and trade secrets to improperly compete with Plaintiffs by launching its new "lifestyle" membership-based travel program, which is merely a cut-and-paste of Plaintiffs' travel platform. The harm caused by Seacret's wrongful conduct is not only imminent, but ongoing and has caused, and will continue to cause irreparable damage to Plaintiffs' business. Seacret's unlawful actions continue to diminish the value of Plaintiffs' assets, including the loss of goodwill, damage to customer, employee, Sales Representative, and vendor/supplier relationships, and are

endangering Plaintiffs' ongoing bankruptcy proceedings. Recovery of damages cannot provide Plaintiffs complete relief for the injuries caused by Seacret. Plaintiffs have no adequate remedy at law and thus are entitled to immediate equitable and injunctive relief.

149. There is a substantial likelihood that Plaintiffs will succeed on the merits of the case. Seacret has improperly and impermissibly converted Plaintiffs' Confidential Information and trade secrets to create a competing travel program and brand. Moreover, Seacret has breached the parties' agreements (to the extent not avoidable) and is tortiously interfering with Plaintiffs' contractual business relationships. Additionally, by promoting its travel programs using Plaintiffs' DreamTrips™ brand, Seacret is guilty of trademark violations. Seacret also, whether directly or through proxies, has and continues to infringe and trade off of Plaintiffs' trademarks. Finally, Seacret enabled the fraudulent transfer of Plaintiffs' most valuable assets without providing reasonably equivalent value.

150. The injury Plaintiffs face outweigh any purported injury that would be sustained by Seacret as a result of the injunctive relief. Public interest further supports Plaintiffs' request for injunctive relief.

151. Therefore, pursuant to Federal Rule of Civil Procedure 65, Plaintiffs are entitled to injunctive relief as described herein.

152. Without the requirement of posting a bond and from the date of the preliminary injunction order until trial and final order, Plaintiffs seek a preliminary injunction against Seacret, and those persons bound under Federal Rule of Civil Procedure 65(d), to include the parties, officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Seacret, who have actual notice of the preliminary injunction order, prohibiting, restraining, and enjoining Seacret from:

a) Using any confidential information or trade secrets of Plaintiffs for any purpose;

b) Offering for sale, either directly or through Sales Representatives, any membership-based travel business through direct sales to Plaintiffs' Members

c) Interfering with Plaintiffs' existing and prospective business relationships with its customers, Members, employees, Sales Representatives, vendors, suppliers, business consultants, and/or all other persons or entities in privity with Plaintiffs;

d) Recruiting or soliciting Plaintiffs' employees, customers, Members, Sales Representatives, vendors, and/or suppliers for any membership-based, direct sales of travel services and/or products; and

e) Using Plaintiffs' trade names, trademarks, copyrighted material, designs, symbols, or any derivative thereof, for any purpose; and

f) Engaging Head, in any capacity, to participate, either directly or indirectly, in an membership-based travel business through direct sales.

**Attorneys' Fees**

153.     As a result of Seacret's wrongful conduct described above, Plaintiffs were forced to retain the undersigned counsel to enforce their legal rights against Seacret in relation to this action. Thus, pursuant to Texas Civil Practice & Remedies Code ¶¶ 38.001, 134A.005, and 143.002, 18 U.S.C. § 1836 (b)(3)(D), 17 U.S.C. § 505, and 15 U.S.C. § 1117, Plaintiffs seek an award of reasonable and necessary attorneys' fees and costs incurred through trial and appeal of this cause.

**Exemplary Damages**

154.     Plaintiffs re-allege and incorporate all allegations set forth herein.

155. Plaintiffs seek exemplary damages because Seacret's actions were willful, intentional, malicious, and in blatant disregard of Plaintiffs' rights. Specifically, among other things, by its conduct described herein, Seacret intended to gain benefits for itself at the expense of the Plaintiffs and engaged in acts of self-dealing that offended the public's sense of justice and propriety. Thus, Plaintiffs seek exemplary damages against Seacret to the full extent of law in an amount to be determined at trial.

## VI.
## CONDITIONS PRECEDENT

156. Plaintiffs have satisfied all conditions precedent to recovery sought herein.

## VII.
## REQUEST FOR RELIEF

157. For these reasons, Plaintiffs respectfully request that Defendant Seacret Direct LLC be cited to appear and answer, and that Plaintiffs be awarded a judgment against Defendant Seacret Direct LLC for the following:

(a) A preliminary injunction
(b) A permanent injunction;
(c) Actual damages;
(d) Disgorgement;
(e) Exemplary damages;
(f) Attorneys' fees and expenses;
(g) Court costs;
(h) Pre- and post-judgment interest;
(i) Rescission;
(j) declaratory relief; and
(k) All other relief, general or special, either at law or in equity, to which Plaintiffs may be justly entitled to receive.

DATED: March 5, 2021           Respectfully submitted by:

/s/ Steven C. Lockhart
Marcus A. Helt (TX 24052187)
Robert Slovak (24013523)
Steven C. Lockhart (24036981)
Aaron E. Chibli (24091222)
Emily F. Shanks (24110350)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
mhelt@foley.com
rslovak@foley.com
slockhart@foley.com
achibli@foley.com
eshanks@foley.com

**COUNSEL FOR THE PLAINTIFFS**
**SPHERATURE INVESTMENTS LLC,** *et al*
**d/b/a WORLDVENTURES HOLDINGS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 5, 2021, a true and correct copy of the foregoing document was served electronically on all parties in interest to these Cases by the Court's PACER system.

/s/ Steven C. Lockhart
Steven C. Lockhart

4843-8228-2460.3