EXHIBIT 3

## EXECUTIVE EMPLOYMENT AGREEMENT

### *Kenneth E. Head*

This EXECUTIVE EMPLOYMENT AGREEMENT (this "*Agreement*"), dated to be effective as of _July 12_, 2018 (the "*Effective Date*"), is made and entered into by and between WORLDVENTURES HOLDINGS, LLC, a Nevada limited liability company (together with its Affiliates, as defined herein, collectively the "*Company*"), and KENNETH E. HEAD, a Texas resident (the "*Executive*") (the Company and the Executive may sometimes herein be referred to individually as a "*Party*" and collectively as the "*Parties*").

### RECITALS

WHEREAS, the Executive has certain skills, experience, and abilities that are beneficial to the Company's business and operations; and

WHEREAS, the Company and the Executive desire to set forth the terms and conditions pursuant to which the Executive will be employed by the Company;

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and undertakings contained herein, and for such other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I

### DUTIES AND COMPENSATION

1.01. <u>Title and Duties</u>. The Company hereby agrees to employ the Executive, and the Executive hereby agrees to be employed by the Company on an exclusive basis, as the Company's President. The Executive shall report to the Chief Executive Officer of the Company (the "*CEO*"), and shall have such duties, functions, responsibilities, and authority as are from time to time delegated to the Executive by the CEO. Except as provided in this <u>Section 1.01</u>, during the Term (as defined in <u>Section 1.02</u>), the Executive shall devote his entire working time, energy, skill, and best efforts to the performance of his duties hereunder in a manner that faithfully and diligently furthers the business and interests of Company. Notwithstanding the foregoing and so long as such activities do not interfere with the performance of the Executive's responsibilities hereunder, the Executive may (i) serve on corporate, civil, or charitable boards or committees; (ii) manage personal investments, provided that such investments are passive in nature; and (iii) participate in the activities of trade organizations relating to the Company's business.

1.02. <u>Term</u>. The Executive's employment with the Company under this Agreement shall continue until the earlier of (i) the Executive's termination of employment as set forth in <u>Section 2.01</u> or <u>2.03</u>; or (ii) the Company's termination of the Executive's employment as set forth in <u>Section 2.02</u>, <u>2.04</u>, or <u>2.05</u> (the earliest to occur of the terminations described in Clauses

(i) and (ii) being hereinafter referred to as the "*Termination Date*"). The period commencing on the Effective Date and ending on the Termination Date shall be referred to as the "*Term*."

1.03.  Compensation.

(a)  Salary.  The Executive's gross base salary during the Term shall be as set forth on Exhibit A attached hereto, as may be amended pursuant to the Company's employee compensation policies in effect from time to time (the "*Base Salary*").  The Base Salary shall be paid in accordance with the Company's normal payroll program. The Company shall withhold from the taxable portion of each installment all applicable federal, state, and local income and other payroll taxes.

(b)  Bonus Plan.  The Executive shall be eligible for an annualized bonus equal to 50% of the Executive's total annual Compensation (the "*Executive Bonus*").  The Executive Bonus will be based on the Company objectives and financial goals being achieved, as well as performance goals as mutually agreed upon between the Executive and the CEO, as further described on Exhibit B.  The Company shall withhold from the taxable portion of each bonus all applicable federal, state, and local income and other payroll taxes.

(c)  Equity Incentive Grant.  The Executive shall be eligible to participate in the Company's 2017 Equity Incentive Plan: Liquidity Units and 2017 Equity Incentive Plan: Profits Participation Units (collectively, the "*Incentive Plans*"), as more fully described on Exhibit C attached hereto, as may be amended from time to time.

(d)  Benefits.  During the Term, the Company agrees to provide the Executive with medical health insurance coverage for himself and his family and such other fringe benefits and other benefits as are generally provided to senior officers of the Company, including without limitation, vacation, health, and insurance benefits, as more particularly described on Exhibit D attached hereto, as may be amended from time to time.

(e)  Expense Reimbursements.  The Executive shall be entitled to expense reimbursements in accordance with the Company's expense reimbursement policy for reasonable business expenses incurred by the Executive on behalf of or in furtherance of the business of the Company.

1.04.  Security and Access; Anti-Bribery and Conflicts.  The Executive covenants and agrees (i) to comply with all of the Company's security policies and procedures as in force from time to time, including without limitation, those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, e-mail systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords, and any and all other Company facilities, IT resources and communication technologies (collectively, "*Facilities Information Technology and Access Resources*"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by the Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Executive's employment with the Company, whether

termination is voluntary or involuntary. The Executive agrees to notify the Company promptly in the event he learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with, any Facilities and Information Technology Access Resources or other Company or affiliate property or materials by others. In addition, the Executive agrees to comply with the Company's anti-bribery and conflicts of interest policies as in force from time to time, the current version of which is attached hereto as Exhibit E.

## ARTICLE II

## RIGHTS ON TERMINATION OF EMPLOYMENT

2.01.　Right to Terminate Employment. The Executive may, at his option, terminate his employment under this Agreement at any time. In the case of a voluntary termination by the Executive, except as specified in this Agreement, the Company shall have no further obligations under this Agreement, including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law) in respect of periods following the date of termination.

2.02.　Disability. If because of the Executive's mental, physical, or other disability, the Executive shall be incapable for a period of 12 weeks in any one-year period (the "*Disability Period*") of fully performing his obligations and duties hereunder with or without reasonable accommodation (hereinafter referred to as a "*Disability*"), then, at the election of the Company's Board of Managers (the "*Board*") expressed to the Executive in writing, the Executive's employment under this Agreement shall terminate upon the later of (i) the last day of the Disability Period; or (ii) the date set forth in the written notice of termination. Upon termination under this Section 2.02, the Company shall have no further obligations under this Agreement, including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law) following the date of termination.

2.03.　Death. In the event of the Executive's death, the Company shall have no further obligations under this Agreement (other than as set forth in Sections 2.06), including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law) in respect of periods following the date of the Executive's death.

2.04.　Termination for Cause. Unless the Executive's conduct, or any action or inaction of the Executive, is irrevocably and materially injurious to the Company (in which event no prior notice is required), the Board shall give the Executive written notice of Cause (as defined in Section 3.01) for termination of the Executive's employment under this Agreement specifying the nature of the conduct, action, or inaction giving rise to such Cause. The Executive shall thereafter have a reasonable time, in no event greater than 10 days, to fully cure such Cause. The Company shall be entitled to terminate the Executive's employment under this Agreement without further notice to the Executive if the Executive shall have failed to cure such Cause within such period (or immediately in the case of irrevocably injurious Cause). In the case of a

termination for Cause, the Company shall have no further obligations under this Agreement, including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law), in respect of periods following the date of termination.

2.05. <u>Rights Upon Termination of Employment Without Cause</u>. If the Company terminates the Executive's employment under this Agreement other than as set forth in <u>Section 2.02</u> or <u>2.04</u>, then upon the Executive's execution of an instrument releasing the Company and its Affiliates from all claims, causes, and obligations (except for the obligations set forth in this <u>Section 2.05</u>) tendered by the Executive not more than 60 days following such termination (the "<u>Release</u>"), the Company shall promptly pay to the Executive severance compensation, subject to withholding for all applicable federal, state, and local income and other payroll taxes, an amount equal to 12 months of the Executive's then-current gross base salary, payable in no more than 12 equal monthly installments following the receipt the receipt of the Executive's executed Release.

2.06. <u>Beneficiaries of Payments</u>. If the Executive shall die before receiving all payments to be made by the Company to him during the then-current Term of this Agreement pursuant to any of the provisions of this Agreement, all such payments, or any remaining payments, as the case may be, shall be made by the Company to such beneficiary or beneficiaries as the Executive may designate from time to time by notice in writing filed with the Company, or if the Executive shall fail or fail effectively to designate a beneficiary, or if no beneficiary shall survive the date when the last payment is to be made, any remaining payments shall be made to the Executive's estate.

2.07. <u>Exit Obligations</u>. Within five business days following the termination of the Executive's employment with the Company for any reason, or upon the Company's request at any time during the Executive's employment, the Executive shall (i) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, equipment, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, and data and all documents and materials belonging to the Company or its affiliates and stored in any fashion, including but not limited to, those that constitute or contain any Confidential Information or Work Product, and all Copies thereof (as such terms are defined in <u>Section 3.01</u> below) that are in the possession or control of the Executive, whether they were provided to the Executive by the Company or its affiliates or any of its business associates or created by the Executive in connection with his employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company devices, networks, storage locations and media in the Executive's possession or control.

2.08. <u>Termination of Employment Not a Termination of Entire Agreement</u>. The Executive hereby acknowledges and agrees that, notwithstanding a termination of the Executive's employment with the Company for any reason, the provisions of Article III of this Agreement shall continue in full force and effect.

## ARTICLE III

## CONFIDENTIALITY AND NON-COMPETE

3.01.  Additional Definitions.  Whenever used in this Agreement, the following terms shall have the meanings respectively assigned to them in this Article.  The use of any of the following defined terms in their un-capitalized form shall indicate that the words have their normal meaning.

"*Affiliate*" shall mean, with respect to a Person, any other Person in which the Person owns or controls an equity interest equal to more than 5% of the outstanding equity interests of such Person; or any other Person for whom the Person serves or is employed or retained as an officer, director, manager, full- or part-time employee, consultant, independent contractor, commissioned sales representative, broker, or agent.

"*Cause*" shall mean with respect to the Executive (i) any material uncured breach of this Agreement; (ii) a conviction of, or plea of *nolo contendere* to, any felony; (iii) an indictment for theft of Company Property (as defined below); (v) unexcused absences totaling more than 20 business days in any 90-day period; (vi) gross negligence or willful misconduct in the discharge of his duties under this Agreement; (vii) inappropriate posting or commenting on Social Media (as defined below) in violation of the Company's policies, as communicated to the Executive from time to time; (viii) a credible allegation of sexual harassment or discrimination against the Executive; (ix) inappropriate behavior, whether or not during business hours, that would reasonably be expected to cast the Company in a negative light or adversely affect the Company's reputation; (x) any communication with or disclosure to one or more Sales Representatives or Customers (as such terms are defined below) of any Confidential Information of the Company or internal discussions or deliberations of the Board, other than for express use in developing sales, promotions, compensation, events, or marketing strategies with leaders serving on committees, PAC or IAC teams or contractors engaged to support these programs; and/or (xi) the Executive's failure to adhere to reasonable written policies, procedures, or directives established by the Board.

"*Competing Business*" shall mean a Person (other than the Company) that provides Services.

"*Confidential Information*" shall mean all information of a confidential or proprietary nature of a Person, including, but not limited to, rate and price information on products and services provided or offered by such Person; records and data relating to past or current customers of such Person; records and data relating to employees and independent contractors of such Person; records and data relating to vendors, suppliers, representatives, and agents of such Person; financial information of such Person, including, but not limited to, revenues, expenses, capital expenditures, profits and losses, sources of financing, tax reporting, investments, and acquisitions; records and data relating to investors, creditors, partners, and Affiliates of such Person; business know-how and trade secrets of such Person; sales and marketing programs and techniques of such Person; business, computer, employee, and other programs and systems developed or used by such Person; compensation and benefits paid or offered to any officer,

manager, employee, independent contractor, agent, or representative of such Person; and any other information designated as confidential, whether prior or subsequent to its disclosure to the Executive, provided, however, that the term "Confidential Information" shall not include any information concerning such Person that is or shall become generally known to the industry or to the public through no fault of the Executive.

"*Control*" shall mean the power to manage the business of a Person, whether through the ownership of voting securities of such Person or by contract.

"*Copy*" shall mean any reproduction or representation of a thing or information, including a reproduction or representation of a Copy, including, but not limited to, photocopies, facsimiles, handwritten transcriptions, pictures, compact discs, floppy discs, magnetic tapes, and digitally stored reproductions or representations, whether on a computer or other medium.

"*Customer*" shall mean any Person to whom or to which the Company is currently providing Services and shall include a Member.

"*Disability*" shall have the meaning that is assigned to such term in Section 2.02.

"*Member*" shall mean any Customer who has purchased the Company's travel club membership product.

"*Non-Compete Period*" shall mean the period commencing with the Effective Date and ending with the date 24 months following the termination for any reason, either by the Executive or the Company, of the Executive's employment with the Company.

"*Open Market*" shall mean those countries in which the Company enrolls Sales Representatives, Members, or Customers.

"*Person*" shall mean any individual, corporation, partnership, limited liability company, trust, estate, or other entity.

"*Prior Employer*" shall mean any Person with whom or with which the Executive was Affiliated prior to the date of this Agreement, including Persons with whom or with which the Executive continues to be Affiliated.

"*Property*" shall mean all property and assets of a Person, whether tangible or intangible, including, but not limited to, computers, peripherals, parts, accessories, software programs and copies thereof, manuals, furniture, supplies, stationery, business cards, promotional materials, and any other thing owned by such Person.

"*Sales Representative*" shall mean the independent sales representatives that are authorized by the Company to sell its Services.

"*Services*" shall mean membership-based travel services marketed through direct sales.

"*Social Media*" shall mean any online or digital forum where people can post comments, videos, or photos, whether or not anonymously, including, but not limited to, Facebook, Twitter, Instagram, Snapchat, and Reddit.

"*Territory*" shall mean any Open Market or any country that the Company has taken substantial steps to cause to be an Open Market during the Term of this Agreement.

"*Work Product*" shall mean the Company's or its affiliates' proprietary, licensed, or custom-generated information, including, but not limited to, plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer applications, software design, web design, work in process, databases, manuals, results, reports, graphics, market studies, notes, communications, product plans, styles, audio visual programs, original works of authorship, specifications, customer information, customer lists, marketing information, and sales information.

3.02.    Covenants Regarding Competitive Protection.  The Executive acknowledges and agrees that he holds an important, senior position with the Company and the Executive's job responsibilities have a significant impact on substantially all aspects of the Company's business. The Executive also acknowledges and agrees that the Company does business throughout the world and the Executive's job responsibilities affect the Company's operations in all markets in which the Company conducts business or has Customers.  Accordingly, the Executive hereby covenants and agrees to each and all of the following:

(a)    Solicitation of Sales Representatives.  The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's Sales Representatives and prospective Sales Representatives.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in acquiring its Sales Representatives and in developing and maintaining its Sales Representatives relationships. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to solicit, either directly or through an Affiliate, any Sales Representatives for purposes of encouraging such Sales Representative to become Affiliated with, or offer the Services of, a Competing Business.

(b)    Solicitation of Customers. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's Customers and prospective Customers.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in acquiring its Customers and in developing and maintaining its Customer relationships. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to solicit, either directly or through an Affiliate, any Person that is a Customer for purposes of offering Services to such Person.

(c)  Solicitation of Employees. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's employees.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in recruiting its employees and in maintaining the Company's relationship with such employees. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to employ or retain as an independent contractor, either directly or through an Affiliate, any current employee of the Company or any individual who was an employee of the Company during the preceding six months, and agrees not to solicit, or contact in any manner that could reasonably be construed as a solicitation, either directly or through an Affiliate, any employee of the Company for purposes of encouraging such employee to leave or terminate his employment with the Company.

(d)  Non-Interference with Vendors. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's Sales Representatives, vendors, suppliers, and independent contractors.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in acquiring its Sales Representatives, vendors, suppliers, and independent contractors and in maintaining its relationships with such vendors, suppliers, and independent contractors. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to solicit, either directly or through an Affiliate, any current Sales Representative, vendor, supplier, or independent contractor of the Company for purposes of encouraging such Sales Representative, vendor, supplier, or independent contractor to cease or diminish providing products or services to the Company, or to adversely change the terms under which such current vendor, supplier, or independent contractor provides such products or services.

(e)  Competing Business in the Territory. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have access to Confidential Information concerning the Company and its Customers that gives the Company a considerable competitive advantage.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in developing its Confidential Information and in maintaining its competitive advantage. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to become an Affiliate with any Competing Business that resides in or operates in the Territory.

3.03.  Confidentiality; Disparagement.  The Company hereby agrees to provide the Executive with Confidential Information concerning the Company and its Customers from time to time during the Term of this Agreement. The Executive hereby agrees that he will not at any time, including following the termination of his employment with the Company for any reason, use for his own purposes or disclose to any Person, other than pursuant to a final judicial order, any Confidential Information of the Company, any of its Customers, or any of the Company's or its Customers' employees. In addition, the Executive hereby agrees that he will not at any time, including following the termination of his employment with the Company for any reason, disparage the Company or any Customer, any officer or employee of the Company or any Customer, or any business practice employed by the Company, any Customer, or any officer or employee thereof.

3.04.  Executive Inventions.  The Executive hereby agrees that all inventions, designs, creations, ideas, innovations, improvements, or discoveries relating directly to the business of the Company or the methods of conducting business used by the Company (including new contributions, improvements, ideas, and discoveries, whether patentable or copyrightable or not) conceived or made by the Executive during his employment with the Company shall belong exclusively to the Company, except as may be set forth in other agreements executed by the Company and the Executive (the foregoing being referred to herein as the "*Executive Inventions*"). The Executive will promptly disclose all Executive Inventions to the Board and perform all actions reasonably requested by the Board to establish and confirm the Company's ownership thereof.

3.05.  Prohibition Against Use of Prior Employer's Confidential Information.  The Executive hereby covenants and agrees not to use or disclose, or encourage or assist any other Person that has an Affiliation with the Company to use or disclose, or introduce into any database, file, or information system of the Company, any Confidential Information of any Prior Employer.

3.06.  Prohibition Against Use of Prior Employer's Property.  The Executive hereby covenants and agrees not to use or bring on to any premises of the Company, or encourage or assist any other Person that has an Affiliation with the Company to use or bring on to any premises of the Company, any Property of any Prior Employer.

3.07.  Reasonableness of Covenants.  The Executive hereby acknowledges and agrees that the covenants and restrictions of this Article III are reasonable in their terms and do not impose any undue hardship on the Executive's current or future employment prospects and are fully supported by the severance compensation in the event of a termination of the Executive's employment without Cause and the Company's disclosure to the Executive during the term of his employment of valuable Confidential Information of the Company. The Executive further acknowledges and agrees that the competitive use of the Company's Confidential Information would cause grievous damage to the Company's business, and the Company would not hire the Executive and disclose Confidential Information to him in the absence of the protections afforded by the confidentiality and non-compete provisions in this Article III. The Executive further agrees that if the laws of the State of Texas applicable to the provisions set forth in this Article III should change, or if any court of competent jurisdiction should hold any term or

provision of this Article III invalid or unenforceable, there shall be substituted in the place of such changed, invalid, or unenforceable term or provision a new term or provision that most nearly fulfills or promotes the purpose and intention of this Article III and is consistent with such law or judicial decision.

# ARTICLE IV

## MISCELLANEOUS

4.01.   Further Assurances.  Each Party agrees to perform any further acts and to execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement.

4.02.   Severability.  In the event that any of the provisions, or portions thereof, of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby.

4.03.   Construction.  Whenever used herein, the singular number shall include the plural, and the plural number shall include the singular.

4.04.   Gender.  Any references herein to the masculine gender, or to the masculine form of any noun, adjective, or possessive, shall be construed to include the feminine or neuter gender and form, and vice versa.

4.05.   Headings.   The headings contained in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of any of the provisions contained herein.

4.06.   Multiple Counterparts.   This Agreement may be executed in multiple counterparts, including by facsimile signature, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**4.07.   GOVERNING LAW; VENUE.    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE CHOICE OR CONFLICT OF LAWS RULES THEREOF OR OF ANY STATE.  VENUE FOR ANY ACTION BROUGHT HEREUNDER SHALL BE PROPER ONLY IN THE FEDERAL OR STATE COURTS HAVING JURISDICTION IN DALLAS COUNTY, TEXAS.**

4.08.   Court Costs and Attorneys' Fees.  If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing Party shall be entitled to recover costs of court and reasonable attorneys' fees from the other Party or Parties to such action, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief that may be awarded.

4.09. <u>Inurement</u>. Subject to the restrictions against transfer or assignment as herein contained, the provisions of this Agreement shall inure to the benefit of, and shall be binding on, the assigns, successors in interest, personal representatives, estates, heirs, and legatees of each of the Parties.

4.10. <u>Waivers</u>. No waiver of any provision or condition of this Agreement shall be valid unless executed in writing and signed by the Party to be bound thereby, and then only to the extent specified in such waiver. No waiver of any provision or condition of this Agreement shall be construed as a waiver of any other provision or condition of this Agreement, and no present waiver of any provision or condition of this Agreement shall be construed as a future waiver of such provision or condition.

4.11. <u>Amendment</u>. This Agreement may be amended only by the unanimous written consent of the Parties.

4.12. <u>Entire Agreement</u>. This Agreement, including any Exhibits hereto, contains the entire understanding between the Parties concerning the subject matter hereof. There are no representations, agreements, arrangements, or understandings, oral or written, between the Parties relating to the subject matter of this Agreement that are not fully expressed herein. This Agreement expressly supersedes any prior agreement, arrangement, or understanding with the Executive, whether oral or written, concerning any aspect of the subject matter herein.

4.13. <u>Construction of Agreement</u>. Each Party and its counsel have participated fully in the drafting and review of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply in the interpretation of this Agreement.

4.14. <u>Execution</u>. Each Party hereby represents and warrants to the other Party that such Party has full power and capacity to execute, deliver, and perform this Agreement, which has been duly executed and delivered by, and which evidences the valid and binding obligation of, such Party enforceable in accordance with its terms subject to applicable liquidation, conservatorship, bankruptcy, insolvency, reorganization moratorium, or similar laws affecting the enforcement of creditors' rights from time to time in effect and to general principles of equity.

4.15. <u>Assignment</u>. This Agreement and the Executive's obligations, duties, and responsibilities hereunder are of a personal nature. Accordingly, the Executive may not assign this Agreement or any of his obligations, duties, or responsibilities hereunder. A merger or consolidation of the Company, a sale of all or substantially all of the Company's assets, or a change of control of the Company shall not constitute an assignment of this Agreement.

4.16. <u>Publicity</u>. The Executive hereby irrevocably consents to any and all uses and displays, by the Company or its affiliates and its agents, representatives, and licensees, of the Executive's name, voice, likeness, image, appearance, and biographical information in, on, or in connection with any pictures, photographs, audio and video recordings, digital images, websites,

television programs and advertising, other advertising and publicity, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the period of his employment by the Company, for all legitimate commercial and business purposes of the Company or its affiliates ("*Permitted Uses*") without further consent from or royalty, payment, or other compensation to the Executive. The Executive hereby forever waives and releases the Company or its affiliates and its directors, officers, managers, members, employees, and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of his employment by the Company, arising directly or indirectly from the Company or its affiliates' and its agents', representatives' and licensees' exercise of their rights in connection with any Permitted Uses.

  4.17. <u>Section 409A of the Code</u>. The following provisions shall apply as needed to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*"):

    (a) <u>Separation from Service</u>. Notwithstanding anything herein to the contrary, the payment (or commencement of a series of payments) under this Agreement of any nonqualified deferred compensation (within the meaning of Section 409A of the Code) upon a termination of employment shall be delayed until such time as the Executive has also undergone a "separation from service" as defined in Treasury Regulation Section 1.409A-1(h), at which time such nonqualified deferred compensation (calculated as of the date of the Executive's termination of employment hereunder) shall be paid (or commence to be paid) to the Executive as set forth herein as if the Executive had undergone such termination of employment (under the same circumstances) on the date of his ultimate "separation from service."

    (b) <u>Specified Employee</u>. Notwithstanding any provision in the Agreement to the contrary, any payment otherwise required to be made hereunder to the Executive at any date as a result of the termination of the Executive's employment shall be delayed for such period of time as may be necessary to meet the requirements of Section 409A(2)(B)(i) of the Code. On the earliest date on which such payments can be made without violating the requirements of Section 409A(a)(2)(B)(i) of the Code, there shall be paid to the Executive, in a single cash lump-sum payment, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence.

    (c) <u>Delay of Payment</u>. The Company may delay payment of a benefit hereunder upon such events and conditions as the Internal Revenue Service may permit in generally applicable published regulatory or other guidance under Section 409A of the Code, including, without limitation, payments that the Company reasonably anticipates will be subject to the application of Section 162(m) of the Code, or will violate Federal securities laws or other applicable law; provided, however, that any such delayed payment will be made at the earliest date at which the Company reasonably anticipates that the making of the payment would not cause such a violation.

(d)     <u>Acceleration of Payment</u>.  The time or schedule of payment hereunder may be accelerated only upon such events and conditions as the Internal Revenue Service may permit in generally applicable published regulatory or other guidance under Section 409A of the Code, including, without limitation, payment to a person other than the Executive to the extent necessary to fulfill the terms of a domestic relations order (as defined in Section 414(p)(1)(B) of the Code) or payment of the amount required to be included in income for the Executive as a result of failure of this Agreement at any time to meet the requirements of Section 409A of the Code with respect to the Executive.

(e)     <u>Code Section 409A Compliance</u>.  This Agreement is intended to comply with the requirements of Section 409A of the Code and the Treasury Regulations and other guidance promulgated or issued thereunder, as in effect from time to time.  To the extent a provision of this Agreement is contrary to or fails to address the requirements of Section 409A of the Code and related Treasury Regulations, this Agreement shall be construed and administered as necessary to comply with such requirements to the extent allowed under applicable Treasury Regulations until this Agreement is appropriately amended to comply with such requirements.

[The remainder of this page left intentionally blank]

THE EXECUTIVE ACKNOWLEDGES THAT PRIOR TO SIGNING THIS AGREEMENT HE READ THIS AGREEMENT IN ITS ENTIRETY.  THE EXECUTIVE FURTHER ACKNOWLEDGES THAT HE HAS HAD THE OPPORTUNITY TO ASK QUESTIONS CONCERNING ANY TERM OR PROVISION OF THE AGREEMENT AND THE CONSEQUENCES THEREOF AND, TO THE EXTENT THAT HE ASKED SUCH QUESTIONS, HAS RECEIVED ANSWERS THAT HE DEEMS SATISFACTORY.  THE EXECUTIVE ACKNOWLEDGES THAT HE HAS BEEN URGED TO CONSULT HIS OWN LEGAL COUNSEL CONCERNING THE INTERPRETATION AND CONSEQUENCES OF THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties have set their respective hands hereto as of the date first written above.

**THE COMPANY**:

**WorldVentures Holdings, LLC**

By:     Joshua Raine,
         Chief Executive Officer

**THE EXECUTIVE**:

Kenneth E. Head

## EXHIBIT A

### Base Salary

The Base Salary shall be $459,000.36 per annum, payable bi-weekly in accordance with the Company's standard payroll practices for salaried employees.

## EXHIBIT B

### Bonus Plan

The Executive will be eligible to earn the Executive Bonus based on milestones that will be developed and deployed within 60 days following the Effective Date.

## EXHIBIT C

### Equity Plan

The Executive will be granted 4,800,000 Liquidity Units and 4,800,000 Profits Participation Units, as defined in and governed by the Incentive Plans. The Liquidity Units will represent 4.0% of the equity of the Company on a fully-diluted basis, based on 85,179,482 units of membership interest of the Company currently issued and outstanding and 34,820,518 Liquidity Units authorized under the Incentive Plans; and the Profits Participation Units will represent 4.0% of the equity of the Company on a fully-diluted basis, based on 85,179,482 units of membership interest of the Company currently issued and outstanding and 34,820,518 Profits Participation Units authorized under the Incentive Plans.

The Liquidity Units and Profits Participation Units will 100% vested on the date of grant. The Company Value Per Unit upon the date of grant will be $0.25, which equates to a $21.3 million valuation of the Company.

The grant of the Liquidity Units and Profits Participation Units will be represented by separate agreements under the Incentive Plans.

## EXHIBIT D

### Employee Benefits

The Executive will be eligible to participate in the Company's employee benefit plans that are offered to all regular full-time employees of the Company. The current description of the Company's benefit plans, which are subject to change from time to time in the discretion of the Company, are annexed to this Exhibit D.

# EXHIBIT E

## Anti-Bribery and Conflicts of Interest Policies

[attached]