

# CO-MARKETING AGREEMENT

This Co-Marketing Agreement ("Agreement") dated as of July 22, 2020 (the "Effective Date") by and between WorldVentures Marketing, LLC, a Nevada limited liability company ("WVM"), with its primary place of business located at 5100 Tennyson Parkway, Plano, TX 75025 and Seacret Direct LLC, an Arizona limited liability company ("Seacret"), with its primary place of business located at 8125 N. 86th Place, Scottsdale, AZ 85258. WVM and Seacret are referred to collectively as the "Parties" and each, individually, as a "Party".

## RECITALS

Whereas, WVM is a multi-level marketing company that markets and sells lifestyle membership products and services to customers ("Members");

Whereas, Seacret sells proprietary products including dietary supplements, nutritional and skincare ("Product" or "Products") through its network of sales representatives;

Whereas, WVM wishes to make Seacret's Products available to WVM's Members, based upon available inventory, for purchase by WVM Members, in all domestic and international countries in which WVM conducts business and in which Seacret gives its approval to sell its Products ("Territory"); and

Whereas, Seacret agrees to make its Products available to WVM's Members in the Territory, to sell its Products to such Members if available and as provided herein, and to remunerate WVM for each purchase of Seacret's Products made by WVM's Members.

NOW, THEREFORE, in consideration of the premises, and the mutual covenants and conditions contained herein, WVM and Seacret agree as follows:

## AGREEMENT

1. Program Description & Responsibilities.

    1.1 Seacret will establish WVM as an affiliate so that WVM can refer WVM's Members to purchase Seacret's Products as VIP Customers ("VIPC").

    1.2 Seacret, at no charge to WVM, will create and manage the VIPC portal for WVM Members based on its existing platform.

    1.3 WVM's Members will be verified by WVM through a single sign-on process (SSO) to authenticate.

    1.4 Seacret agrees to make its Products available to WVM's Members for purchase in the Territory, based upon available inventory, with the understanding that Seacret will not provide that service or sell any Product to any WVM Member in any country in which WVM does not possess the appropriate network marketing licensure and/or in which WVM is not in full compliance with all local laws affecting network marketing.

    1.5 Seacret will provide "Turnkey Product" ordering, fulfillment and shipping services for VIPC orders made by WVM Members in the Territory, subject to available inventory. The Parties will review additional market expansion opportunities for their respective representatives and customers within markets already open for each.

1.6 Seacret will process all VIPC referral orders made by WVM Members as it would as a direct customer order; except that:

    1.6.1 The Parties acknowledge that Seacret has its own agents and customers to whom Seacret will also be selling Products;

    1.6.2 Seacret shall have the right to prioritize its agents and customers, in terms of processing and fulfilling orders, over WVM Members;

    1.6.3 Seacret shall have the discretion to allocate its Product to its own agents and customers, and to WVM Members, in its sole discretion; and

    1.6.4 Seacret's processing of all VIPC referral orders made by WVM Members shall be subject to available inventory, and shall not be liable to any WVM Member or to WVM for failing to fulfill an order due to the Product being out of stock or otherwise unavailable for purchase.

1.7 Seacret will provide customer service to WVM Members making VIPC purchases of Seacret's Products based on available inventory. Such customer service shall include, but not necessarily limited to, assisting WVM and WVM Members in connection with the Products, Product ordering, grievances, and complaints, and accepting reasonable Product returns consistent with Seacret's existing policies.

1.8 Seacret shall be responsible for monitoring adverse events reported by WVM or WVM Members and will report such adverse events as required by law.

1.9 Seacret agrees that during the Term of this Agreement it will not enter into any other agreements with multi-level-marketing companies to provide Seacret products under an affiliate or affiliate-like relationship similar to that established by this Agreement.

2. **WVM's Responsibilities**

2.1 WVM agrees to actively and regularly promote Seacret and Seacret's Products to WVM's Members, via corporate website and communications, back office, and particularly social media.

2.2 WVM agrees that it will not enter into any other agreements with any third parties developing, manufacturing, distributing or selling the same or substantially similar types of Products as those sold by Seacret to WVM's Members. The Parties agree that nothing in this Section 2.2. shall prohibit WVM from selling its own products under the Dream-Body brand using any fulfillment source as they deem appropriate, so long as such "Dream-Body" products are limited to the immunity support products, meal replacement/protein bars, bcaa supplements, "flavors of the world" e.g. spices, coffee, tea and chocolate, fitness equipment, apparel and training content, and so long as WVM does not use any Seacret Intellectual Property, as defined herein, in developing, improving, marketing or selling such Dream-Body brand products. WVM will assess whether any manufacturing or fulfillment opportunities exist for Seacret with respect to such "Dream-Body" products. In the event that WVM any Dream-Body brand product, other than those product types listed above, that is the same or substantially similar to a product then sold by Seacret, WVM shall not market or sell that Dream-Body brand product without the written consent of Seacret.

2.3 WVM agrees that it shall be solely responsible for the payment of any and all commissions or other compensation to its Members, whether paid out of the WVM Commission or WVM Remuneration (as defined below) or otherwise. Seacret shall have no financial obligations to WVM Members. WVM agrees to defend, indemnify and hold Seacret harmless from and against any claims made by WVM's Members for unpaid commissions, payments or other financial obligations owed to WVM's Members.

2.4 WVM agrees to inform its Members, to be responsible for, and to ensure that its Members do not identify themselves, at any time, as Seacret agents or representatives, it being understood that WVM's Members are affiliated with WVM only, and have no employment, independent contractor, agent, representative or any other status or relationship with Seacret other than customer.

3. **Compensation**

    3.1 Seacret will pay WVM a commission (the "WVM Commission") equal to twenty percent (20%) of the "Gross Margin" (as defined herein) of any Products purchased by WVM Members during the term of this Agreement. The term "Gross Margin" shall be calculated as follows: Total Revenue collected minus uncollected shipping and fulfilment costs, minus Tax/VAT charges, minus refunds, and minus any discounts or promotion costs. Seacret will pay WVM the WVM Commissions to WVM on a weekly basis, via ACH funds, in arrears, and calculated on the prior week's sales to WVM Members.

    3.2 Seacret will also separately pay WVM an amount (the "WVM Remuneration") equal to fifty percent (50%) of the "Net Margin" (as defined herein) of any Products purchased by WVM Members during the Term of this Agreement. The term "Net Margin" shall be calculated as follows: Gross Margin minus credit card processing costs, minus Cost of Goods Sold ("COGS"), minus the WVM Commission. The term "COGS" shall mean Seacret's actual cost to develop, manufacture, acquire, distribute and sell its Product, including but not limited to shipping, logistics, customs, and related legal services, based upon the prior year's actual costs, or an amount equal to twenty-three percent (23%) of the Price of the Product, whichever is greater. (Seacret's actual COGS for 2019 is attached hereto as Exhibit A.) In the event that Seacret's actual cost to develop, manufacture, acquire, distribute and sell its Product exceeds twenty-three percent (23%) of the Price of the Product, WVM may demand that Seacret provide proof of its actual cost. Seacret will pay the WVM Remuneration to WVM on a monthly basis, via ACH funds, in arrears, and calculated on the prior month's sales to WVM Members.

    3.3 Seacret will provide WVM with weekly reports, in API format, of all purchases made by WVM Members, as contemplated in this Section, to including individual transaction records with statistics and characteristics of the transactions, base price, mark up (if applicable), all taxes specified separately in addition to chargebacks and returns. The weekly report shall be provided in a form that is reasonably acceptable to WVM.

3.4 Secret, shall for a period of three (3) years after their creation, keep, maintain and preserve complete and accurate records and accounts, including all invoices, correspondence, ledgers, financial and other records pertaining to the sales of Products to WVM Members and to the payment of any WVM Commissions or WVM Remuneration by Seacret and such records and corporate accounts shall be available for inspection and audit at Seacret's corporate offices as designated by Seacret, at any time or times during the Term of this Agreement or within ninety (90) days thereafter, but at no time more than once per year, during reasonable business hours, by WVM or its nominee. In the event that WVM discovers and proves that WVM was paid less than ninety percent (90%) of the WVM Commission or the WVM Remuneration owed during the Term of this Agreement, Seacret shall pay such underpayment amount to WVM.

4. **Representations and Warranties**

    4.1 Seacret represents and warrants to WVM that:

    4.1.1 Seacret has the full legal right, power and authority to enter into this Agreement.

    4.1.2 This Agreement is the legal, valid, and binding obligation of Seacret, enforceable against Seacret in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

    4.1.3 All Products sold to WV Members shall be manufactured and packaged in accordance with the good manufacturing practices prevailing in the industry, including the applicable provisions of the Current Good Manufacturing Practices published by the Food and Drug Administration (21 CFR Parts 110, 111 and 117), and as required by any other state or federal authorities. Seacret shall promptly notify WVM of any noncompliance with such practices or provisions. If Seacret learns of any condition that raises the possibility of finished Products being adulterated or misbranded within the meaning of any federal, state or local law, Seacret shall notify WVM within twenty-four (24) hours of first notice. Seacret shall be responsible for product recalls or market withdrawals as necessary, including notifications to affected purchasers of the Products. In the event of any Product recall or decision by Seacret, in its sole discretion, to refund the purchase price, WVM shall forfeit to Seacret any related WVM Commission payment or WVM Remuneration payment.

    4.1.4 Seacret shall be responsible for ensuring compliance with the labeling requirements of the Food and Drug Administration, and similar regulatory agencies in countries in which Seacret sells its Products including claims on product labeling, packaging, inserts and other promotional materials distributed at the point of sale.

    4.1.5 Seacret's Products are composed of safe ingredients, manufactured, labeled, packaged, stored, and shipped under conditions compliant with all applicable federal, state, and local requirements including but not limited to applicable laws, regulations, and guidelines adopted by (i) the Food and Drug

Administration ("FDA") pursuant to the Federal Food, Drug, and Cosmetic Act, as amended (the "Act"); and the Public Health Security and Bioterrorism Preparedness and Response Act (the "Bioterrorism Act"), including but not limited to the safety, composition, labeling, registration, and manufacturing provisions and current industry good manufacturing practices; (ii) the Federal Trade Commission ("FTC"); (iii) the Standardized Information on Dietary Ingredients Work Group ("SIDI"); and (iv) applicable state and local authorities responsible for regulating the manufacture, storage, and shipment of food products and establishments, including without limitation, the California Safe Drinking Water and Toxic Enforcement Act of 1986, and all applicable laws, rules and regulations where the Products are sold.

    4.1.6    All edible Products shall be merchantable and fit for human consumption, where applicable.

    4.1.7    Seacret is not subject to, nor is it aware of, any pending or threatened order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency regarding the manufacturing processes, storage conditions, or purity of any Products produced by Seacret.

    4.1.8    Seacret agrees that this Agreement shall have no impact upon WVM's' sale of travel products to its Members, and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement.

4.2    WVM represents to Seacret that:

    4.2.1    WVM has the full legal right, power and authority to enter into this Agreement.

    4.2.2    This Agreement is the legal, valid, and binding obligation of WVM, enforceable against WVM and its affiliates, including World Ventures Holdings, LLC, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

    4.2.3    The signing and delivery of this Agreement by WVM and the performance by WVM of all of WVM's obligations under this Agreement will not breach any agreement to which WVM is a party, or give any person the right to accelerate any obligation of WVM; violate any law, judgment, or order to which WVM is subject; or require the consent, authorization, or approval of any person, including but not limited to any governmental body.

    4.2.4    WVM understands and agrees that all sales of Products by Seacret to WVM's Members shall be based on available inventory, and that Seacret shall not be responsible to WVM or its Members for any shortfall in inventory or "out of stock" items.

    4.2.5    WVM understands and agrees that this Agreement shall have no impact upon Seacret's sale of its Products to its agents and customers.

5. **Indemnification**

    5.1 Seacret shall defend, indemnify and hold harmless WVM, its officers, directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including reasonable attorney fees) (collectively, "Claims") resulting from or relating to any breach by Seacret of any provision, warranty or covenant, under this Agreement. Seacret further agrees to indemnify and hold harmless WVM and its officers, directors and agents, from and against any and all damages, loss, cost, liability or expense (including attorney fees and costs) incurred by any such party in connection with any complaints, demands, claims, or legal actions alleging illness, injury, death, or damage as a result of the consumption or use of any Product, unless those complaints, demands, claims, or legal actions arise out of WVM's negligence.

    5.2 WVM agrees to defend, indemnify and hold harmless Seacret, its directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including attorney fees) (collectively, "Claims") resulting from or relating to any breach by WVM of any provision, warranty or covenant, WVMunder this Agreement.

    5.3 The party entitled to indemnification under this Section 5 (the "Indemnified Party") will provide the party obligated to provide indemnification (the "Indemnifying Party") with prompt notice of any third-party Claim for which its seeks indemnification, provided that the failure to do so will not excuse the Indemnifying Party of its obligations except to the extent prejudiced by such failure or delay. The Indemnifying Party will have the sole right to control the defense and settlement of the third-party Claim, provided that the Indemnifying Party may not, without the Indemnified Party's consent, enter into any settlement which admits guilt, liability or culpability on the part of the Indemnified Party. The Indemnified Party will provide reasonable cooperation to the Indemnifying Party in defending any third-party Claim.

    5.4 EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY OR THEIR AFFILIATES HAVE ANY LIABILITY WHATSOEVER TO THE OTHER PARTY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS, BUT NOT LIMITED TO, LOSS OF PROFIT OR REVENUE; LOSS OF USE OF THE PRODUCTS; COST OF CAPITAL; OR CLAIMS RESULTING FROM CONTRACTS BETWEEN A PARTY'S CUSTOMERS AND/OR SUPPLIERS.

6. **Term, Termination & Effects of Termination**

    6.1 <u>Term</u>. This Agreement shall run for a period of two (2) years from the date hereof (the "Term"), unless terminated sooner. After the end of the Term, the Agreement shall automatically renew for successive one (1) year terms unless either Party gives written notice of its intent not to renew at least ninety (90) days before the expiration of that Term.

6.2 <u>Termination.</u>

    6.2.1 <u>Termination for Material Breach</u>. Either Party may terminate this Agreement upon written notice to the other Party, if such other Party materially breaches this Agreement and the breach remains uncured for a period of thirty (30) days after receipt of written notice of such breach.

    6.2.2 <u>Termination for Injury to Reputation</u>. Neither Party nor their agents or employees will take any action which is intended, or would reasonably be expected, to harm the other Party's reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the other Party; provided, however, the foregoing limitation shall not apply to (a) compliance with any legal process or subpoena or (b) statements in response to authorized inquiry from a court or regulatory body. Notwithstanding any other provisions of this Agreement, if either Party in its sole judgment believes that the material breach of this Agreement or the conduct of the other Party constitutes an immediate and material threat to its integrity or business reputation, it may immediately terminate this Agreement without the requirement of any notice to the other Party.

    6.2.3 <u>Termination for Bankruptcy</u>. Either Party may terminate this Agreement upon written notice to the other Party, if such other Party assigns its assets and/or rights for the benefit of creditors or makes a general arrangement with creditors, commits any act of bankruptcy, files a petition under any bankruptcy of insolvency law, or, if such a petition is filed against that Party, the petition is not dismissed within sixty (60) days from filing.

6.3 <u>Return of Confidential Information</u>. Immediately following termination of this Agreement, each Party shall deliver to the other all of the other Party's Confidential Information, and all copies thereof (electronic or otherwise) in its possession or under its control, or destroy the such Confidential Information, and all copies thereof (electronic or otherwise), as directed by the other Party. In the event a Party directs the other Party to destroy its Confidential Information, and all copies thereof, the other Party shall provide it with a signed and dated statement from an officer of the company certifying that all such Confidential Information and all copies thereof have been destroyed.

7. **<u>Confidentiality</u>**

7.1. "<u>Confidential Information</u>" means this Agreement and all confidential or otherwise proprietary business and technical information relating to the Parties and their respective businesses, including, without limitation, ideas, know-how, trade secrets, production, manufacturing techniques, recipes and formulas, sources of supply, pricing, costing, and accounting procedures, and customer information. Confidential Information does not include information that is in the public domain at the time of disclosure by the disclosing Party; that enters the public domain after disclosure by the disclosing Party through no fault of the receiving Party; that was or is separately disclosed to the receiving Party by a third party not itself subject to an obligation of confidentiality to the disclosing Party with respect to such information; or that was in the receiving Party's possession at the time of disclosure by the disclosing Party.

7.2 Each Party agrees to maintain the other Party's Confidential Information in strict confidence and, except to the extent expressly permitted in this Agreement or otherwise consented to in writing by the other Party, that the Confidential Information will not be disclosed by it or its "Representatives" (defined to include affiliates, directors, shareholders, officers, employees, agents, subcontractors, consultants, members, managers, advisors, or other representatives including legal counsel, and accountants or any "Person" (defined to include individuals, partnerships, companies, limited liability companies, entities, corporations, or agents thereof) except with the specific prior written consent of the other.

7.3 The Parties agree that each of their downline organizations (i.e. names, addresses and other personally identifiable information commonly used in the MLM industry to identify members, agents and representatives of each organization) constitute their proprietary and confidential information. Each Party agrees that during the Term of this Agreement and for a period of one (1) year following termination neither it nor its officers, directors or senior management shall recruit or attempt to recruit a member of the other Party's downline organization to leave the other Party and join any other network marketing or direct selling business including a Party's affiliated business(es). Neither Party, nor its officers, directors or senior management shall offer, entice, encourage, solicit or attempt to influence a member of the other Party's downline organization to sign up with it and leave his or her organization in which they are currently involved. Notwithstanding the foregoing, either Party may sell its products to the other party's members or agents (as customers) after the termination of this Agreement.

7.4 Both Parties agree that during the Term of this Agreement and for a period of one (1) year after the termination hereof, unless otherwise agreed by the Parties, that each Party and its employees shall not contact, solicit, seek or in any way enter into an employment relationship with any person who was an employee of the other Party as of the date of termination.

**8. Insurance**

8.1 During the Term of this Agreement, each Party shall maintain (i) Workers' Compensation and Employees' Liability Insurance (as required by law); and (ii) Public Liability Insurance including Contractual Liability and Products Liability Coverage with a combined single limit of not less than Five Million Dollars ($5,000,000). The insurance policies shall be claims based and name the other Party as an additional insured party and provide that at least thirty (30) days prior written notice of cancellation, amendment, or lapse of coverage shall be given to said additional insured by the insurer. Each Party will submit policies and/or certificates of insurance evidencing the above coverage to the other Party upon the other Party's reasonable written request.

**9. Regulatory Action**

9.1 If the FDA or any other domestic or foreign federal, state or local government agency makes, with respect to any Product sold or distributed by Seacret under this Agreement, (i) an inquiry, or (ii) gives notice of or makes an inspection at Seacret's premises (including warehouses), or (iii) seizes any such Product or requests a recall, or (iv) directs Seacret to take or cease taking any action, WVM shall be notified immediately but in no event later than the next business day. Seacret will investigate the inquiry or complaint

and provide WVM with a written report within ten (10) Business Days after the notification.

**10. Intellectual Property**

10.1 <u>Seacret's Intellectual Property.</u> Seacret is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to Seacret's Products ("Seacret's Intellectual Property"). WVM shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how or processes from the Products or permit or encourage any third-party to do so. Unless otherwise expressly stated herein, this Agreement does not confer to WVM any intellectual property or other rights with respect to Seacret's Products, brand, formulas, packaging, or any names or logos used in connection with the Products. As between Seacret and WVM, Seacret owns and shall continue to own all such intellectual property rights.

10.2 WVM's Intellectual Property. WVM is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to WVM's business ("WVM's Intellectual Property"). Seacret shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how or processes or permit or encourage any third-party to do so. Unless otherwise expressly stated herein, this Agreement does not confer to Seacret any intellectual property or other rights with respect to WVM's brand, packaging, or any names or logos used in connection with the WVM's business. As between Seacret and WVM, WVM owns and shall continue to own all such intellectual property rights.

**11. Trademarks and Tradenames**

11.1 The Parties recognize that the corporate name and respective trademarks or tradenames of the other are valuable and that all goodwill associated with use of such names and marks shall inure to the benefit of the other. Either Party shall have the right to terminate this Agreement immediately in the event that the other Party acts in a manner which would negatively impact the reputation of such Party and/or of its name or marks and/or would infringe or dilute the value of the other Party's name or marks or which is not in compliance with applicable law in the United States or any other country in which either Party conducts business as the case may be. Each Party shall be solely responsible for the registration and maintenance of its trademarks and tradenames in the Territory. During the Term of this Agreement, each Party shall grant the other Party a revocable, limited, non-assignable license to use its corporate name, trademarks or tradenames in connection with its promotion or operation of the program described hereunder.

**12. Dispute Resolution**

12.1 The Parties shall in good faith attempt to resolve any dispute arising out of or relating to this Agreement promptly by negotiations between executives who have authority to settle the controversy. A party may give the other parties written notice of any dispute not resolved in the normal course of business. Within 20 days after delivery of that

notice, executives of the affected parties shall meet at a mutually acceptable time and place, or by teleconference and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. If the matter has not been resolved within 60 days of the disputing party's notice, or if the parties fail to meet within 20 days, either party may initiate mediation of the controversy or claim as provided in Section 12.3.

12.2 Any controversy or claim arising out of or relating to this Agreement or the existence, validity, breach or termination thereof, whether during or after its Term, will be finally settled by compulsory arbitration in accordance with the Commercial Arbitration Rules and Supplementary Procedures for Commercial Arbitration of the American Arbitration Association ("AAA").

12.3 To initiate arbitration, either party will file the appropriate notice at the appropriate Regional Office of the AAA. The arbitration proceeding will take place in Phoenix, Arizona, for a period not to exceed three (3) days. The arbitration panel will consist of three (3) arbitrators, one arbitrator appointed by each Party and a third neutral arbitrator appointed by the AAA. Any communication between a Party and any arbitrator will be directed to the AAA for transmittal to the arbitrator.

12.4 The arbitral award will be the exclusive remedy of the Parties for all claims, counterclaims, issues or accountings presented or plead to the arbitrators. The award will (i) be granted and paid in U.S. Dollars exclusive of any tax, deduction or offset and (ii) include interest from the date of breach or other violation of the Agreement until the award is fully paid, computed at the then-prevailing LIBOR rate. Judgment upon the arbitral award may be entered in any court that has jurisdiction thereof. Any additional costs, fees or expenses incurred in enforcing the arbitral award will be charged against the Party that resists its enforcement.

13. **Miscellaneous**

    13.1 Relationship of Parties. Seacret and WVM are independent contractors for the purpose of this Agreement. Neither the execution, delivery nor performance of this Agreement will be construed to constitute either party as an agent or representative of the other for any purpose. Neither the execution, delivery nor performance of this Agreement will be deemed to establish a joint venture or partnership between the Parties. Except as otherwise provided herein, neither Party has the authority to (i) bind the other Party by or to any contract, representation, understanding, act or deed, (ii) represent that either Party is an agent of the other Party, or (iii) represent that either Party is responsible for the acts or omissions of the other Party.

    13.2 Force Majeure. The Parties shall not be responsible for any failure to perform due to unforeseen circumstances or causes beyond their reasonable control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, fires, floods, accidents, strikes, epidemics, pandemics, or shortages of transportation, facilities, fuel, energy, labor, or materials. In the event of any such delay, the Parties may defer performance hereunder for a period equal to the time of such delay.

    13.3 Severability. If any provision of this Agreement shall be prohibited or unenforceable by any applicable law, the provision shall be ineffective only to the extent and for the

duration of the prohibition or unenforceability, without invalidating any of the remaining provisions.

13.4 <u>Waiver</u>. The temporary, limited, or specific waiver of any term, provision, or condition of this Agreement or a breach thereof will not be considered a waiver of any other term, provision, or condition, or of any subsequent breach of the same term, provision, or condition.

13.5 <u>Amendment</u>. This Agreement may be amended only by a written document signed by the party against whom enforcement is sought.

13.6 <u>Assignability</u>. This Agreement shall be binding upon and be for the benefit of the Parties and their legal representatives, successors, and assigns. Neither party may assign this Agreement without the prior written consent of the other.

13.7 <u>Choice of Law</u>. This Agreement shall be interpreted and construed in accordance with the laws of the state of Arizona, without giving effect to, choice of law rules. The Parties consent to jurisdiction and venue in the state and federal courts located in Maricopa County, Arizona.

13.8 <u>Notice</u>. All Payments must be remitted via ACH funds. All notices shall be made in writing and may be given by personal delivery, via overnight courier requiring a signature for delivery, or by certified or registered mail, return receipt requested. Notices sent by mail should be addressed as follows:

> WorldVentures Marketing, LLC
> Attn: Eric Haynes, Chief Legal Officer
> 5100 Tennyson Parkway
> Plano, Texas 75024
> Email: ehaynes@worldventures.com
>
> Seacret Direct LLC
> Attn: Izhak Benshabat
> 8125 N. 86th Place
> Scottsdale, AZ 85258
> Email: izhak@seacret.com

and when so addressed shall be deemed given five (5) days after deposited in the U.S. mail, first class, postage prepaid, and postmarked. In all other instances, notices, bills, and payments shall be deemed given at the time of actual delivery. Changes may be made in the names and addresses of the person to whom notices, bills, and payments are to be given by giving notice pursuant to this section.

13.9 <u>Construction</u>. Section headings are included for convenience but shall not form a part of the Agreement or affect the interpretation of any part hereof. The word "including" is used in this Agreement in a non-exclusive sense and, unless otherwise expressly set forth, shall be interpreted as being illustrative and not limiting.

13.10 No Third-Party Beneficiaries. Nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Agreement.

13.11 Expenses. Each party shall bear its own expenses associated with this Agreement.

13.12 Compliance. Each Party will comply with all laws relating to the performance of this Agreement including federal and state laws, rules and regulations and represents and warrants that execution of this Agreement and performance of its obligations under this Agreement does not and will not breach any other agreement to which it is or will be a party, including but not limited to any agreements with its customers.

13.13 Press Releases. Neither Party shall publish any press release, make any other public announcement or otherwise communicate with any news media concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party; provided, however, that nothing contained herein shall prevent either Party from promptly making all filings with governmental authorities as may, in its judgment be required or advisable in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

13.14 Counterparts & Electronic Signatures. This Agreement may be signed in counterparts. A fax transmission of a signature page will be considered an original signature page. Any signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Party with the intent to sign, authenticate or accept such contract or record) hereto or to any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Texas State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act, and the parties hereby waive any objection to the contrary.

13.15 Entire Agreement. This Agreement embodies the entire understanding of the Parties and shall supersede all previous communications, representations or understandings either oral or written between the Parties relating to the subject matter hereof.

**ACCEPTED AND AGREED:**

**SEACRET DIRECT, LLC:**

By: _____
Izhak Benshabat
Title: Managing Member

**WORLDVENTURES MARKETING, LLC**

By: _____
Eddie Head
Title: President, Spherature Holdings, llc,

**EXHIBIT A**

**SEACRET'S COST OF GOODS SOLD – 2019**