

5100 Tennyson Parkway
Plano, Texas 75024

November 10, 2020



<u>*VIA E-MAIL: izhak@seacret.com*</u>

Mr. Izhak Ben Shabat
Chief Executive Officer
Seacret Direct, LLC
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253

   Re: Terms of a Multi-Agreement Asset Purchase with Spherature Investments LLC Dear

Izhak:

  Per our continuing discussions, please allow this letter to serve as a summary of the material terms pursuant to which Seacret Direct, LLC ("<u>Seacret</u>") would purchase certain assets from Spherature Investments LLC, a Nevada limited liability company formerly known as 'WorldVentures Holdings, LLC" (together with its subsidiaries and affiliates, "<u>WVH</u>"), on a cash-free/debt-free basis;; Secret would enter into new marketing agreements with the WVH's Sales Representatives, WVH would release such WVH Sales Representatives from their non-competes with WVH; and Seacret would enter into ancillary agreements with Rovia, LLC ("Rovia") and Wayne Nugent (collectively, the "<u>Transaction</u>"). The Parties acknowledge that the Co-Marketing Agreement between them, dated July 22, 2020, has been terminated and will remain terminated. The Transaction will have no effect upon and will not revive the Co-Marketing Agreement or any of its terms. For purposes of this letter, WVH and Seacret will be referred to, individually, as a "Party," and collectively as the "Parties."

  This letter is intended and shall be construed solely as a recitation of certain proposed deal points that the Parties intends to be part of a definitive asset purchase agreement and related documents (collectively, the "<u>*Definitive Agreements*</u>") based on facts known to it as of the date of this letter. Such points may or may not become part of the eventual fully executed Definitive Agreements, if any, based on the results of the Parties' due diligence on their respective businesses and entities. Except for the confidentiality, governing law/venue, and costs provisions set forth in <u>Section II</u> of this letter, which shall be binding on the Parties in accordance with their terms, this letter is not intended to impose any obligation whatsoever on any Party, it being expressly understood that the Parties do not intend to be bound by any agreement (other than the provisions of <u>Section II</u>) until all Parties agree to, sign, and deliver the Definitive Agreements.

  The proposed terms and conditions of the Transaction, which are entirely subject to the terms and conditions to be set forth in the Definitive Agreements between the Parties, are as follows:

{00522830.1 }

**I.     The Transaction:**

| | |
|---|---|
| *Asset Purchase:* | At the Closing (as defined below), Seacret would purchase the following assets of WVH: only those trademarks, tradenames, technology, databases, and other related assets of WVH that are necessary to support the marketing efforts of WVH's Sales Representatives (collectively, the "Assets") on a cash-free/debt-free basis. In furtherance thereof, WVH would release its Sales Representatives from their non-competes. Following the Closing, and when entering into new marketing agreements with WVH's Sales Representatives, Seacret will ensure that WVH's Sales Representatives have resigned from their positions at WVH. |
| *Purchase Price:* | In consideration for its purchase of the Assets, Seacret would make royalty payments to WVH, up to a total of $12,000.000.00 (Twelve Million and no/100 Dollars) (the "Royalty Payments"), as follows, subject to the following conditions, and pursuant to the following schedule: |

(a) Seacret would pay royalties to WVH equal to five percent (5.0%) of the gross revenues derived from all sales by WVH's Sales Representatives (as defined herein) of WVH travel products and services and Seacret products and services until such time as the total amount of Royalty Payments paid to WVH equals $7,000,000.00 (Seven Million and no/100 Dollars).

(b) Once Seacret pays WVH a total of $7,000,000.00 in Royalty Payments, as described in (a), above, then Seacret would make Royalty Payments to WVH equal to four percent (4.0%) of the gross revenues derived from all sales by WVH's Sales Representatives of WVH travel products and services and Seacret products and services until such time as the additional amount of Royalty Payments paid to WVH equals $1,500,000.00 (One Million Five Hundred Thousand and no/100 Dollars).

    (c) Once Seacret pays WVH a total of $8,500,000.00 in Royalty Payments, as described in (a) and (b), above, then Seacret would make Royalty Payments to WVH equal to two and one-half percent (2.5%) of the gross revenues derived from all sales by WVH's Sales Representatives of WVH travel products and services and Seacret products and services until such time as the additional amount of Royalty Payments paid to WVH equals $1,500,000.00 (One Million Five Hundred Thousand and no/100 Dollars).

    (d) Once Seacret pays WVH a total of $10,000,000.00 in royalties, as described in (a), (b) and (c), above, then Seacret would make Royalty Payments to WVH equal to two 0 percent (2.0%) of the gross revenues derived from all sales by WVH's Sales Representatives (as defined herein) of WVH travel products and services and Seacret products and services until such time as the additional amount of Royalty Payments paid to WVH equals $2,000,000.00 (Two Million and no/100 Dollars).

*New Agreements with*
*WVH Sales Representatives:*   The term "WVH Sales Representatives" means (i) those persons who, as independent contractors, currently market and sell WVH travel products and services, and who transition over to Seacret to continue to sell WVH travel products and services and Seacret products and services, and (ii) those persons who are subsequently recruited by WVH Sales Representatives to sell WVH travel products and services and Seacret products and services as a Seacret agent. Seacret would enter into new marketing agreements with the WVH Sales Representatives, transition them to Seacret agents/sales representatives, and pay them commissions pursuant to Seacret's standard commissions schedule. Seacret would maintain the current WVH downline structure within Seacret's sale force, and the WVH Sales Representatives would inherit their current respective downline positions within that current WVH downline structure at Seacret. WVH Sales Representatives will not be allowed to maintain duplicate positions in Seacret independent of the

WVH tree. Seacret will terminate such duplicate positions immediately when discovered and reverse any commissions paid in violation of this policy through such positions.

In addition, and within its sole discretion, Seacret may elect to pay enhanced commissions (the "Enhanced Commissions") to the WVH Sales Representatives, as needed, for incentives. Seacret has the option of paying said Enhanced Commissions once the entire amount of Royalty Payments ($12,000,000.00) is paid, or earlier, at its sole discretion.

For WVH Sales Representatives who enter into new marketing agreements with Seacret, WVH would release such WVH Sales Representatives from their non-compete covenants with WVH in exchange for such WVH Sales Representatives releasing WVH from all claims, including past-due commissions.

Following the Closing, Seacret will develop an applied programming interface ("API") to report sales data to WVH on a real-time basis or as close to on a real-time basis as is technologically possible. Until it develops such API, Seacret will provide WVH with bi-monthly sales data of Seacret product sales to WVH Sales Representatives and customers; provide WVH with bi-monthly sales data of DreamTrip membership sales to Seacret sales representatives and customers; provide bi-monthly reporting of WVH Sales Representatives and customer new enrollments, resignations, chargebacks, and payment failures.

*Agreement with Rovia:* Seacret would enter into a membership and travel-fulfillment agreement with Rovia including travel pricing, service levels and performance requirements, pursuant to which Rovia would support Seacret's travel membership and trip fulfillment products and services for a minimum period of two (2) years. On an interim basis, and prior to of the execution of a Master Services Agreement between Seacret and Rovia, Seacret would provide consideration by paying Rovia a fee of 20% of the monthly and initial fees charged by Seacret to each WVH DreamTrips member (or travel memberships consisting of the same or materially similar benefits by another name) and Seacret customers who are or become members with the exception of so-called, "free billed" accounts (for example Get 4 pay no more). After the first 18 months,

                                      Seacret would have the right to terminate its agreement with Rovia upon 90 days' prior written notice, subject to paying any monthly fees due up to the date of termination. Seacret will promote WVH travel products and services to all of its customers where legally supported.

*Agreement with Wayne Nugent:* Seacret would enter into an agreement with Wayne Nugent whereby Mr. Nugent would provide ongoing services to Seacret. It is anticipated that in consideration for these services and his agreement not to compete with Seacret or solicit Seacret's agents or employees (or the WVM Sales Representatives), Mr. Nugent would receive the following consideration:

    a. Mr. Nugent's current top position in the WVH downline structure would be moved over to Seacret in the same capacity such that he would hold the same position within that WVH downline structure.

    b. Mr. Nugent would be engaged as a Seacret Visionary Leader and would serve on an advisory board of global sales leaders.

    c. Seacret would provide Mr. Nugent with a sales override equal to two and one-half percent (2.5%) of the gross revenue received by Seacret from all sales made by WVH Sales Representatives of WVH travel-related products and services and Seacret products and services. Once Seacret pays WVH a total of $8,500,000.00 in Royalty Payments, as described in section (c) of the Purchase Price section, above, then Seacret would make Royalty Payments to Mr. Nugent equal to one-half percent (0.5%) of the gross revenues derived from all sales by WVH's Sales Representatives of WVH travel products and services and Seacret products and services until such time as all Royalty Payments paid to WVH and/or Mr. Nugent equal $12,000,000.00 (Twelve Million and no/100 Dollars).

    d. The issuance of membership interest options in Seacret to Mr. Nugent equal to 5% of Seacret when total sales by the WVH Sales Representatives and customers post-Closing equals at least $200 million and equal to an additional 5% (non-dilutive of the initial 5%, for a total of 10%) when at least $400

|  |  |
|---|---|
|  | million in total revenue is derived from all sales attributed to the WV representative and customer audience. |
| *Credit* | The Parties acknowledge that they entered into a separate agreement (the "Interim Agreement") whereby Seacret agreed to pay certain royalties to WVM on an interim basis pending the consummation and closing of the Transaction. The Parties agree that any royalties paid by Seacret to WVH in connection with that Interim Agreement shall be credited against the Purchase Price set forth herein. |
| *Closing Date:* | The Parties anticipate that the closing of the Transaction will occur no later than November [_], 2020 (the "Closing Date"). |

## II. Operative Provisions of this letter

Following the date upon which this letter is signed by WVH and by Seacret (the "*Execution Date*"), this letter shall survive and remain in full force and effect until the earliest of (i) the Closing Date; (ii) the date on which Seacret notifies WVH in writing that it no longer desires to pursue the Transaction; or (iii) November [ ], 2020, unless WVH and Seacret mutually agree to extend such time period. The period that this letter is in effect shall be referred to as the "*Effective Period*."

During the Effective Period and subject to applicable law, WVH will provide Seacret and its attorneys and accountants with reasonable access to all information, books, records, and data relating to their respective businesses and assets. All due diligence materials and information obtained as a result of such examination shall be treated as confidential information subject to paragraph 4 of this Section II.

During the Effective Period, no Party shall disclose information concerning this letter, the Definitive Agreement, or the transactions contemplated hereby or thereby without the prior written consent of the other Party, and each Party shall consult with and obtain the prior written consent of the other Party as to the form and substance of any press release or other disclosure; provided that nothing contained herein shall prevent any Party from disclosing any information to its attorneys, accountants, bankers, and lenders or as may be required to be disclosed in accordance with any law, regulation, or order of a court or regulatory agency of competent jurisdiction.

All information that is furnished to either Party (the "*Receiving Party*") by the other Party (the "*Disclosing Party*") during the Effective Period shall be treated as confidential, and the Receiving Party shall take normal and reasonable precautions to preserve the confidentiality of such information until the Closing Date. If a closing of the Transaction does not occur, this provision shall remain in effect indefinitely following the expiration or termination of the Effective Period and, upon termination of this letter, the Receiving Party shall return all documents and other materials containing, reflecting, and referring to such information and shall take normal and reasonable precautions to preserve the confidentiality of such information. The Receiving Party's obligations hereunder shall not apply to any information that: (i) was already in its possession prior to the disclosure thereof by the Disclosing Party; (ii) was then generally known to the public; (iii) became known to the public through no fault of the Receiving Party or any of its

agents or representatives; or (iv) was disclosed to the Receiving Party by a third party unaffiliated with the Disclosing Party who was not bound by an obligation of confidentiality to the Disclosing Party.

This letter supersedes all prior or contemporaneous negotiations, understandings, and agreements between WVH, Seacret, and representatives of WVH.

Arizona law shall govern any dispute under this letter or the Definitive Agreement, and venue for any action under this letter or the Definitive Agreement shall be proper only in Maricopa County, Arizona. The Parties shall provide, in the Definitive Agreement, for the mediation of any disputes prior to the institution of litigation.

WVH and the Sellers agree to bear their own costs and expenses in connection with the Transaction contemplated by this letter, including any costs associated with any finder, broker, sales agent, or investment banker retained by such Party in connection herewith.

Except for the agreements regarding confidentiality, governing law/venue, and costs set forth in this Section II, neither Party will have any obligation regarding the Transaction contemplated herein unless and until the Definitive Agreement is executed and delivered by them after necessary corporate or other organizational authorization.

If this letter meets with your approval, please so indicate by executing this letter in the space provided below.

**WorldVentures Holdings, LLC**

By: Wayne Nugent,
Chief Executive Officer

*Agreed and Acknowledged:*

**Seacret Direct, LLC**

By: Izhak Ben Shabat,
Chief Executive Officer