**EXHIBIT 7**

# LIMITED SOLICITATION AGREEMENT

This Agreement ("Agreement"), dated November 11, 2020 (the "Effective Date"), is entered into by and between WorldVentures Marketing, LLC, a Nevada limited liability company ("WVM"), with its primary place of business located at 5100 Tennyson Parkway, Plano, TX 75025, and Seacret Direct LLC, an Arizona limited liability company ("Seacret"), with its primary place of business located at 8125 N. 86th Place, Scottsdale, AZ 85258. WVM and Seacret are referred to herein, collectively, as the "Parties," and individually, as a "Party".

## RECITALS

Whereas, WVM is a multi-level marketing company that markets and sells lifestyle membership products and services to customers ("Members");

Whereas, Seacret sells proprietary products including dietary supplements, nutritional and skincare ("Product" or "Products") through its network of sales representatives;

Whereas, WVM and Seacret are parties to a Co-Marketing Agreement dated July 22, 2020 (the "Co-Marketing Agreement");

Whereas, due to its current financial situation, WVM has requested that Seacret assist it in protecting and maintaining its sales force, including all members of WVM's downline organization (collectively, the "WVM Sales Representatives"), by allowing WVM Sales Representatives to join Seacret's downline organization in order to sell, and directly receive a commission for selling, Seacret products;

Whereas, in addition to providing commissions to WVM Sales Representatives, Seacret is willing to pay a royalty to WVM to assist WVM with its current financial situation; and

Whereas, Seacret is willing to assist WVM in that regard pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises, and the mutual covenants and conditions contained herein, WVM and Seacret agree as follows:

## AGREEMENT

1. **Right to Solicit WVM Sales Representatives Only**

    1.1 Seacret is immediately allowed to solicit any WVM Sales Representatives and enlist only such WVM Sales Representatives to join Seacret's downline organization and otherwise be associated with Seacret, as independent contractors, in order to sell current and future Seacret products and services and directly receive a commission or other compensation from Seacret for such sales. In connection therewith, WVM waives, and agrees not to enforce, any non-competition provisions or similar restrictions that might exist in any agreements between WVM and the WVM Sales Representatives.

{00523096.1 }

        For the sake of clarity, WVM Sales Representatives may continue to sell WVM products and services while also selling Seacret products and services.

1.2    Seacret will enter into new marketing agreements with the WVM Sales Representatives, register them as Seacret agents/sales representatives, and pay them commissions pursuant to Seacret's standard commissions schedule. Seacret will maintain the current WVM downline structure within Seacret's sales force, and the WVM Sales Representatives would inherit their current respective downline positions within that current WVM downline structure at Seacret.

1.3    WVM agrees that Seacret shall have unfettered access to WVM's database (or other electronic materials and information) related to WVM's downline structure for the WVM Sales Representatives. Seacret agrees that such information is confidential and will treat it as such pursuant to the terms of this Agreement.

1.4    The Parties agree that during the term of this Agreement, WVM shall be responsible for assisting the WVM Sales Representatives in continuing to market and sell WVM's lifestyle membership products and services to customers, and that WVM shall be solely responsible for fulfilling such sales. Subject to the provisions of Section 8.2, WVM shall retain all direct commissions, indirect commissions and overrides produced by WVM Sales Representatives selling WVM's lifestyle membership products and services to customers.

1.5    Seacret shall not, and shall cause their respective affiliates not to, directly or indirectly or through any other person or entity: (i) induce or attempt to induce any employee of WVM, including but not limited to, Paul Jenkins, Jenny Trask, Eddie Head, Justin Call, John Halcomb, Gayle Bock, Michael Poates, (each, an "**Employee**") to leave the employment or other retention of WVM or any of its affiliates, or in any way interfere adversely with the relationship between any Employee and WVM or any of its affiliates, (ii) induce or attempt to induce any Employee to work for, render services or provide advice to, or supply confidential business information or trade secrets of WVM or any of its affiliates to any person or entity, (iii) employ, or otherwise pay for services rendered by, any Employee in any business enterprise with which Seacret or any affiliate thereof may be associated, connected, or affiliated, or (iv) induce or attempt to induce any vendor, including, but not limited to, Grapestar International, Inc., Club Swan/AU Card, Corp., AU Card, Ltd., AU Card, LLC, and Nvayo, Ltd. or any supplier, to cease doing business with WVM or any of its affiliates, or in any way interfere with the relationship between any such vendor or supplier and WVM or any of its affiliates.

2.    **Termination of Co-Marketing Agreement**

2.1 WVM and Seacret hereby mutually agree to terminate the Co-Marketing Agreement with immediate effect, as of the Effective Date, with the express intent and understanding that neither Party shall have any rights against, or continuing obligations to the other Party (financial or otherwise) under the Co-Marketing Agreement as of the Effective Date; provided, however, that only the following sections of the Co-Marketing Agreement shall continue to apply between the Parties in full force and effect: 5.1, 5.2, 5.3, 5.4, 7.1, 7.2, 12.1, 12.2. 12.3, 12.4, 13.1, 13.7, 13.8, 13.9, 13.10, 13.11, 13.14 and 13.15.

3. **Compensation**

3.1 In consideration for the agreements and covenants exchanged herein, and during the Term of this Agreement, Seacret will make royalty payments to WVM, up to a total of $12,000,000.00 (Twelve Million and no/100 Dollars) (the "Royalty Payments"), as follows, subject to the following conditions, and pursuant to the following schedule:

(a) Seacret will pay royalties to WVM equal to five percent (5.0%) of the Gross Revenues ("Gross Revenues" is defined as all revenue generated from sales of Seacret Products by WVM Sales Representatives, minus sales tax, credit card processing fees and shipping and handling costs) until such time as the total amount of Royalty Payments paid to WVM equals $7,000,000.00 (Seven Million and no/100 Dollars).

(b) Once Seacret pays WVM a total of $7,000,000.00 in Royalty Payments, as described in (a), above, then Seacret would make Royalty Payments to WVM equal to four percent (4.0%) of the Gross Revenues derived from all sales by WVM Sales Representatives of Seacret Products until such time as the additional amount of Royalty Payments paid to WVM equals $1,500,000.00 (One Million, Five Hundred Thousand and no/100 Dollars).

(c) Once Seacret pays WVM a total of $8,500,000.00 in Royalty Payments, as described in (a) and (b), above, then Seacret would make Royalty Payments to WVM equal to three percent (3.0%) of the Gross Revenues derived from all sales by WVM Sales Representatives of Seacret Products until such time as the additional amount of Royalty Payments paid to WVM equals $1,500,000.00 (One Million, Five Hundred Thousand and no/100 Dollars).

(d) Once Seacret pays WVM a total of $10,000,000.00 in Royalty Payments, as described in (a), (b) and (c), above, then Seacret would make Royalty Payments to WVM equal to three percent (2.5%) of the Gross Revenues derived from all sales by WVM Sales Representatives of Seacret Products until such time as the additional amount of Royalty Payments paid to WVM equals $2,000,000.00 (Two Million and no/100 Dollars).

3.2 Seacret, shall for a period of four (4) years after their creation, keep, maintain and preserve complete and accurate records and accounts,

including all invoices, correspondence, ledgers, financial and other records pertaining to the sales of Seacret Products by WVM Sales Representatives covered hereunder and to the payment of any Royalty Payments by Seacret and such records and corporate accounts shall be available for inspection and audit at Seacret's corporate offices as designated by Seacret, at any time or times during the Term of this Agreement or within ninety (90) days thereafter, but at no time more than once per year, during reasonable business hours, by WVM or its nominee.

3.3  As additional consideration to WVM, Seacret agrees to make and diligently pursue the offer to purchase certain of WVM's assets as outlined in the attached Letter of Intent; provided however, Seacret reserves the right to require "stalking horse" protections if such purchase proceeds pursuant to a marketing and auction process, including in connection with a section 363 bankruptcy sale. Seacret will also be entitled to credit any amount it pays to WVM under this Agreement towards the purchase price in any definitive documentation to purchase certain of WVM's assets.

4. **Representations and Warranties**

   4.1  Seacret represents and warrants to WVM that:

   4.1.1  Seacret has the full legal right, power and authority to enter into this Agreement.

   4.1.2  This Agreement is the legal, valid, and binding obligation of Seacret, enforceable against Seacret in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

   4.1.3  Seacret is not subject to, nor is it aware of, any pending or threatened order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency that would limit this Agreement or its ability to enter this Agreement.

   4.1.4  Seacret agrees that this Agreement shall have no impact upon WVM's' sale of travel products to its Members or through the WVM Sales Representatives, and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement.

   4.2  WVM represents to Seacret that:

      4.2.1    WVM has the full legal right, power and authority to enter into this Agreement.

      4.2.2    This Agreement is the legal, valid, and binding obligation of WVM, enforceable against WVM and its affiliates, including World Ventures Holdings, LLC, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

      4.2.3    The signing and delivery of this Agreement by WVM and the performance by WVM of all of WVM's obligations under this Agreement will not breach any agreement to which WVM is a party, or give any person the right to accelerate any obligation of WVM; violate any law, judgment, or order to which WVM is subject; or require the consent, authorization, or approval of any person, including but not limited to any governmental body.

      4.2.4    WVM is not subject to, nor is it aware of, any pending or threatened order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency that would limit this Agreement or its ability to enter this Agreement..

      4.2.5    WVM understands and agrees that this Agreement shall have no impact upon Seacret's sale of its Products to its agents and customers.

5. **Indemnification**

    5.1    Seacret shall defend, indemnify and hold harmless WVM, its officers, directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including reasonable attorney fees) (collectively, "Claims") resulting from or relating to any breach by Seacret of any provision, warranty or covenant, under this Agreement.

    5.2    WVM agrees to defend, indemnify and hold harmless Seacret, its directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including reasonable attorney fees) (collectively, "Claims") resulting from or relating to any breach by WVM of any provision, warranty or covenant under this Agreement.

    5.3    The party entitled to indemnification under this Section 5 (the "Indemnified Party") will provide the party obligated to provide

indemnification (the "Indemnifying Party") with prompt notice of any third-party Claim for which its seeks indemnification, provided that the failure to do so will not excuse the Indemnifying Party of its obligations except to the extent prejudiced by such failure or delay. The Indemnifying Party will have the sole right to control the defense and settlement of the third-party Claim, provided that the Indemnifying Party may not, without the Indemnified Party's consent, enter into any settlement which admits guilt, liability or culpability on the part of the Indemnified Party. The Indemnified Party will provide reasonable cooperation to the Indemnifying Party in defending any third-party Claim.

5.4 EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY OR THEIR AFFILIATES HAVE ANY LIABILITY WHATSOEVER TO THE OTHER PARTY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS, BUT NOT LIMITED TO, LOSS OF PROFIT OR REVENUE; LOSS OF USE OF THE PRODUCTS; COST OF CAPITAL; OR CLAIMS RESULTING FROM CONTRACTS BETWEEN A PARTY'S CUSTOMERS AND/OR SUPPLIERS.

6. **Term, Termination & Effects of Termination**

   6.1 Term. This Agreement shall be effective unless and until Seacret consummates, and closes on, a purchase of certain of WVM's assets as outlined in the attached Letter of Intent (the "Term"), unless terminated sooner.

   6.2 Termination.

      6.2.1 Termination for Material Breach. Either Party may terminate this Agreement upon written notice to the other Party, if such other Party materially breaches this Agreement and the breach remains uncured for a period of thirty (30) days after receipt of written notice of such breach.

   6.3 Effect of Termination. The Parties agree that the termination of this Agreement shall not prevent Seacret from continuing to solicit and have WVM Sales Representatives market and sell Seacret products and services, or release Seacret from continuing to pay such WVM Sales Representatives commissions or other compensation in connection with such sales.

7. **Confidentiality**

7.1. "Confidential Information" means this Agreement and all confidential or otherwise proprietary business and technical information relating to the Parties and their respective businesses, including, without limitation, ideas, know-how, trade secrets, production, manufacturing techniques, recipes and formulas, sources of supply, pricing, costing, and accounting procedures, and customer information. Confidential Information does not include information that is in the public domain at the time of disclosure by the disclosing Party; that enters the public domain after disclosure by the disclosing Party through no fault of the receiving Party; that was or is separately disclosed to the receiving Party by a third party not itself subject to an obligation of confidentiality to the disclosing Party with respect to such information; or that was in the receiving Party's possession at the time of disclosure by the disclosing Party.

7.2 Each Party agrees to maintain the other Party's Confidential Information in strict confidence and, except to the extent expressly permitted in this Agreement or otherwise consented to in writing by the other Party, that the Confidential Information will not be disclosed by it or its "Representatives" (defined to include affiliates, directors, shareholders, officers, employees, agents, subcontractors, consultants, members, managers, advisors, or other representatives including legal counsel, and accountants or any "Person" (defined to include individuals, partnerships, companies, limited liability companies, entities, corporations, or agents thereof) except with the specific prior written consent of the other.

7.3 The Parties agree that each of their downline organizations (i.e. names, addresses and other personally identifiable information commonly used in the MLM industry to identify members, agents and representatives of each organization) constitute their proprietary and confidential information.

**8.** **Insurance and Commissions**

8.1 During the Term of this Agreement, each Party shall maintain (i) Workers' Compensation and Employees' Liability Insurance (as required by law); and (ii) Public Liability Insurance including Contractual Liability and Products Liability Coverage with a combined single limit of not less than Five Million Dollars ($5,000,000). The insurance policies shall be claims based and name the other Party as an additional insured party and provide that at least thirty (30) days prior written notice of cancellation, amendment, or lapse of coverage shall be given to said additional insured by the insurer. Each Party will submit policies and/or certificates of insurance evidencing the above coverage to the other Party upon the other Party's reasonable written request.

8.2 During the Term of this Agreement, each Party shall timely pay any commissions due from such Party to the WVM Sales Representatives for products or services sold during the Term of this Agreement. Nothing in this

section obligates Seacret to pay commissions due from WVM to the WVM Sales Representatives, and nothing in this section obligates WVM to pay commissions due from Seacret to the WVM Sales Representatives.

9. **Reserved**

10. **Intellectual Property**

    10.1 <u>Seacret's Intellectual Property.</u> Seacret is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to Seacret's Products ("Seacret's Intellectual Property"). WVM shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how or processes from the Products or permit or encourage any third-party to do so. Unless otherwise expressly stated herein, this Agreement does not confer to WVM any intellectual property or other rights with respect to Seacret's Products, brand, formulas, packaging, or any names or logos used in connection with the Products. As between Seacret and WVM, Seacret owns and shall continue to own all such intellectual property rights.

    10.2 <u>WVM's Intellectual Property.</u> WVM is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to WVM's business ("WVM's Intellectual Property"). Seacret shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how, travel booking platforms, software, patents, formulas, or processes or permit or encourage any third-party to do so. Unless otherwise expressly stated herein, this Agreement does not confer to Seacret any intellectual property or other rights with respect to WVM's travel booking platforms, software, patents, formulas, brand, packaging, or any names or logos used in connection with the WVM's business. As between Seacret and WVM, WVM owns and shall continue to own all such intellectual property rights.

11. **Trademarks and Tradenames**

    11.1 The Parties recognize that the corporate name and respective trademarks or tradenames of the other are valuable and that all goodwill associated with use of such names and marks shall inure to the benefit of the other. Either Party shall have the right to terminate this Agreement immediately in the event that the other Party acts in a manner which would negatively impact the reputation

of such Party and/or of its name or marks and/or would infringe or dilute the value of the other Party's name or marks or which is not in compliance with applicable law in the United States or any other country in which either Party conducts business as the case may be. Each Party shall be solely responsible for the registration and maintenance of its trademarks and tradenames in the Territory. During the Term of this Agreement, each Party shall grant the other Party a revocable, limited, non-assignable license to use its corporate name, trademarks or tradenames in connection with its promotion or operation of the program described hereunder.

12. **Dispute Resolution**

    12.1 The Parties shall in good faith attempt to resolve any dispute arising out of or relating to this Agreement promptly by negotiations between executives who have authority to settle the controversy. A party may give the other parties written notice of any dispute not resolved in the normal course of business. Within 20 days after delivery of that notice, executives of the affected parties shall meet at a mutually acceptable time and place, or by teleconference and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. If the matter has not been resolved within 60 days of the disputing party's notice, or if the parties fail to meet within 20 days, either party may initiate mediation of the controversy or claim as provided in Section 12.3.

    12.2 Any controversy or claim arising out of or relating to this Agreement or the existence, validity, breach or termination thereof, whether during or after its Term, will be finally settled by compulsory arbitration in accordance with the Commercial Arbitration Rules and Supplementary Procedures for Commercial Arbitration of the American Arbitration Association ("AAA").

    12.3 To initiate arbitration, either party will file the appropriate notice at the appropriate Regional Office of the AAA. The arbitration proceeding will take place in Plano, Texas, for a period not to exceed three (3) days. The arbitration panel will consist of three (3) arbitrators, one arbitrator appointed by each Party and a third neutral arbitrator appointed by the AAA. Any communication between a Party and any arbitrator will be directed to the AAA for transmittal to the arbitrator.

    12.4 The arbitral award will be the exclusive remedy of the Parties for all claims, counterclaims, issues or accountings presented or plead to the arbitrators. The award will (i) be granted and paid in U.S. Dollars exclusive of any tax, deduction or offset and (ii) include interest from the date of breach or other violation of the Agreement until the award is fully paid, computed at the then-prevailing LIBOR rate. Judgment upon the arbitral award may be entered in any court that has jurisdiction thereof. Any additional costs, fees

or expenses incurred in enforcing the arbitral award will be charged against the Party that resists its enforcement.

13. **Miscellaneous**

   13.1 <u>Relationship of Parties</u>. Seacret and WVM are independent contractors for the purpose of this Agreement. Neither the execution, delivery nor performance of this Agreement will be construed to constitute either party as an agent or representative of the other for any purpose. Neither the execution, delivery nor performance of this Agreement will be deemed to establish a joint venture or partnership between the Parties. Except as otherwise provided herein, neither Party has the authority to (i) bind the other Party by or to any contract, representation, understanding, act or deed, (ii) represent that either Party is an agent of the other Party, or (iii) represent that either Party is responsible for the acts or omissions of the other Party.

   13.2 <u>Force Majeure</u>. The Parties shall not be responsible for any failure to perform due to unforeseen circumstances or causes beyond their reasonable control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, fires, floods, accidents, strikes, epidemics, pandemics, or shortages of transportation, facilities, fuel, energy, labor, or materials. In the event of any such delay, the Parties may defer performance hereunder for a period equal to the time of such delay.

   13.3 <u>Severability</u>. If any provision of this Agreement shall be prohibited or unenforceable by any applicable law, the provision shall be ineffective only to the extent and for the duration of the prohibition or unenforceability, without invalidating any of the remaining provisions.

   13.4 <u>Waiver</u>. The temporary, limited, or specific waiver of any term, provision, or condition of this Agreement or a breach thereof will not be considered a waiver of any other term, provision, or condition, or of any subsequent breach of the same term, provision, or condition.

   13.5 <u>Amendment</u>. This Agreement may be amended only by a written document signed by the party against whom enforcement is sought.

   13.6 <u>Assignability</u>. This Agreement shall be binding upon and be for the benefit of the Parties and their legal representatives, successors, and assigns. Neither party may assign this Agreement without the prior written consent of the other.

   13.7 <u>Choice of Law</u>. This Agreement shall be interpreted and construed in accordance with the laws of the state of Arizona, without giving effect to,

choice of law rules. The Parties consent to jurisdiction and venue in the state and federal courts located in Collin County, Texas.

13.8  Notice. All Payments must be remitted via ACH funds. All notices shall be made in writing and may be given by personal delivery, via overnight courier requiring a signature for delivery, or by certified or registered mail, return receipt requested. Notices sent by mail should be addressed as follows:

> WorldVentures Marketing, LLC
> Attn: Eric Haynes, Chief Legal Officer
> 5100 Tennyson Parkway
> Plano, Texas 75024
> Email: ehaynes@worldventures.com

> Seacret Direct LLC
> Attn: Izhak Benshabat
> 8125 N. 86th Place
> Scottsdale, AZ 85258
> Email: izhak@seacret.com

and when so addressed shall be deemed given five (5) days after deposited in the U.S. mail, first class, postage prepaid, and postmarked. In all other instances, notices, bills, and payments shall be deemed given at the time of actual delivery. Changes may be made in the names and addresses of the person to whom notices, bills, and payments are to be given by giving notice pursuant to this section.

13.9  Construction. Section headings are included for convenience but shall not form a part of the Agreement or affect the interpretation of any part hereof. The word "including" is used in this Agreement in a non-exclusive sense and, unless otherwise expressly set forth, shall be interpreted as being illustrative and not limiting.

13.10  No Third-Party Beneficiaries. Nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Agreement.

13.11  Expenses. Each party shall bear its own expenses associated with this Agreement.

13.12  Compliance. Each Party will comply with all laws relating to the performance of this Agreement including federal and state laws, rules and

regulations and represents and warrants that execution of this Agreement and performance of its obligations under this Agreement does not and will not breach any other agreement to which it is or will be a party, including but not limited to any agreements with its customers.

13.13 <u>Press Releases</u>. Neither Party shall publish any press release, make any other public announcement or otherwise communicate with any news media concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party; provided, however, that nothing contained herein shall prevent either Party from promptly making all filings with governmental authorities as may, in its judgment be required or advisable in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

13.14 <u>Counterparts & Electronic Signatures</u>. This Agreement may be signed in counterparts. A fax transmission of a signature page will be considered an original signature page. Any signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Party with the intent to sign, authenticate or accept such contract or record) hereto or to any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Texas State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act, and the parties hereby waive any objection to the contrary.

13.15 <u>Entire Agreement</u>. This Agreement embodies the entire understanding of the Parties and shall supersede all previous communications, representations or understandings either oral or written between the Parties relating to the subject matter hereof.

**ACCEPTED AND AGREED:**

| **SEACRET DIRECT, LLC:** | **WORLDVENTURES MARKETING, LLC** |
|---|---|
| By: _____ <br> Izhak Benshabat <br> Title: Managing Member | By: _____ <br> Wayne Nugent <br> Title: Chief Executive Officer |