## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | **Case No. 20-42492** |
| ***et al.*,**[1] | § | |
| | § | **Jointly Administered** |
| Debtors. | § | |

| | | |
|---|---|---|
| **SPHERATURE INVESTMENTS, LLC,** | § | **Adversary No. 21-04059** |
| ***et al.* d/b/a WORLDVENTURES** | § | |
| **HOLDINGS, LLC,** | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | |
| **SEACRET DIRECT LLC,** | § | |
| | § | |
| Defendant. | § | |

### SEACRET DIRECT LLC'S
### MOTION TO COMPEL ARBITRATION, MOTION TO DISMISS,
### AND MOTION FOR MORE DEFINITE STATEMENT

**No hearing will be conducted on this motion unless a written objection is filed with the Clerk of the United States Bankruptcy Court and served upon the party filing this pleading *WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE* shown in the certificate of service unless the Court shortens or extends the time for filing such objection. If no objection is timely served and filed, this pleading shall be deemed to be unopposed, and the Court may enter an order granting the relief sought. If an objection is filed and served in a timely manner, the Court will thereafter set a hearing with appropriate notice. If you fail to appear at the hearing, your objection may be stricken. The Court reserves the right to set a hearing on any matter.**

---

[1] The "Debtors" and the "Plaintiffs" in the above-captioned cases are:  Spherature Investments LLC ("Spherature") EIN#5471; Rovia, LLC ("Rovia") EIN#7705; WorldVentures Marketing Holdings, LLC ("WV Marketing Holdings") EIN#3846; WorldVentures Marketplace, LLC ("WV Marketplace") EIN#6264; WorldVentures Marketing, LLC ("WV Marketing") EIN#3255; WorldVentures Services, LLC ("WV Services") EIN#2220.

Seacret Direct, LLC ("Seacret") moves to compel arbitration of the Debtors' claims against Seacret in accordance with the parties' contractual agreement to do so, as mandated by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. In the alternative, Seacret moves to dismiss Debtor's claims under Federal Rule of Civil Procedure 12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012, for failure to state a claim upon which relief can be granted. In the further alternative, Seacret moves for a more definite statement under Federal Rule of Civil Procedure 12(e), made applicable by Federal Rule of Bankruptcy Procedure 7012.

## INTRODUCTION

1.      This adversary proceeding involves a commercial dispute between Seacret, a network marketing company that sells lifestyle products and services, and the Debtors, which sell travel club memberships under the "WorldVentures" trade name ("WV"). In essence, WV alleges that Seacret has engaged in an elaborate and far-fetched conspiracy to "steal" WV's travel business by somehow tricking WV and its sophisticated executives as well as multiple attorneys into entering into several agreements.

2.      WV's fictional and misleading account of the historical interactions between the parties is belied by the readily available facts and evidence, which demonstrate that all of the acts about which WV now complains were authorized by arm's length agreements between the parties and were known to and approved by WV. But before those facts can be fully adjudicated, WV's claims against Seacret face another more basic problem: WV has asserted them in the wrong venue. Indeed, the very contract that WV accuses Seacret of breaching—the parties' Limited Solicitation Agreement dated November 11, 2010 (the "LSA")—contains a valid, enforceable, and broadly worded dispute-resolution provision requiring compulsory arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement, or the existence,

validity, breach or termination thereof." The contract that governed the parties' business relationship before the LSA—the Co-Marketing Agreement dated July 22, 2020 (the "CMA," and together with the LSA, the "Agreements")—contains a substantially identical provision.

3.     As the Supreme Court has stressed over and over again in recent years, the FAA represents a strong federal policy in favor of enforcing arbitration provisions. *E.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). As explained below, the compulsory arbitration provisions that WV agreed to in the Agreements are valid and enforceable, and WV's claims against Seacret fall within their broad scope. Moreover, no federal statute or policy renders WV's claims nonarbitrable. The majority of the claims do not even arise under the Bankruptcy Code, but under state law, and compelling arbitration of all of WV's claims would not conflict with or undermine the purposes of Bankruptcy Code. For these reasons, this Court should enforce the parties' agreement to arbitrate by compelling WV to submit its claims against Seacret for compulsory arbitration under the applicable rules and procedures of the American Arbitration Association ("AAA").

## JURISDICTION AND VENUE

4.     This Court has jurisdiction to hear this matter under 28 U.S.C. § 1334 and the standing order of reference from the District Court. Seacret, however, does not concede that this Court has constitutional authority to enter final orders in this adversary case or that this adversary case is a core proceeding.

5.     The statutory predicate for relief is the FAA.

6.     Absent the agreed dispute-resolution provisions in the CMA and LSA, venue would be proper in this District under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

7.      WV's Complaint is rife with false statements and misleading narratives about the historical interactions between Seacret and WV. Contrary to WV's unfounded accusations, Seacret's communications, negotiations, and agreements with WV have always been marked by transparency and good faith.

**A.      WV, facing a sharp downturn in its business, negotiates and enters into the CMA with Seacret.**

8.      The true story begins in 2016, when WV's CEO Wayne Nugent first approached Seacret's CEO Izhak Ben Shabat about the possibility of starting a business relationship between Seacret and WV. Nugent and two of Seacret's executives, Dan Stammen and Eddie Head, flew to Phoenix, Arizona, on a couple of occasions to meet with Ben Shabat to discuss a potential "merger of equals" between our two companies. Those discussions, while friendly and productive, did not result in an agreement between Seacret and WV at that time.

9.      Several years later in the spring of 2020, Ben Shabat received word through a contact at the beauty-product company Juenesse that WV might be interested in restarting negotiations with Seacret. Ben Shabat asked one of Seacret's field managers, Muzafer Najfi, to reach out to WV. After receiving an encouraging response from Najfi, Ben Shabat emailed Nugent to follow up, and Nugent convened a conference call with Ben Shabat and Head to discuss WV's interest. As Ben Shabat learned on that call, WV at that time was experiencing a sharp downturn in its business due to the COVID-19 pandemic, was struggling to pay commissions to many of its sales representatives, and was trying to find a way to jump-start its sales to avoid a mass exodus of sales representatives and financial collapse. Nugent viewed Seacret as a potential savior for WV, and he wanted Seacret to establish WV as an affiliate so that WV could refer its members to purchase Seacret products.

10.     Eventually, after a few weeks of back-and-forth negotiations, Seacret and WV entered into a Co-Marketing Agreement dated July 22, 2020 (the "CMA"), which designated WV as an affiliate of Seacret and permitted WV to offer Seacret products under certain terms and conditions. The primary purpose of the CMA was to create another revenue stream for WV and its sales representatives while at the same time enlarging Seacret's customer base for its products. Ben Shabat led the negotiations over the CMA on behalf of Seacret. Nugent made all of the important business decisions for WV and demanded that his counter-negotiator be the person who made all of the important business decisions for Seacret. To a lesser extent, Ben Shabat also interacted (mostly by email) with Head, who appeared to have been tasked with carrying out Nugent's business decisions and circulating the various drafts of the CMA.

11.     During the negotiations over the CMA, Nugent and Ben Shabat had a number of discussions regarding Seacret's long-standing interest in establishing its own travel membership program. At one point Nugent even suggested that when the global travel industry had recovered from the pandemic, the parties should consider expanding their business relationship so that WV could fulfill the travel benefits sold by Seacret's agent. While the parties did not enter into an agreement covering travel, they did include a provision in the CMA that contemplated a later agreement on that topic.

**B.     WV's financial condition continues to deteriorate, and Seacret learns of a conspiracy by certain WV executives to take control of the company.**

12.     Several months after the CMA was executed but only a few weeks after WV began offering Seacret products to its members, Seacret started hearing rumors that WV's financial condition was continuing to deteriorate. It was also evident from Seacret's sales data that WV's sales representatives were not performing as anticipated under the CMA.

13.    Around the same time, Najfi informed Ben Shabat that he had been contacted by WV's President Bo Short to arrange a conference call involving Ben Shabat, Short, and WV's COO Michael Poates. During that call, which occurred on or about October 1, 2020, Poates told Ben Shabat that WV's financial condition was so poor that it would not be able to operate for much longer and was considering filing for bankruptcy. Poates also told Ben Shabat that he and Short intended to sideline Nugent (by threatening a criminal referral), fire Head and most of his sales team, and take control of WV. Poates then offered to facilitate the sale of WV to Seacret for $15 million. In exchange, Poates and Short wanted Ben Shabat to agree to give them and other WV executives 49% of the shares of the combined company. Needless to say, Ben Shabat was surprised and deeply concerned by the news of the potential bankruptcy, the planned "takeover," and the extent of Poates's and Short's self-dealing. He ended the call by declining their offer and resolved to communicate directly with Nugent, as the owner and CEO of WV, about the issues raised by Poates and Short.

14.    On or about October 7, 2020, Ben Shabat sent an email to Nugent, Poates, and Head expressing his concerns about a potential bankruptcy and suggesting that Seacret and WV agree to terminate the CMA. Before sending my email, Ben Shabat spoke with Poates and Short to give them notice and an opportunity to comment on his planned communication. Short was adamant that the communication not be focused on the potential bankruptcy, but on lackluster sales—otherwise, he said, Nugent and Head "would feel no responsibility." Ben Shabat then texted and called Head to ask for confirmation of the potential bankruptcy. Head appeared to be surprised by the question and denied having any knowledge of a potential bankruptcy. Head asked Ben Shabat to wait 24 hours so he could discuss the issue with Nugent and schedule a follow-up call.

15.     In Ben Shabat's follow-up conversation with Nugent and Head, Nugent strongly denied that WV was considering filing for bankruptcy, but he conceded that WV was in a precarious financial condition. Nugent also told Ben Shabat that he wanted to explore a different kind of partnership that would allow WV to keep operating while at the same time benefiting Seacret. At a later point, Ben Shabat also told Nugent about Poates and Short's scheme to take control of WV. Nugent fired Short after receiving that information but kept Poates on board because Nugent felt Poates could be "managed."

**C.     WV proposes to merge with Seacret.**

16.     In the numerous discussions that followed between Nugent and Ben Shabat (including a meeting at Nugent's house in Dallas, Texas), Nugent convinced Ben Shabat that the answer to WV's problems was not to terminate the CMA, as Ben Shabat had originally proposed, but to double down on the business relationship and consider a "merger" of the two companies. As representatives of both companies openly discussed with each other and their leading agents and sales representatives, a merger (or some other form of combination) would give both companies what they wanted: WV and its sales representatives would get a financial lifeline and new skincare and nutritional product offerings, while Seacret would get access to WV's sales representatives and a partner for a new integrated travel membership program.

17.     Nugent was strongly pushing for an agreement as soon as possible because WV's sales representatives had not been paid the commissions they had earned for months. Many of WV's sales representatives left as a result of WV's failure to pay commissions and those who remained were voicing their intent to leave the company. As Seacret discovered later, WV's failure to pay its sales representatives was a problem of its own making. Poates told Ben Shabat that WV had funds to pay sales-representative commissions, but chose to pay other creditors

instead because of concerns over an involuntary bankruptcy filing. Shockingly, Seacret later learned that WV apparently did have the funds to pay Poates, Paul Jenkins (WV's Chief Technology Officer), and Eric Haynes (WV's Chief Legal Officer) bonuses totaling almost $750,000 in August and November of 2020. Interestingly, Head, who was WV's President at the time and—according to the Complaint—the alleged criminal mastermind, was unable to finagle himself a bonus.

18.     By late October 2020, WV's bankruptcy seemed inevitable despite Nugent's earlier denials. In a discussion presided over by Nugent, Ben Shabat and their respective attorneys, the parties agreed on a two-step process where they would first enter into a solicitation agreement to try to stabilize the sales force and then Seacret would enter into a letter of intent that would be the basis of a "stalking horse" offer for WV's assets in the future bankruptcy.

19.     Around this time, and at Nugent's urging, Nugent and Ben Shabat made several presentations to WV's leading sales representatives (some of which were recorded) about the proposed combination. These presentations were intended to instill confidence that agents had products to sell on which they would be paid commissions and that WV had a viable path forward, even though these representatives had not been paid by WV in months. Importantly, during those presentations, Nugent and Ben Shabat repeatedly represented what WV's sales leaders were demanding as a precondition of staying with WV: that Seacret would launch its own travel membership program and, as part of this launch, integrate WV's "DreamTrips" and "You Should Be Here" travel programs after the combination.

**D.     WV negotiates and enters into the LSA and LOI with Seacret and then promotes Seacret as its new strategic partner.**

20.     From late October to early November 2020, attorneys for WV and Seacret negotiated the terms of a Limited Solicitation Agreement dated November 11, 2010 (the "LSA")

and a letter of intent to purchase WV's assets out of bankruptcy (the "LOI"). WV's Chief Legal Officer Eric Haynes prepared the first draft of the LOI. Seacret's outside counsel prepared the first draft of the LSA after a lengthy call that included multiple executives and attorneys from both sides, and it was based on the form of the existing CMA. Both the LSA and LOI were heavily negotiated over several days.

21.     As with the CMA, Ben Shabat led the negotiations on behalf of Seacret, and he primarily interacted with Nugent, who appeared to make all of the important business decisions for WV. Besides Nugent and Head, other representatives of WV—including Haynes, Poates, Ray Balestri of the law firm of Bell Nunnally LLP (WV's outside counsel), and Marcus Helt of the law firm of Foley Lardner LLP (WV's bankruptcy counsel)—were also directly involved in the negotiations and were copied on many of the communications concerning both agreements. For example, in a text message chain between Poates, Haynes, and Ben Shabat in early November 2020, Poates stated that he and Haynes had reviewed the LOI and were urging Nugent to sign and return it to Seacret as soon as possible. This is, of course, in stark contrast to WV's current allegations in the Complaint of a "conspiracy" led by Head.

22.     On or about November 11, 2020, Nugent (on behalf of WV) and Ben Shabat (on behalf of Seacret) signed the LSA and LOI. Executed copies of both agreements were immediately circulated to all parties and their counsel. No one objected at that time. To the contrary, the agreement was celebrated, and WV soon issued a press release (on or about November 14, 2020) describing the new business relationship as a "partnership" and "strategic alliance" in which WV's sales representatives would be "opting in" as Seacret agents so that they could be paid commissions on sales of Seacret products. The press release contained the following statement:

Like many companies with a travel centric product offering, WorldVentures has been deeply impacted during the COVID-19 pandemic and maintaining its customer base through the launch of this product line and a new enhanced agreement with Seacret allows for its representatives to enjoy additional income opportunities while maintaining the benefits of their membership community and products.

**E.    WV asks and authorizes Seacret to hire multiple high-level employees as part of a workforce reduction.**

23.    Around this time, WV was executing a workforce reduction that included multiple high-level employees. As part of this process, Nugent asked Seacret to consider hiring some of WV's employees to assist in the transition to Seacret and so that they could be removed from WV's struggling payroll. Poates also made the same request. For example, on a call with Ben Shabat on November 17, 2020, Poates repeatedly requested that Seacret hire several WV employees in order to help avoid costly severance payments and WARN Act issues. Further, Poates said that WV would provide a list of employees to be released for Seacret to hire.

24.    The following day, Haynes sent an email to Seacret's outside counsel formally approving Seacret's recruitment of certain WV employees and confirming that WV was "waiving" any anti-solicitation rights it might have with respect to those employees under § 1.5 of the LSA. The "waiver" covered ten current WV employees (including Eddie Head and Justin Call) and three former WV employees. Nugent and Poates were copied on the email, and Poates responded with "Thank you!" Interestingly, Haynes (who, as WV's Chief Legal Officer, is the person in charge of interpreting and enforcing WV's employee rights) himself applied for a job at Seacret in late October 2020. Of course, WV has now sued Seacret for hiring Head (and sued Head and is now attempting to enjoin him from his employment at Seacret) and failed to mention any of these facts in its Complaint.

**F.    Seacret begins negotiating a purchase agreement for WV's assets in reliance on WV's previous commitments.**

25.    Following the public announcement of the LSA, and throughout November and into December 2020, WV and Seacret negotiated the terms and conditions of an asset purchase agreement that would be presented in WV's imminent bankruptcy as a "stalking horse" bid for WV's assets (the "APA"). WV's bankruptcy counsel, along with Seacret's outside counsel, drafted the APA. During that time, and as expressly authorized by the LSA, Seacret began registering WV sales representatives as Seacret agents so that they could begin selling Seacret products and services and receive commissions for these sales directly from Seacret. Under the LSA, WV is entitled to receive a royalty from Seacret based on the gross amount of these sales. Seacret has paid $747,835.30 in royalties to WV to date and $701,438.35 in royalties since WV filed for bankruptcy. WV continues to receive and accept the royalties paid by Seacret.

26.    As the two sides were going back and forth trying to finalize the APA, Poates called Ben Shabat and urged him to consider including Rovia in Seacret's offer. Poates also represented that if Seacret offered to give him and several other current WV executives an ownership stake in Rovia, he would make sure that a sale of Rovia would be consummated. He also reiterated his plan to push Nugent out of the company. In two later calls between Ben Shabat and Poates, Poates repeated his proposal, including volunteering that he had "pre-borrowed" $1 million to invest in the transaction and that Rovia's "stock will sky rocket" after closing. Seacret did not agree to Poates's scheme and did not include Rovia in its purchase offer at that time.

**G.    Seacret hires Eddie Head, as previously authorized by WV.**

27.    On or about December 30, 2020, Ben Shabat received a call from Head, who stated that he had been forced to resign from WV. While Seacret had always anticipated that Head—along with Nugent and several other WV employees—would eventually join Seacret as

part of the transition contemplated by the LSA and LOI, no one at Seacret had previously had a discussion with Head about his employment at Seacret. During the call, and as expressly permitted by WV back in November 2020, Ben Shabat offered a job to Head, although they did not discuss his position or job responsibilities in detail. Ben Shabat had gotten to know Head over the previous few months, thought highly of him, and knew that his professional skills and experience would be a good fit for Seacret.

28.    When Head officially joined Seacret in early January 2021, he was assigned to work on project development, especially with respect to the development of new marketing and sales tools, hiring and grooming a new executive team to support Seacret's growing business, including a chief legal officer and sales leaders in Europe, Central America, and South America, supporting the opening of Seacret's Hong Kong business, and developing a project management team and business practices to support enterprise-level demands. After Seacret's Chief Strategy Officer Tyler Williams left the company on or about January 20, 2021, Seacret asked Head to take that role on a temporary basis. Head now holds the title of President.

29.    Contrary to WV's allegations in its Complaint, Seacret did not hire Head to create or launch a new travel membership program because at that time Seacret was still under the impression that WV intended to honor its commitment to collaborate with Seacret on the integrated travel membership program envisaged by the LSA and LOI. Head is not responsible for the overall performance of Seacret and has no role in product development. Since joining Seacret, Head has never had any duties or oversight regarding any travel benefits offered by Seacret and has not been involved in the development of a travel membership program. Moreover, Head has never disclosed to anyone at Seacret any of the confidential or proprietary information now claimed by WV. To the extent Seacret is in possession of any of the

confidential or proprietary information now claimed by WV, Seacret obtained that information

directly from WV as a result of the performance of the CMA and LSA.

**H.    WV files for bankruptcy and inexplicably refuses to continue negotiating the asset purchase agreement with Seacret.**

30.    On or about December 21, 2020, WV and its affiliates filed for bankruptcy.

31.    Shortly after the bankruptcy was filed, WV inexplicably dropped Seacret's

purchase offer despite the fact that the APA had been finalized and was ready to present to the

Court once the disclosure schedules were prepared. WV also suspended Seacret's access to the

data room that had been set up for parties interested in bidding on WV's assets on the pretext that

Seacret did not have a nondisclosure agreement (although the LOI included confidentiality

provisions and Seacret had been provided information under those provisions for weeks), and

WV thereafter refused to negotiate a nondisclosure agreement. In other words, WV cut Seacret

off from the bidding process and denied its access to the data it needed to improve its bid. At the

same time, WV shared the confidential LOI between Seacret and WV with other potential

bidders, presumably in order to entice them to make an offer. Finally, on or about January 28,

2021, WV sent out a notice to its sales representatives stating that there would be no merger

between WV and Seacret and that WV would only allow its sales representatives to sell Seacret

products, as outlined in the LSA, until such time as the global travel industry rebounded.

32.    As an odd—but unsurprising—coda, on or about February 26, 2021, Dan

Stammen, a former president of WV, hosted a Zoom call with various Seacret and WV sales

representatives. On this call, Stammen made numerous disparaging comments about Seacret and

presaged the exact litigation that WV filed against Seacret a week later. Stammen also told the

attendees that he was coming back to WV as CEO and that he had a deal to take the company out

of bankruptcy. When asked who would be staying at WV in connection with his deal, Stammen

replied that Michael Poates, Eric Haynes and Paul Jenkins would run the business.

## MOTION TO COMPEL ARBITRATION

### Relevant Facts

**A.    The CMA and LSA contain broadly worded dispute-resolution provisions requiring compulsory arbitration.**

33.    Before filing for bankruptcy on December 21, 2020, WV entered into two

agreements with Seacret governing their business relationship: the CMA and LSA. Absent those

agreements, WV and Seacret would have no legal relationship with each other. The CMA and

LSA are each governed by Arizona law, without giving effect to choice-of-law rules. *See* CMA

(ECF No. 1-5) § 13.7; LSA (ECF No. 1-7) § 13.7.

34.    The CMA and LSA each contain substantively identical dispute-resolution

provisions requiring compulsory arbitration:

> 12.2    **Any controversy or claim arising out of or relating to this Agreement or the existence, validity, breach or termination thereof, whether during or after its Term**, will be finally settled by compulsory arbitration in accordance with the Commercial Arbitration Rules and Supplementary Procedures for Commercial Arbitration of the American Arbitration Association ("AAA").

> 12.3    To initiate arbitration, either party will file the appropriate notice at the appropriate Regional Office of the AAA. The arbitration proceeding will take place in Phoenix, Arizona, for a period not to exceed three (3) days. The arbitration panel will consist of three (3) arbitrators, one arbitrator appointed by each Party and a third neutral arbitrator appointed by the AAA. Any communication between a Party and any arbitrator will be directed to the AAA for transmittal to the arbitrator.

> 12.4    The arbitral award will be the **exclusive remedy of the Parties for all claims**, counterclaims, issues or accountings presented or plead to the arbitrators. . . .

CMA §§ 12.2-12.4 (emphases added); *accord* LSA §§ 12.2-12.

**B.     The Complaint primarily consists of non-core claims.**

35.     WV's Complaint asserts a number of non-bankruptcy claims, most of which arise under state law, against Seacret, (the "Non-Bankruptcy Claims"). The Non-Bankruptcy Claims include:

(a)     tortious interference with an existing contract under state law (in connection with Seacret's exercise of its rights under the LSA and with Seacret's employment of Eddie Head);

(b)     aiding and abetting a breach of fiduciary duty under state law (alleging that the LSA and LOI were part of a "conspiracy" spearheaded by Eddie Head);

(c)     trademark infringement (notwithstanding that the LSA grants a license to Seacret to use WV's trademarks in § 11.1);

(d)     harmful access by a computer under Texas law (even though Arizona law applies to the parties' relationship under § 13.7 of the CMA and LSA);

(e)     conversion under state law;

(f)     an unknown cause of action entitled "misappropriation of effort";

(g)     fraudulent transfer under state law (seeking avoidance of the LSA);

(h)     breach of the LSA under state law (and potentially the CMA and LOI as well); and

(i)     related requests for declaratory judgments and injunctive relief.

36.     WV also requests ancillary relief under the Bankruptcy Code (the "Fraudulent Transfer Claims" and together with the Non-Bankruptcy Claims, the "Claims"). The Fraudulent Transfer Claims include:

1.     state-law fraudulent-transfer claims brought under § 544(b);

2.     constructive fraudulent-transfer claims brought under § 548; and

3.     liability related to those claims under § 550.

37.     Each of the Fraudulent Transfer Claims depends upon a determination of state contract law or state fraudulent-transfer law. In fact, the Fraudulent Transfer Claims specifically assert that the LSA was a so-called fraudulent transaction.[2]

## Argument

38.     The Federal Arbitration Act requires courts to enforce arbitration agreements according to their terms without exception. *See* 9 U. S. C. § 2; *see Epic Sys.*, 138 S. Ct. at 1621 ("The [FAA] establishes a liberal federal policy favoring arbitration agreements") (cleaned up). "There is a strong presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus.,* Inc., 362 F.3d 294, 297 (5th Cir. 2004).

39.     In the Fifth Circuit, courts generally perform a two-step inquiry to determine whether parties should be compelled to arbitrate a dispute. The first step asks whether there is a valid arbitration agreement under state law, and the second steps asks whether the parties' dispute falls within the scope of that agreement. *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009). But when a valid arbitration agreement contains a delegation clause, as is the case here, the arbitrability question—that is, the question of whether the dispute is covered by the arbitration agreement—is left to the arbitrator, meaning that the court's only duty is to decide whether there is a valid arbitration agreement. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.").

---

[2] Compl. (ECF No. 1) ¶¶ 107-136. The Complaint defines "Fraudulent Obligations" as the transaction that occurred under the LSA. *See id.* at ¶ 36.

---

40.     According to the United State Supreme Court, the arbitration inquiry should end after these two questions have been answered. *Id.* Under Fifth Circuit precedent, however, bankruptcy courts may decline to enforce otherwise enforceable arbitration agreements only if two additional requirements are met. First, "the proceeding must adjudicate statutory rights conferred by the Bankruptcy Code and not the debtor's prepetition legal or equitable rights." *Henry v. Educ. Fin. Serv. (In re Henry),* 944 F.3d 587, 590-91 (5th Cir. 2019) (citing *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069 (5th Cir. 1997)). Second, arbitration must conflict with the purposes of the Bankruptcy Code. *Id.* at 591 (citing *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495 (5th Cir. 2002)).

41.     Here, the arbitration agreements between WV and Seacret in the CMA and LSA should be enforced. Those agreements are valid under state law, and Debtors cannot overcome the presumption in favor of arbitration. Therefore, this Court should grant this motion and compel arbitration of this dispute.

**A.      The arbitration provisions are valid and enforceable under the FAA.**

42.     The FAA governs written arbitration agreements in any contract evidencing a transaction involving commerce. 9 U.S.C. § 2. The Agreements undisputedly evidence commerce, and therefore, the arbitration provisions are enforceable under the FAA. In fact, the Complaint is entirely based on allegedly wrongdoing that took place in connection with the Agreements.

**1.      The arbitration provisions are presumed to be valid.**

43.     Under the FAA, a court must direct the parties to proceed to arbitration when they have a written agreement to do so. 9 U.S.C. § 4; *see also Dean Whitter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "[A] written arbitration agreement is prima facie valid and must be

<u>enforced</u> unless the opposing party . . . alleges and proves that the arbitration clause itself was a product of fraud, coercion, or such grounds as exist at law or in equity for the revocation of the contract." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 341 (5th Cir. 2004) (emphasis added). As acknowledged by WV in its Complaint, the Agreements are "valid and enforceable contracts." Compl. ¶ 142. In any event, the Agreements, which are attached to the Complaint and contain the arbitration provisions, are presumed to valid and enforceable.

44.     To the extent further analysis regarding validity is required, courts apply ordinary state-law contract principles. *See Webb v. Investacorp, Inc.,* 89 F.3d 252, 258 (5th Cir. 1996). Arizona law, which governs the Agreements, *see* CMA § 13.7 (governed by Arizona law) *and* LSA § 13.7 (governed by Arizona law), requires the enforcement of valid arbitration agreements. *See* A.R.S. § 12-1501 ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract."); *see also Webb*, 89 F.3d at 258 ("in applying state law, however, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration") (internal citation omitted).

45.     To satisfy the FAA and Arizona law, Seacret need only show that WV and Seacret entered into an agreement to arbitrate. Each of the arbitration provisions in the Agreements undeniably forms an agreement to arbitrate. Further, the Agreements are expressly

enforceable against WV[3] and Seacret in accordance with their terms.  CMA §§ 4.1.2 & 4.2.2;

*accord* LSA §§ 4.1.2 & 4.2.2.

### 2.    WV's Claims fall within the scope of the arbitration provisions.

46.    Because the parties clearly agreed to arbitrate the arbitrability of WV's Claims,

this Court's inquiry should end after finding that the arbitration provisions are valid. The dispute-

resolution provisions in the CMA and LSA incorporate the AAA rules, which provide that the

arbitrability question is delegated to the arbitrators.

> [A]n arbitration agreement that incorporates the AAA Rules presents clear and
> unmistakable evidence that the parties agreed to arbitrate arbitrability. Under
> AAA Rule 7(a), [t]he arbitrator shall have the power to rule on his or her own
> jurisdiction, including any objections with respect to the existence, scope, or
> validity of the arbitration agreement or to the arbitrability of any claim or
> counterclaim.

*Archer & White Sales, Inc. v. Henry Schein, Inc.,* 935 F.3d 274, 279-80 (5th Cir. 2019) (internal

citations omitted).

47.    Additionally, unlike in *Henry Schein*, in this case there are no claims or types of

relief carved out from the arbitration agreement. *Id*. at 281-82. ("The plain language incorporates

the AAA rules—and therefore delegates arbitrability—for all disputes except those under the

carve-out. Given that carve-out, we cannot say that the Dealer Agreement evinces a 'clear and

unmistakable' intent to delegate arbitrability."). In fact, the Fifth Circuit's *Petrofac* decision,

---

[3] The Complaint also specifically asserts that all "Plaintiffs" executed the CMA and LSA.
Compl. ¶ 32. "[F]actual assertions in pleadings are ... judicial admissions conclusively binding
on the party that made them." *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir.
1983).  As further explained below, the Complaint purports to name all of the Debtors as
plaintiffs, including for a breach of contract claim related to the Agreements, but does not meet
Rule 8's pleading requirements as to each plaintiff.  In any event, because each plaintiff relies on
the Agreements as the basis of their Claims, all of them can be compelled to arbitrate. *See Wash.
Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004) (applying equitable estoppel to
a non-signatory plaintiff attempting to enforce an agreement that contained an arbitration
agreement).

discussed by the *Henry Schein* panel on remand, contains an arbitration provision similar to the ones here, without any carve-outs that expressly incorporate the AAA rules and the delegation of arbitrability to the arbitrators. *See Petrofac, Inc. v. DynMcDermott Petro. Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("Here, the parties expressly incorporated into their arbitration agreement the AAA Rules. These rules state that the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement. We agree with most of our sister circuits that the express adoption of these rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.") (internal citations omitted) (also collecting cases).

48.     Under Fifth Circuit precedent, this Court should not opine on the arbitrability of the Claims. Out of an abundance of caution, however, Seacret notes that the arbitration provisions by their plain language cover all conceivable actions related to the Agreements. Additionally, "a dispute arises out of or relates to a contract if the legal claim underlying the dispute could not be maintained without reference to the contract." *Tittle v. Enron Corp.*, 463 F.3d 410, 422 (5th Cir. 2006) (internal citations omitted).

49.     The factual basis for WV's Claims are the Agreements.[4] The parties' relationship derives exclusively from the Agreements. In fact, WV's own narrative in the Complaint begins

---

[4] To the extent certain causes of action do not specifically discuss the Agreements, it is important to note that the Fifth Circuit has held that "whenever the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration." *Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 755 (5th Cir. 1993); *see also Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) ("[O]nce a court determines that an agreement to arbitrate exists, the court must pay careful attention to the strong federal policy favoring arbitration and must resolve all ambiguities in favor of arbitration."). Further, the factual allegations in the Complaint, rather than the legal cause of action determine whether a claim falls within the scope of an arbitration clause. *Colt Unconventional Res., LLC v. Resolute Energy Corp.*, No. 3:13-CV-1324-K, 2013 U.S. Dist. LEXIS 102411, at *15 (N.D. Tex. July 19, 2013) (citing *Prudential Sec. Inc. v. Marshall*, 909

with execution of the CMA. *See* Compl. ¶ 4. WV's narrative further explains how the parties' relationship evolved from the CMA to the LSA. *Id.* at ¶¶ 4-6 & 32-44. WV's theory of the case seems to be that Seacret used the Agreements to gain access to WV and "steal" its business. The Fraudulent Transfer Claims (counts 8-10) allege that the LSA itself is a fraudulent transfer. *Id.* at ¶¶ 109-140. Count 11 is a breach-of-contract claim alleging that Seacret breached the Agreements and the LOI. *Id.* at ¶¶ 141-146. Count 7 seeks a declaratory judgment related to the LSA. *Id.* at ¶¶ 105-108. While Secret disputes many of the factual and legal allegations in the Complaint, it cannot be disputed that the parties' relationship derives from the Agreements and that arbitrators will be asked to rule on not only accuracy of the facts contained in the Complaint, but also whether the Agreements permitted Seacret to take many of the actions described by the Complaint.[5]

## B.  The Bankruptcy Code does not preclude enforcement of the arbitration provisions.

50.     A party opposing arbitration bears the heavy burden of proving that a statute or policy supersedes the general applicability of the Federal Arbitration Act. *Epic Sys.*, 138 S. Ct. at 1624. This burden is particularly heavy in light of strong statements from the Supreme Court in recent years upholding arbitration agreements in the face of alleged conflicts between the FAA

---

S.W.2d 896, 900 (Tex. 1995)). Here, "[w]here the arbitration clause is broad, it is only necessary that the dispute touch matters covered by the agreement to arbitrate." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1068 (5th Cir. 1998).

[5] To the extend WV requests injunctive relief. Such injunctive relief is the within the providence of the arbitration panel. Seacret reserves the right to contest the Court's ability to enter injunctive relief after ordering arbitration of Complaint. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,* 726 F.2d 1286, 1292 (8th Cir. 1984*)* ("[W]here the Arbitration Act is applicable and no qualifying contractual language has been alleged, the district court errs in granting injunctive relief."); *Grasso Enters., LLC v. CVS Health Corp.,* 143 F. Supp. 3d 530, 543 (W.D. Tex. 2015); *N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, Civil Action No. 4:17-CV-00062, 2017 U.S. Dist. LEXIS 84687, at *10 (E.D. Tex. June 2, 2017).

and other federal statutes. *Id*. at 1627 ("In many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected every such effort to date (save one temporary exception since overruled), with statutes ranging from the Sherman and Clayton Acts to the Age Discrimination in Employment Act, the Credit Repair Organizations Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations Act.").

51.     "A bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings." *Gandy*, 299 F.3d at 495. Even "core" bankruptcy proceedings are not inherently excluded from arbitration. *See Nat'l Gypsum*, 118 F.3d at 1067 ("Certainly not all core bankruptcy proceedings are premised on provisions of the Code that 'inherently conflict' with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code . . . , the core/non-core distinction is a practical and workable one it is nonetheless too broad.") (internal citations omitted).

52.     The propriety of enforcing an arbitration agreement in the context of a bankruptcy proceeding depends on the underlying nature of the claims. Under the *National Gypsum* test for enforcing arbitration agreements in bankruptcy proceedings, courts must determine: (a) whether the claims arise exclusively from the Bankruptcy Code; and if so, (b) whether arbitration of the proceeding would undermine the policies of the Bankruptcy Code. *See Gandy*, 299 F.3d at 495; *see also Nat'l Gypsum*, 118 F.3d at 1067. If either element of this two-part test cannot be answered in the affirmative, compelling arbitration is warranted. *See Gandy*, 299 F.3d at 495

("[I]t is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings").

### 1.    The majority of the Claims do not arise from the Bankruptcy Code.

53.    Where claims arise primarily from a Debtors' "pre-petition legal rights rather than entirely from federal rights conferred by the Bankruptcy Code," those claims cannot be characterized as "core." *Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys*., No. H-14-2086, 2015 U.S. Dist. LEXIS 169257; at *27 (S.D. Tex. December 18, 2015); 11 U.S.C. § 157(b)(2).

54.    Each of the Non-Bankruptcy Claims stem from a non-bankruptcy claim, remedy, or cause of action. The only arguably core claims are the Fraudulent Transfer Claims. Even these, however, are arguably statutorily core claims that are not necessarily within this Court's constitutional authority, nor are they the predominate causes of action asserted in the Complaint. *See Stern v. Marshall*, 564 U.S. 462, 482 (2011); *see also* 5 Debtor-Creditor Law § 42.10 [3](2021) (discussing the split of authority as to whether fraudulent transfer claims, under both state and bankruptcy law, are *Stern* claims).[6] The Fraudulent Transfer claims are still derived from the parties' pre-petition legal rights, rather than entirely from the Bankruptcy Code. Therefore, they also should not be characterized as "core" for these purposes. *Elite Precision*, 2015 U.S. Dist. LEXIS 169257; at *28 ("Even analyzed as 'core' for these purposes, [the Plaintiff's] claims fail the first prong of *National Gypsum* because they derive from [the Plaintiff's] pre-petition legal rights rather than entirely from federal rights conferred by the Bankruptcy Code.").

---

[6] Under *Stern*, the Court would also lack constitutional authority to adjudicate the Non-Bankruptcy Claims without Seacret's consent. Seacret does not consent to such adjudication.

55.     Because WV's Claims do not arise in or under the Bankruptcy Code, they fail the first element of the two-part *National Gypsum* test. Accordingly, this Court does not have discretion to refuse to compel the arbitration provisions, and this Court should direct WV and Seacret to arbitrate the Claims.

**2.     Enforcing the arbitration provisions will not undermine the Bankruptcy Code.**

56.     In addition to failing the first element of the *National Gypsum/Gandy* test, the Claims fail the second element as well: arbitrating the Claims will not offend the policy goals of the Bankruptcy Code. Courts have enumerated several policy goals of the Bankruptcy Code that arbitration may frustrate. These policy goals include: (1) the equitable and expeditious distribution of assets of the debtors' estate; (2) centralized resolution of pure bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation, and (4) the undisputed power of a bankruptcy court to enforce its orders. *See Nat'l Gypsum*, 118 F.3d at 1069.

57.     Because WV's Claims fail the first element of the *National Gypsum/Gandy* test, arguments related to the second element of the test do not change the conclusion that this Court should compel arbitration here. Nevertheless, the second element of the *National Gypsum/Gandy* test also mandates arbitration.

58.     Here, arbitration will not disturb any of the policy goals typically identified by *National Gypsum*. Compelling arbitration of the Claims will not threaten expeditious and equitable distribution of the Debtors' assets, as this adversary case does not implicate assets of the Debtors' estates, other than the Claims. This is not the case of an adversary proceeding (and potential arbitration) that also seeks to adjudicate a proof of claim and offset the debtor's claim against the creditor's proof of claim. *Cf. Acis Capital Mgmt., GP, LLC v. Highland Capital*

*Mgmt., L.P. (In re Acis Capital Mgmt., L.P.),* 600 B.R. 541, 558 (Bankr. N.D. Tex. 2019) (declining to compel arbitration of a small sub-set claims alleged by the reorganized debtor in the context of a claim objection and thirty-plus count adversary). Further, an arbitration can proceed as expeditiously as an adversary proceeding, if not more so, and can be significantly less costly.[7]

59.      Arbitration of this adversary proceeding will not impact pure bankruptcy issues because, as stated above, this proceeding includes mostly Non-Bankruptcy Claims, which are outside this Court's constitutional authority. Further, the main bankruptcy case will continue unaffected by this adversary proceeding. This is not the case of a party-in-interest trying to arbitrate a plan or an involuntary petition. *Cf. Neutra, Ltd. v. Terry (In re Acis Capital Mgmt., L.P.),* 604 B.R. 484, 503 (N.D. Tex. 2019) (noting that the bankruptcy court declined to order the arbitration of an involuntary petition).

60.      Given the breadth of the arbitration provisions, there is no threat of piecemeal litigation because all aspects of this adversary proceeding are subject to arbitration and there are no other similarly situated contract counter-parties. *Cf. In re Mirant Corp.,* 316 B.R. 234, 241 (Bankr. N.D. Tex. 2004) (declining to compel arbitration related to a rejected executory contract as many of the other rejected contracts contained similar arbitration provisions).

61.      Finally, this adversary proceeding does not concern this Court's own orders. *Cf. Zimmerli v. Ocwen Loan Servicing, LLC,* 432 B.R. 238, 242 (Bankr. N.D. Tex. 2010) (declining to compel arbitration of an adversary complaint that alleged an automatic stay violation, contempt of court for violation of the bankruptcy court's order, and improper and unauthorized fees in violation of Bankruptcy Rule 2016, among other causes of action).

---

[7] https://go.adr.org/impactsofdelay.html

62.     Accordingly, because arbitration here will not frustrate any objective of the Bankruptcy Code, this Court should compel WV and Seacret to arbitrate.

## MOTION TO DISMISS

63.     If, despite the parties' expressed agreement to arbitrate, this Court declines to order the parties to arbitration, Seacret moves to dismiss the Complaint in its entirety.

### Applicable Law

**A.      WV must state a claim upon which relief can be granted.**

64.     Federal Rule of Civil Procedure ("FRCP") 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure ("FRBP") 7012, provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted." The Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), provide a framework for the factual allegations that a complaint must contain to survive a motion to dismiss under FRCP 12(b)(6). *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). Both the *Iqbal* and *Twombly* decisions emphasize that a claim for relief under FRCP 8 must provide enough facts to state a claim for relief that is "plausible on its face." *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570; *see also Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

65.     Determining if a plausible claim has been well-pleaded is "context-specific, requiring the reviewing court to draw on its experience and common sense." *See Iqbal,* 556 U.S. at 663-64. According to the Supreme Court, the plausibility standard is not the same as a "probability requirement," but requires more than a "sheer possibility that a defendant has acted unlawfully." *See Iqbal*, 556 U.S. at 678. A claim has "facial plausibility" if the moving party pleads factual content that allows the court to draw a "reasonable inference" that the non-moving

party is liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678. In the context of Rule12(b)(6), this Court must accept all well-pleaded facts in the Complaint as true and view all facts in the "light most favorable to the plaintiff." *See Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 338 (5th Cir. 2008). But mere "threadbare recitals" of the elements of a cause of action that are supported by mere conclusory statements are not sufficient. *See Iqbal*, 556 U.S. at 678. Rather, legal conclusions must be "supported by factual allegations." *Id.* at 679.

**B.     The Complaint is partially subject to a heightened pleading standard.**

66.     FRCP 8, which governs pleading requirements, is incorporated into Bankruptcy Rule 7008. In relevant part, FRCP 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

67.     FRCP 9(b), made applicable here by FRBP 7009, imposes a ***heightened*** pleading standard with respect to allegations of fraud or mistake, including the fraudulent transfer claims alleged by WV. *See* Fed. R. Civ. P. 9(b) ("[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"). "When the FRCP 9(b) pleading standard applies, the complaint must contain factual allegations stating the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *See Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 117 (5th Cir. 2019) (citing *Tuchman v. DSC Communications Corp*., 14 F.3d 1061, 1068 (5th Cir. 1994)). Essentially, WV "must plead the who, what, when, where, and why as to the fraudulent conduct." *See id*. at 117.

68.     WV's allegations related to fraudulent transfers should be required to the heightened pleading standard of FRCP 9(b). The Fifth Circuit has not affirmatively decided that FRCP 9(b) applies to fraudulent transfers, however, it recently acknowledged that there is a

circuit split on this topic and noted that courts in the Fifth Circuit are not uniform in their application of FRCP 9(b) to fraudulent transfer claims. *See Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 118 (5th Cir. 2019) (collecting the diversity of opinions on the subject). In noting that it has not decided the issue, the Fifth Circuit stated, "two of our sister circuits have held that constructive fraudulent transfer claims are subject to Rule 9(b)…no other circuits appear to have directly addressed the issue." *Id.* at 120 (citing *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997); *Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 n. 6 (8th Cir. 2018)). This Court should follow the only Circuit courts that have decided the issue and apply the heightened pleading standard to the fraudulent transfer claims. *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1297 (4th ed. 2020) ("Claims of fraudulent transfer or fraudulent conveyance are also subject to the heightened standard of Rule 9(b).").

## Argument

69.     As an initial matter, there is very little law referenced in the Complaint. What little law is referenced is largely Texas state law. But this is not the applicable law for any dispute between the parties. As explained above, the Agreements contain choice-of-law provisions stating that they are governed by ***Arizona*** law without giving effect to choice-of-law rules.[8] This Court is therefore required to apply Arizona law. Both the federal and Texas's

---

[8] While the Fifth Circuit has not decided whether the forum or federal choice-of-law rules apply, most bankruptcy courts in Texas "apply choice-of-law rules of the forum in which they sit over state-law claims that do not implicate federal policy." *ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 60-61 (S.D. Tex. 2007) (collecting cases); *see also Moser v. Navistar Int'l Corp.*, Civil Action No. 4:17-CV-00598, 2019 U.S. Dist. LEXIS 31694, at *12 (E.D. Tex. Feb. 28, 2019) (collecting cases). Under a Texas state choice-of-law analysis, "actions involving the internal affairs of a foreign corporation are governed by the law of the state of incorporation." Tex. Bus. Orgs. Code § 1.105; *see also In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007). Under Texas's and Arizona's choice-of-law rules, the state of incorporation determines

choice-of-law rules require Courts to apply the law of the contractual choice-of-law provisions. *See Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004) ("In Texas, contractual choice-of-law provisions are typically enforced.") (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677-78 (Tex. 1990)); s*ee also Great Lakes Reinsurance (UK) PLC v. Durham Auctions Inc.*, 585 F.3d 236, 242 (5th Cir. 2009).

70.     WV alleges that each of the Debtors is a plaintiff and each has the same cause of action and same harm. Thus, the Complaint alleges only general harm to the Debtors, while disregarding their corporate separateness. This type of general harm does not meet the requisite pleading standard as it has not been sufficiently alleged that each Plaintiff is entitled to relief. *See* FED. R. CIV. P. 8(a)(2); *see also Greene v. Mobil Oil Corp.*, 188 F.R.D. 430, 432 (E.D. Tex. 1999) ("[n]owhere . . . has there been a short, concise statement of any *individual* plaintiff as to the type of damages claimed, the party or parties responsible, [or] the act, omissions, or emissions of a *specific* defendant causing such damages") (emphasis added). As to each cause of action in the Complaint, the Debtors fail to meet the requisite pleading standard and state actionable claims due to the general, non-specific allegations.

**A.     Cause of Action One:  Tortious Interference with Existing Contracts, Fails to State a Claim.**

71.     Under Arizona law, applicable to the Complaint pursuant to the Agreements, in order to state a claim for tortious interference with an existing contract the "plaintiff must show [1] the existence of a valid contractual relationship or business expectancy; [2] the interferer's

---

fiduciary duties. *See Reed v. Linehan (In re Soporex, Inc.), 463* B.R. 344, 404 (Bankr. N.D. Tex. 2011); *CLN Props., Inc. v. Republic Servs.*, 688 F. Supp. 2d 892, 897 (D. Ariz. 2010); *Amerco v. Shoen,* 184 Ariz. 150, 152 n. 1, 907 P.2d 536, 538 n. 1 (Ct. App. 1995); Restatement 2d of Conflict of Laws, § 309 (2nd 1988). Therefore, Nevada law (the state of incorporation for all of the Debtors) determines Count Two. Compl. ¶ 20.

knowledge of the relationship or expectancy; [3] intentional interference inducing or causing a breach or termination of the relationship or expectancy; and [4] resultant damage to the party whose relationship or expectancy has been disrupted. . . . [5] In addition, the interference must be improper as to motive or means before liability will attach." *Neonatology Assocs. v. Phx. Perinatal Assocs.*, 216 Ariz. 185, 164 P.3d 691 (Ct. App. 2007) (internal citations omitted); *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 34, 730 P.2d 204, 211 (1986).

72.    The Debtors' tortious-interference claim fails as it does not state which contract or contracts are at issue, particularly as it relates to "employees," "vendors/suppliers," and "members/customers."  Compl. ¶ 66. The Debtors assert that general contracts are at issue. As it is not clear what contract or contracts are in dispute, the remaining requirements for the foregoing claim have not been met. For example, the Complaint does not assert that there was a breach or termination of any of the aforementioned ambiguous "contracts." Given this deficiency, the claim should be dismissed.

**B.    Cause of Action Two:  Knowing Participation / Aiding and Abetting Fiduciary Breach, Fails to State a Claim and the Debtors Fail to Join a Required Party.**

73.    Under Nevada law, applicable herein because the Debtors are Nevada entities, in order to assert a claim for aiding and abetting a breach of fiduciary duty the Plaintiffs must assert: "aiding and abetting the breach of a fiduciary duty has four required elements:  (1) there must be a fiduciary relationship between two parties, (2) that the fiduciary breached, (3) the defendant third party knowingly and substantially participated in or encouraged that breach, and (4) the plaintiff suffered damage as a result of the breach." *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 130 Nev. 801, 812-13, 35 P.3d 190, 198 (2014).

---

74.     The Complaint does not state in non-conclusory terms the fiduciary relationship between Head and the Debtors, how that relationship was allegedly breached, and how Seacreat knowingly and substantially participated or encouraged such breach.

75.     Further, pursuant to FRCP 12(b)(7), the Debtors' failure to join Head, should result in the dismissal of this cause of action. *See Two Shields v. Wilkinso*n, 790 F.3d 791, 798 (8th Cir. 2015) (finding the party allegedly breaching its fiduciary duty should be joined in a suit alleging aiding and abetting breach of fiduciary duty).

**C.     Cause of Action Three:  Trademark Infringement, Fails to State a Claim.**

76.     To state a claim for trademark infringement, a plaintiff must allege that another person has used "(1) any reproduction, counterfeit, copy or colorable imitation of a mark (2) without the registrant's consent (3) in commerce (4) in connection with the sale, offering for sale, distribution or advertising of any goods (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Svc. Merchandise Co. v. Svc. Jewelry Stores, Inc.*, 737 F. Supp. 983, 991 (S.D. Tex. 1990); 15 U.S.C. § 1114(1).

77.     WV has failed to allege specific facts regarding what trademarks were violated, how such trademarks were violated, which entity owns such trademark, and that any use by Seacret was without consent.

78.     The failure to plead lack of consent is particularly notable. The LSA, which is attached to the Complaint, provides a license to use trademarks in section 11.1. Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("Although the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's

claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim."); *see also Kaye v. Lone Star Fund V (U.S.), L.P.,* 453 B.R. 645, 662 (N.D. Tex. 2011). So the Complaint itself negates the elements of the alleged infringement claim.

**D.      Cause of Action Four:  Harmful Access by Computer, Fails to State a Claim.**

79.      As stated above, Arizona law is applicable to the relationship between the Debtors and Seacret. Therefore, claims based on Texas state law, including "Harmful Access by Computer," which do not have correspondence causes of action under Arizona law, should be dismissed. *See Tessier v. H.S. Anderson Trucking Co.,* 713 F.2d 135, 136 (5th Cir. 1983).

80.      Additionally, the LSA specifically authorizes the complained of computer access. Dismissal under Rule 12(b)(6) is appropriate when a successful affirmative defense is conclusively established on the face of the Complaint. *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006). In the context of a motion to dismiss the Court may consider items attached to the Complaint. *See Gines v. Horton*, 699 F.3d 812, 820 (5th Cir. 2012). Here, the LSA, attached to the Complaint provides that Seacret is permitted extensive access to the Debtors' database and intellectual property. LSA §§ 1.3 & 11.1; Comp. Exh. 7 [Docket No. 1-7]. In fact, the LSA contradicts the Complaint—Seacret is permitted to access the Debtors' information.

**E.      Cause of Action Five:  Conversion, Fails to State a Claim.**

81.      In order to state a claim for conversion under Arizona law, the Plaintiffs must assert "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Universal Mktg. & Entm't v. Bank One of Ariz., N.A.*, 203 Ariz. 266, 268,

53 P.3d 191, 193 (Ct. App. 2002). The Debtors have not adequately asserted a claim for conversion.

82.    Again, this Court must consider the terms of the LSA and dismiss the conversion claim because of an affirmative defense apparent on the face of the Complaint. Here, it is clear on the face of the Complaint that the Debtors consented to the so-called "conversion" and in fact provided the "converted" property to Seacret themselves. Consent is an affirmative defense to conversion. *See Scott v. Allstate Ins. Co.*, 553 P.2d 1221, 1225 (1976) ("an act which would otherwise constitute a conversion may be precluded from having that effect by the plaintiff's consent to the act, either express or implied."). As the Debtors consented to the LSA, this claim fails based on the Complaint itself.

**F.    Cause of Action Six:  Misappropriation of Effort, Fails to State a Claim.**

83.    The "misappropriation of effort" cause of action does not appear to be an actionable cause of action under Arizona law, and such, should be dismissed. *See Tessier v. H.S. Anderson Trucking Co.,* 713 F.2d 135, 136 (5th Cir. 1983). Additionally, the LSA specifically authorizes the complained of actions and therefore, such claim must be dismissed. *See EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006).

**G.    Cause of Action Seven:  Request for Declaratory Relief under 28 U.S.C. §§ 2201 *et seq.*, Fails to State a Claim.**

84.    Cause of Action Seven appears to attempt to declare that the LSA is a fraudulent transfer. However, the Complaint contains causes of action under TUFTA (erroneously) and Sections 544, 548, 550, and 551 of the Bankruptcy Code for fraudulent transfers. Compl. ¶¶ 109-140. Courts in the Fifth Circuit reject declaratory judgment claims seeking resolution of issues that are redundant or will be resolved as part of other claims in a suit. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016). When declaratory

judgments are used in such manner, the appropriate remedy is to dismiss the declaratory

judgment claim under Rule 12(b)(6) because 28 U.S.C. § 2201 "serves no useful purpose." *See*

*MWK Recruiting, Inc. v. Jowers*, No. 1:18-CV-444-RP, 2020 U.S. Dist. LEXIS 229755, at *26

(W.D. Tex. Dec. 8, 2020). As the declaratory judgment claim is duplicative of otherwise asserted

claims, it should be dismissed.

**H.    Cause of Action Eight:  Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 548(a)(1)(B), Fails to State a Claim.**

85.    Section 548(a)(1)(B) of the Bankruptcy Code states the following:

(a)(1)The trustee may avoid any transfer…of an interest of the debtor in property, or any obligation…incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—….

> (B) (i)received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I)was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II)was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III)intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> (IV)made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

86.    Despite the Supreme Court's caution against such practice, the Complaint

contains "mere threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements" of Section 548(a)(1)(B). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This is particularly egregious considering the heightened pleading requirements of FRCP 9(b),

that many courts have found to be applicable to constructive fraudulent transfer claims. Here, the

Complaint merely affirmatively states the elements of Section 548(a)(1)(B). The Complaint is

devoid of factual support for this constructive fraudulent transfer claim, let alone the who, what,

when, where, and why as to the same. The Complaint contains no detail regarding what assets were transferred or what obligations were incurred beyond entry of the LSA. There are no facts related to the value the Debtors did receive or what would constitute reasonably equivalent value for the alleged transfers or obligations. There are no facts related to solvency. Therefore, the Complaint fails to state claim for constructive fraudulent transfer or meet the heightened pleading standard related to the same.

**I.**     **Cause of Action Nine:  Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 544 and §§ 24.001 – 24.013 of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Fails to State a Claim.**

87.     As stated above, the applicable law is Arizona law is the applicable law with respect to the relationship between the parties. Regardless, as stated above, the Complaint is devoid of facts to support a constructive fraudulent transfer claim under Arizona state law, including factual assertions related to solvency, value, or the existence of a triggering creditor. Therefore, the Complaint fails to state a fraudulent transfer claim under Arizona state law.

**J.**     **Cause of Action Ten:  Preservation, Recovery and Return of Avoided Conveyances — 11 U.S.C. §§ 550, 551, Fails to State a Claim.**

88.     Section 550 of the Bankruptcy Code requires the Debtors to plead and prove the underlying fraudulent transfer claim in order to recover. 11 U.S.C. § 550; *See also Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,* 138 S. Ct. 883, 899 (2018) ("[i]f a transfer is avoided, § 550 identifies the parties from whom the trustee may recover either the transferred property or the value of that property to return to the bankruptcy estate"); *Crafts Plus+ v. Foothill Capital Corp. (In re Crafts Plus+),* 220 B.R. 331, 338 (Bankr. W.D. Tex. 1998) ("[o]nce it has been established that a qualified transfer has been made, § 550 provides for recovery"). As set forth above, there is no actionable fraudulent transfer and therefore, the Debtors cannot recover pursuant to Section 550. Further, Section 551 does not create a cause of action, but rather only

preserves cause of action for the Debtors. *See generally* 5 Collier on Bankruptcy P 551.01 (16th 2020).

## MOTION FOR MORE DEFINITE STATEMENT

89.     Pursuant to FRCP 12(e), as made applicable herein by FRBP 7012, to the extent the Court declines to compel arbitration or dismiss the Complaint, for the reasons stated above, Seacret moves for a more definite statement of the causes of action asserted in the Complaint.

## RESERVATION OF RIGHTS.

90.     Seacret does not concede that injunctive relief is warranted, attorneys' fees or exemplary damages are available, the facts asserted in the Complaint are true or correct, the conditions precedent have been met, and the damages or relief requested by the Complaint available or proper.

91.     Seacret does not consent to this Court's jurisdiction or to the entry of final orders by this Court. To the extent not dismissed, Seacret requests a jury trial of all causes of action.

## PRAYER

Seacret respectfully requests that this Court: (i) grant this Motion; (ii) compel the Debtors and Seacret to arbitrate the Claims; (iii) abate this Adversary Case pending a final ruling resulting from arbitration of the Claims; (iv) in the alternative, dismiss this Adversary Case; and (v) grant Seacret such other and further relief to which it may be justly entitled, both at law and in equity.

**Dated:  March 31, 2021.**

Respectfully submitted,


By: */s/ Philip Lamberson*
Phillip Lamberson
State Bar No. 0079413
plamberson@winstead.com
Stephen R. Clarke
State Bar No. 24069517
sclarke@winstead.com
Annmarie Chiarello
State Bar No. 24097496
achiarello@winstead.com
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 phone
(214) 745-5390 fax

**ATTORNEYS FOR
SEACRET DIRECT, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2021, notice of this document was electronically mailed to the parties registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District. I hereby further certify that on March 31, 2021, this document will be mailed via First-Class U.S. Mail and Certified Mail Return Receipt Requested to Debtors at the address listed below.

*/s/ Annmarie Chiarello*
One of counsel

Steven C. Lockhart
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 2900
Dallas, TX 75201

Spherature Investments LLC
WorldVentures Marketing Holdings, LLC
Rovia, LLC
WorldVentures Marketplace, LLC
WorldVentures Marketing, LLC
WorldVentures Services, LLC
Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

Spherature Investments LLC
WorldVentures Marketing Holdings, LLC
Rovia, LLC
WorldVentures Marketplace, LLC
WorldVentures Marketing, LLC
WorldVentures Services, LLC
5100 Tennyson Parkway
Plano, TX 75024