**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SPHERATURE INVESTMENTS LLC, | § | Case No.: 20-42492 |
| *et al.* | § | |
| | § | Jointly Administered |
| Debtors. | | |

| | | |
|---|---|---|
| SPHERATURE INVESTMENTS LLC, | § | |
| d/b/a WorldVentures Holdings, LLC, *et* | § | |
| *al.*[1] | § | |
| Plaintiffs, | § | |
| | § | Adversary No. 21-04059 |
| vs. | § | |
| | § | |
| SEACRET DIRECT LLC, | § | |
| | § | |
| Defendant. | | |

**AMENDED COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION**

Plaintiffs WorldVentures and its affiliated Debtors bring this *Amended Complaint* (the

"**Amended Complaint**") against Defendant Seacret Direct LLC ("**Seacret**") pursuant to Federal

Rules of Bankruptcy Procedure 7001(1), (7), and (9) and 7015.  In support of the Amended

Complaint, Plaintiffs show the Court as follows:

## I. NATURE OF THE ACTION

1.      This case concerns a scheme by Seacret to infiltrate and steal WV Marketing's

downline organization—one of the bankruptcy estate's most valuable assets—and Plaintiffs'

---

[1] The "**Debtors**" and "**Plaintiffs**" in the above-captioned cases are: Spherature Investments LLC d/b/a
WorldVentures Holdings, LLC ("**WorldVentures**") EIN#5471; Rovia, LLC ("**Rovia**") EIN#7705; WorldVentures
Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846; WorldVentures Marketplace, LLC ("**WV
Marketplace**") EIN#6264; WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255; WorldVentures
Services, LLC ("**WV Services**") EIN#2220.

intellectual property to gain an unfair competitive advantage over Plaintiffs in the multi-level marketing travel industry and to profit at the expense of Plaintiffs' creditors without providing reasonably equivalent value.  As evidenced by recent testimony, more than 15,000 of Plaintiffs' customers and WV Marketing's sales representatives are affiliated or do business with Seacret, with "most" of these sales representatives now no longer active with Plaintiffs.  The primary purpose of this lawsuit is to set aside these fraudulent transfers pursuant to the United States Bankruptcy Code and obtain recovery for the benefit of Plaintiffs' creditors.

2.      WorldVentures and its subsidiaries are a multi-level marketing enterprise that market, sell, and fulfill lifestyle membership-based travel products and services through a network of sales representatives.

3.      Prior to filing the bankruptcy cases, Plaintiffs explored various options to improve their financial viability and avoid filing for Chapter 11 relief. One such option—aimed at improving Plaintiffs' liquidity and elevating the income and morale of WV Marketing's sales representatives—involved negotiations with Seacret regarding possible business arrangements.

4.      On July 22, 2020, purportedly to drive additional value for its sales representatives and influenced by WorldVentures' former President and Chief Strategy Officer, Kenneth E. Head ("**Head**"), WV Marketing entered into a co-marketing agreement ("**CMA**") with Seacret, wherein WV Marketing made Seacret's non-travel products available to WV Marketing's sales representatives to sell and supplement their income. When it entered into the CMA, Seacret only marketed and sold dietary, nutritional, and skincare products—Seacret did not market or sell any membership-based travel products and services.  Indeed, with no experience in membership-based travel products and services, Seacret surreptitiously gained access to Plaintiffs' confidential

information and trade secrets which enabled Seacret to jumpstart its efforts to now attempt to compete with Plaintiffs' "lifestyle" membership-based travel services through direct sales.

5.      By allowing Seacret an expanded sales force to promote its products and, in turn, affording WV Marketing's sales representatives additional products to sell, the parties' relationship appeared to be mutually aligned. Therefore, on November 10, 2020, WorldVentures and Seacret entered into a letter of intent agreement ("**LOI**") to outline Seacret's proposed acquisition of certain assets of Plaintiffs.

6.      The next day—disguised as a way to add additional value to Plaintiffs' business, to "protect and maintain [WV Marketing's] salesforce" and as a prelude to the asset sale—Head worked with others to replace the CMA with a limited solicitation agreement ("**LSA**") between WV Marketing and Seacret on far less favorable terms. Through that agreement, Seacret obtained limited access to Plaintiffs' confidential and proprietary information related to its travel program, including WV Marketing's sales network. Limited access did not include the right to use that information to either market any products directly to any of WV Marketing's customers, nor did it allow Seacret to create and promote its own membership-based travel products and services through WV Marketing's sales representatives. Shortly after tapping into the database, there was a chilling effect on asset purchase negotiations with Seacret.  Indeed, Seacret materially altered the terms of the contemplated asset purchase which never materialized.

7.      Significantly, the LSA never authorized Seacret to solicit or to sell Seacret products directly to WV Marketing's ***customers***, which are defined in the agreement as its "Members." In fact, Section 1 (located on page 1) of the LSA is titled "Right to Solicit [WV Marketing's] Sales Representatives ***Only***" (emphasis added).  In spite of that express limitation, Seacret has solicited

WV Marketing's Members that are not now, nor have they ever been, Sales Representatives (as defined in the LSA) of WV Marketing.

8.     Even more significantly, nothing in the LSA (or any other agreement) authorizes or contemplates that Seacret would be starting its own membership-based travel services business offered through direct sales or marketing these services at all, and certainly not using Plaintiffs' intellectual property and trademarks.  Indeed, Seacret expressly agreed that the LSA "shall have no impact upon [WV Marketing's] sale of travel products to its Members or through the [WV Marketing] Sales Representatives, *and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement*." In other words, the LSA prohibits Seacret from offering its own travel products to any of WV Marketing's Sales Representatives or Members without a separately negotiated contract. No such contract exists, and indeed, it has never been discussed.

9.     Despite these limitations, Seacret is now marketing its own membership-based travel services under the name "Club Seacret" through direct sales to WV Marketing's Sales Representatives and, upon information and belief, is selling those memberships to WV Marketing's Members.

10.     In short, although Seacret had no historical presence in the membership-based, direct sales travel industry, that all changed after Seacret acquired Plaintiffs' confidential and proprietary information. In fact, soon thereafter, Seacret announced publicly its own competing "lifestyle" brand, which now includes a membership-based, direct sales travel business under the Club Seacret umbrella.

11.     It is beyond refute that Seacret's new foray into the membership-based, direct sales travel industry is a carbon copy of Plaintiffs' travel business. As Seacret's founder admitted in a

video with Head—Seacret's new president—by his side: Seacret is "tak[ing] one of the unique

travel experiences in the world [i.e., Plaintiffs' travel experience] and implement[ing] the program

over here at Seacret." And, despite sworn declaration testimony by Izhak Ben Shabat, Seacret's

CEO, to the contrary, internal e-mails at Seacret (which were shown to Shabat prior to executing

his declaration) show Head's involvement with the development and launch of Club Seacret.  It is

not a coincidence that several of WorldVentures' former key employees have recently been hired

by Seacret, which is also targeting WV Marketing's Sales Representatives and Members to sell

and purchase this new Seacret travel product, respectively, while utilizing Rovia's travel vendors,

some of which have exclusivity agreements. Even Seacret's agents have proclaimed publically

that Seacret's travel product is merely a "rebranding" of Plaintiffs' business.

12.    Importantly, Seacret never disclosed it was planning to use Plaintiffs' confidential

and proprietary information to steal Plaintiffs' key assets (e.g., WV Marketing's downline

organization) and open a competing business with that downline. In addition, no agreement ever

gave Seacret the right to use Plaintiffs' confidential information to recruit and solicit WV

Marketing's Sales Representatives and Members to a competing business nor the right to conduct

business with Plaintiffs' vendors and suppliers. And of course, no agreement authorized Seacret

to use WorldVentures' trademarks or trade secrets to market and sell any travel products at all,

much less its own travel products and services.

13.    In short, the LSA was procured by subterfuge and without a fair exchange of value,

at a time when Plaintiffs were insolvent and their precarious financial condition was exploited

under false pretenses by Seacret.

14.    Simply stated, had Seacret revealed its true motivation for the agreements, neither

WorldVentures nor WV Marketing would ever have signed them. By improperly using Plaintiffs'

intellectual property and confidential information, Seacret has converted that information to create its competing membership-based, direct sales "lifestyle" travel brand and platform, and is guilty of harmful access by computer. Through its subterfuge, Seacret also orchestrated the fraudulent transfer of the bankruptcy estate's most valuable assets without providing reasonably equivalent value. These fraudulent transfers should be set aside under applicable bankruptcy law. Alternatively, by soliciting WV Marketing's customers using such information and soliciting its Sales Representatives and WorldVentures' employees into a competing business, Seacret is tortiously interfering with contractual non-compete restrictions, prospective business relationships, and non-disclosure provisions.

15.    Seacret procured these fraudulent transfers by and through Head's—who Seacret has now hired as its President and Chief Business Development Officer—complicity and heavy influence. By cavorting with Head, Seacret knowingly aided and abetted Head's breach of fiduciary duties and double-dealing. Further, by hiring Head to help lead Seacret's membership-based travel program through direct sales, Seacret tortiously interfered with Head's unambiguous non-compete obligations in his employment agreement.

16.    And, by promoting its travel program using Plaintiffs' DreamTrips™, Rovia™, Anytime Escapes™, WorldVentures™, and other protected marks without consent, Seacret is guilty of trademark violations. Seacret not only abused Plaintiffs' trust, but also used the bankruptcy process itself as a vehicle to defraud Plaintiffs and their creditors at a time in which they were most vulnerable. Seacret's theft of assets and intellectual property and its unfair competition should be enjoined. Plainly, Seacret should pay the estate for the substantial damages caused by its misconduct.

## II. <u>JURISDICTION</u>

17.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

18.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(2)(A), and (O).

19.     This Complaint relates to the Spherature Investments LLC, et al. bankruptcy cases, jointly administered under case number 20-42492, filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Texas (Sherman Division). Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1409(a).

## III. <u>PARTIES</u>

20.     Debtors are each limited liability companies organized under the laws of the State of Nevada.

21.     Defendant Seacret Direct LLC is an Arizona limited liability company with a primary place of business located at 8125 N. 86th Place, Scottsdale, AZ 85258.  Seacret has appeared in this lawsuit.

## IV. <u>FACTS</u>

**A.     Plaintiffs' Membership-Based, Direct Sales Travel Services Business**

22.     Plaintiffs are part of a multi-level marketing business enterprise that markets and sells travel-related products and services. Since 2005, Plaintiffs' business enterprise has specialized in membership-based travel products and services marketed through direct sales ("**Services**").

23.     Combining the power of the internet with the time-tested strength of word-of-mouth marketing, WV Marketing markets Rovia's specifically curated travel program known as

DreamTrips, DreamBreaks and Anytime Escapes—each marketed with the slogan "You Should

Be Here." All DreamTrips, DreamBreaks and Anytime Escapes travel is booked through Rovia.

Notably, DreamTrips™, DreamBreaks™, Anytime Escapes™, WorldVentures™, Rovia™, You

Should Be Here™, and all associated logos are trademarks of the Plaintiffs.[2]

24.    In response to its business needs, Plaintiffs designed, developed and maintained

confidential and proprietary information and intellectual property, including the Rovia,

DreamTrips, DreamBreaks and Anytime Escapes travel products and services; methodologies and

processes to fit customers' needs, software applications, travel booking platforms, vendor/supplier

relationships and lists, sales representative relationships and lists, customer relationships and lists;

sources of supply, pricing, costing, and other financial information; trade secrets, tradenames,

trademarks, brands, logos, and other names used in connection with Plaintiffs' business; business

know-how, specific plans and project requirements, business processes, techniques, and

opportunities; computer programs and systems developed or used by Plaintiffs; and sensitive

information concerning compensation and benefits paid to officers, managers, employees,

independent contractors, and other representatives of the Plaintiffs (collectively, "**Confidential

Information**"). Plaintiffs have spent a substantial amount of time, money, and effort creating,

establishing, maintaining, and protecting this Confidential Information.

25.    WV Marketing has active Sales Representatives that are authorized to market and

sell the Services to individual and group leisure and corporate travelers in all 50 states in the United

States, as well as internationally in Australia, Austria, Botswana, Brazil, Canada, Colombia,

Cyprus, Czech Republic, France, Germany, Greece, Guam, Hong Kong, Hungary, Iceland, Ireland,

Israel, Jamaica, Kenya, Latvia, Malaysia, Malta, Mexico, Namibia, Netherlands, New Zealand,

---

[2] WorldVentures owns each of these trademarks and granted WV Marketing a license to use each.

Philippines, Poland, Puerto Rico, Romania, Russia, Serbia, Singapore, Slovenia, South Africa, Sweden, Taiwan, Uganda, United Kingdom, Zambia and Zimbabwe (collectively, the "**Territory**").

26.     To become a Sales Representative, a person is required to sign a WV Marketing Representative Agreement (the "**Representative Agreement**") and agree to WV Marketing's Policies and Procedures ("**Policies**").[3] As set forth in the Policies, the purpose of these Policies "is to define the relationship between [WV Marketing] and its Representatives, to set standards of permissible business conduct and practices, to protect the business relationships, good will, trade secrets, confidential information, including the [WV Marketing's] business methods and strategies . . . ."[4] WV Marketing allowed its Sales Representatives to use certain Confidential Information, but only in connection with WV Marketing's business operations.[5] Indeed, each Sales Representative agreed not to (i) disclose or disseminate Confidential Information to any other person or entity, or (ii) use WorldVentures' trade names, trademarks, designs, symbols, copyrighted material, or any derivative thereof, except in connection with WV Marketing's business operations and only with WV Marketing's prior written approval.[6]

27.     As a part of the Services, Sales Representatives sell Plaintiffs' curated travel products to customers who purchase membership travel products for a monthly fee. By purchasing Plaintiffs' products, these Members have access to a monthly travel membership subscription. Each new Member, or customer, fills out and signs a WV Marketing Membership Application

---

[3] True and correct copies of Plaintiffs' Representative Agreement and Plaintiffs' Policies are attached hereto as Exhibit 1. The Policies are incorporated into and made a part of the Representative Agreement. *See* Ex. 1 ¶ 4.

[4] *Id.* ¶1.2.

[5] *See id.* ¶5.12.

[6] *See id.* ¶¶ 3.2.1, 6.3, and Appx. I; *see also supra* n.2.

Form ("**Membership Agreement**"), which contains specific membership terms and conditions.[7]

Each Member expressly agrees that "[a]ny software that is made available to download from the

Web Site (the "Software") is the copyrighted work of [WV Marketing], its subsidiary, associate or

affiliated entities and/or its Affiliates and/or their suppliers or licensors. Use of the Software is

governed by the terms of the use of the Website",[8] and "copying or reproduction of the Software

or of the Web Site content to any other server or location for further reproduction or redistribution

is expressly prohibited."[9] Further, Members agree not to:

> [U]se, disseminate or reproduce any [WV Marketing] trademarks,
> copyrights or other intellectual property in marketing materials,
> advertising on social media . . . or any other advertising and or
> marketing outlet without the expressed written consent from the
> [WV Marketing] Compliance department.[10]

## B.    WorldVentures' Former President – Eddie Head

28.    From 2017 through January 14, 2021, Head served as WorldVentures' President

and Chief Strategy Officer ("**CSO**").[11] As President and CSO, Head had unrestricted access to

Plaintiffs' Confidential Information, including information and reports in its database managed by

the direct selling software platform Exigo Office Inc. ("**Exigo**"), which contains detailed

information regarding WV Marketing's Sales Representatives and their respective downlines.

29.    Under his Employment Agreement and the WorldVentures' Confidentiality and

Proprietary Rights Agreement ("**Confidentiality Agreement**"), Head agreed to, among other

---

[7] A true and correct copy of the Membership Agreement is attached hereto as Exhibit 2.

[8] *See* Ex. 2 ¶ 18.

[9] *Id.* ¶ 19.

[10] *Id.* ¶ 20 – 21.

[11] A true and correct copy of Head's Executive Employment Agreement ("Employment Agreement") is attached hereto as Exhibit 3.

things, protect Plaintiffs' Confidential Information.[12] Specifically, Head agreed "not to directly or indirectly disclose, publish, communicate or make available, in whole or in part," any Confidential Information "to any entity or person" both during and after his employment.[13]

30.     Article III of his Employment Agreement prohibits Head from engaging in certain activities for a twenty-four (24) month period following termination of Head's employment (the "**Non-Compete Period**").[14] During the Non-Compete Period, Head expressly agreed not to (i) solicit and interfere with Plaintiffs' respective Sales Representatives, customers, members, employees, vendors, and suppliers, and (ii) unfairly compete with the Plaintiffs (collectively, the "**Non-Compete Provisions**").[15] Head "further acknowledge[d] and agree[d] that the competitive use of [Debtors'] confidential information would cause grievous damage to [Debtors], and [WorldVentures] would not hire [him] and disclose confidential information to him in the absence of the protections afforded by the confidentiality and non-compete provisions in . . . Article III."[16] And, Section 2.08 of his Employment Agreement provides that the Non-Compete Provisions survive after Head's employment with WorldVentures terminates.[17]

**C.     Seacret's Limited Access to Plaintiffs' Confidential Information**

31.     Like the Plaintiffs, Seacret is a multi-level marketing company. Unlike Plaintiffs, however, Seacret historically did not market or sell any membership-based travel services. Rather, Seacret engaged in direct sales and marketing of dietary, nutritional and skin care products ("**Seacret's Legacy Business**").

---

[12] A true and correct copy of Head's Confidentiality Agreement is attached hereto as Exhibit 4.

[13] *See* Ex. 4 § 1b.

[14] *See* Ex. 3 ¶ 3.01.

[15] *See id.* at Article III.

[16] *See id.* ¶ 3.07.

[17] *See id.* ¶ 2.08.

32.    On July 22, 2020, WV Marketing and Seacret executed the CMA, through which Seacret agreed to make its products available to WV Marketing's Sales Representatives to sell such products.[18] On November 10, 2020, WorldVentures and Seacret entered into a LOI for an asset purchase agreement, evidencing Seacret's intent to purchase certain asset of Plaintiffs.[19] Accordingly, the LOI was attached to the LSA executed the following day between WV Marketing and Seacret.[20] Under the LSA, "[a]s additional consideration to [WV Marketing], Seacret agrees to make and diligently pursue the offer to purchase certain of [WV Marketing's] assets as outlined in the attached Letter of Intent."

33.    The LSA and LOI effectively terminated the CMA. However, certain provisions in the CMA continue to apply in full force and effect, including Seacret's express agreement (i) not to disclose WV Marketing's Confidential Information, and (ii) that a joint venture or partnership would not be established between the parties.[21] Likewise, Seacret's confidentiality obligations under the LOI remain in effect.[22]

34.    The Recitals of the LSA provide the purpose and intent of the agreement:

Whereas, due to its current financial situation, [WV Marketing] has requested that Seacret assist it in protecting and maintaining its sales force, including all members of [WorldVentures]'s downline organization . . . by allowing [WV Marketing] Sales Representatives to join Seacret's downline organization in order to sell, and directly receive a commission for selling Seacret products.[23]

---

[18] A true and correct copy of the Co-Marketing Agreement is attached hereto as Exhibit 5.

[19] A true and correct copy of the LOI is attached hereto as Exhibit 6.

[20] A true and correct copy of the LSA is attached hereto as Exhibit 7.

[21] *See* Ex. 7 ¶ 2.1; *see also* Ex. 5 ¶¶ 7.1-7.2, 13.1.

[22] *See* Ex. 6 § 2.

[23] See Ex. 7 at 1.

35.     Seacret's intent was purportedly "to assist [WV Marketing] with its current financial situation."[24] Further, as Seacret acknowledged the LSA was only supposed to be an "interim" agreement while the parties finalized the sale of certain of Plaintiffs' assets to Seacret.

36.     In accordance with the LSA, WV Marketing granted Seacret certain limited rights to (a) solicit WV Marketing's exclusive network of Sales Representatives to sell Seacret's line of dietary, nutritional, and skincare products, (b) access certain Confidential Information, including one of WV Marketing's most critical revenue-generating assets: the Exigo database containing the entirety of WV Marketing's downline sales network, and (c) allegedly waive non-solicit provisions with its Sales Representatives solicited by Seacret ("**Fraudulent Obligations**"). In exchange for the Fraudulent Obligations, Seacret agreed to pay WV Marketing a future product-sales royalty— in an amount not to exceed $12 million—based on the amount of Seacret products sold by WV Marketing's Sales Representatives. To date, Seacret has paid less than 8% of that promised consideration. Notably, the LSA did not permit Seacret to solicit or recruit WV Marketing's Members (*i.e.* customers), employees, suppliers, or vendors.[25] Nor did the LSA "establish a joint venture or partnership between the Parties."[26] Significantly, the LSA never authorized Seacret to solicit or to sell Seacret products directly to WV Marketing's customers, which are defined in the LSA as its "Members," as opposed to Sales Representatives.[27]  In fact, Section 1 (located on page 1) of the limited solicitation agreement is titled "Right to Solicit [WV Marketing's] Sales Representatives *Only*" (emphasis added).

---

[24] *See id.*

[25] *See id.* ¶1.5.

[26] *Id.* ¶13.1.

[27] *Id.* at Recitals and ¶ 1.

37.     Even more significantly, nothing in the LSA authorizes or contemplates that Seacret would be starting its own membership-based travel services business offered through direct sales.  Indeed, the LSA specifically defines "Products" of Seacret as "dietary supplements, nutritional and skincare…through its network of sales representatives."[28] Further, ¶ 1.1 provides that Sales Representatives may continue to sell [WV Marketing's] products and services while also selling Seacret products and services."[29] More to the point, Seacret agreed that the LSA "shall have no impact upon [WV Marketing's] sale of travel products to its Members or through the [WV Marketing's] Sales Representatives, *and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement*."[30] In other words, the LSA prohibits Seacret from offering its own travel products to any Sales Representatives or Members without a separately negotiated contract. No such contract exists, and indeed, it has never been discussed.

38.     Seacret has directly solicited WV Marketing's Sales Representatives (outside the scope of the LSA) and Members (despite the prohibition).[31] And, Seacret announced its intent to launch its own membership-based travel services through direct sales with Head at the helm.[32] To advance that effort, Seacret has opened a portal to its agents to allow them to start signing up for travel.[33]  Upon information and belief, Seacret is offering (or intends to) this travel program to WV

---

[28] *Id.* at Recitals.

[29] *Id.* ¶ 1.1.

[30] *Id.* ¶ 4.1.4 (Emphasis added).

[31] *See, e.g.*, Seacret HQ Email Re: "2 Days Until Blue Friday," to Paul Jenkins (Dec. 17, 2021) (explaining that "Seacret is expanding our global footprint with . . . Global Access!"); Seacret HQ Email Re: "SPECIAL MESSAGE FROM IZHAK BEN SHABAT 10th anniversary Breakaway Trip Announcement," to Paul Jenkins (Jan. 31, 2021) (announcing the 10th anniversary Breakaway trips); Seacret HQ Email Re: "ACCELERATE your business in 2021," to Paul Jenkins (Feb. 1, 2021) (promoting a "carefully curated travel experience"); Seacret HQ Email Re: "Message to Our Seacret Family," to Paul Jenkins (Feb. 5, 2021) (addressing relationship with WorldVentures).

[32] *See infra* Section D.

[33] *Club Seacret*, YOUTUBE (February 27, 2021) https://www.youtube.com/watch?v=qtEOP6qv9Uw .

Marketing's Members as well, whose contact information Seacret has already improperly accessed in the absence of any contractual right. This tortious conduct clearly diminishes the value of any consideration that could be received under the LSA.

39.     Circumstantial evidence suggests that Seacret never intended to perform the LSA and in fact intended to start its own competing travel business and to solicit WV Marketing's Sales Representatives and Members to that travel business long ago. Indeed, in Zoom calls as early as November 26, 2020, Seacret's managing member and Chief Executive Officer, Izhak Ben Shabat, declares to what appears to be a large group that includes WV Marketing's Sales Representatives that Plaintiffs will be in bankruptcy and that, "while we are awaiting the travel membership to be implemented…", sales representatives will be able to sell Seacret products.[34] In that same video, Shabat criticizes Plaintiffs' management and outstanding commissions, and declares that distributors will no longer be distributors of Plaintiffs following the bankruptcy. On or about December 11, 2020, Shabat declares in another call that whether the "deal" with Plaintiffs goes through or not, Seacret will move forward, as "no one can stop this train." Upon information and belief, that "train" was Seacret's own competing travel business, access to which has been provided to WV Marketing's Sales Representatives already.[35] Whether statements like these were intended to drive down the value of any contemplated deal and/or evidence that Seacret never intended to honor the LSA, Seacret clearly has not provided reasonably equivalent value for the assets it surreptitiously acquired—all when it knew Plaintiffs were insolvent. For that reason, the LSA should be discharged.

---

[34] *WorldVentures' Sales Representative Call with Izhak Ben Shabat*, ZOOM (Nov. 26, 2020) https://wvholdings-my.sharepoint.com/:v:/p/pjenkins/EUlUpq6AA0ZChHb2ehs10kQBol69Mat_ADuBbtOYDCAAHA .

[35] *See, e.g.*, *Club Seacret*, YOUTUBE (February 27, 2021) https://www.youtube.com/watch?v=qtEOP6qv9Uw; *WW SEACRET Single Buddies*, FACEBOOK, https://www.facebook.com/groups/WV.Single.Buddies; *WW SEACRET Travel Buddy*, FACEBOOK, https://www.facebook.com/groups/WV.Travel.Buddy.

40.   Seacret also expressly acknowledged and agreed that it shall not:

directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how, travel booking platforms, software, patents, formulas, or processes or permit or encourage any third-party to do so. . . . [T]his [LSA] does not confer to Seacret any intellectual property or other rights with respect to [WV Marketing's] travel booking platforms, software, patents, formulas, brand, packaging, or any names or logos used in connection with the [WV Marketing's] business. As between Seacret and [WV Marketing], [WV Marketing] owns and shall continue to own all such intellectual property rights.[36]

41.   Similarly, Seacret agreed that Plaintiffs' respective trademarks or tradenames "are valuable and that all goodwill associated with use of such names and marks shall inure to the benefit of [WV Marketing]."[37] Similar restrictions exist in the Co-Marketing Agreement.

42.   WV Marketing believed the Co-Marketing Agreement and the LSA would help its sales network overcome a reduction in sales revenue, providing temporary liquidity and allowing its Sales Representatives to generate additional income through sales relating to Seacret's Legacy Business. Prior to executing these agreements, Seacret was never involved in the membership-based, direct sales travel business.

43.   Thus, WV Marketing reasonably believed that the LSA would not be used as subterfuge to facilitate a permanent migration of Sales Representatives from WV Marketing to Seacret so that Seacaret could implement its own strikingly similar competing travel business. Nor did WV Marketing believe that the LSA would be used to solicit and poach Plaintiffs' respective Sales Representatives, employees, members, suppliers, or vendors for the sale of travel services and products in a competing business.  Had Seacret's true intentions been disclosed, WV Marketing would not have signed the LSA.

---

[36] *See* Ex. 7 ¶ 10.2.

[37] *Id.* ¶ 11.1.

**D.    Seacret Hires Plaintiffs' Employees and Representatives to Copy its Travel Business.**

44.    A precipitous revenue decline in 2020 due to factors that include the global pandemic led Plaintiffs to seek viable business alternatives. Plaintiffs brought in an independent restructuring officer, and on December 21, 2020, Plaintiffs, as debtors in possession, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned bankruptcy cases (the "**Chapter 11 Cases**") in which this adversary proceeding is filed.[38] Front and center in the Chapter 11 Cases is the pending sale of Plaintiffs' assets, including the Sales Representatives main downline network structure.

45.    Days after the bankruptcy filing, Head resigned his position with WorldVentures on December 31, 2020. In mid-to-late January, Head resurfaced as the President and Chief Business Development Officer of Seacret.[39]

46.    In late January, Head and numerous former WV Marketing Sales Representatives participated in campaign videos to promote Seacret's new "lifestyle" company. In fact, dozens of videos referencing Seacret's new travel program have surfaced.

47.    Notably, Head appears in a video on January 29, 2021 sitting next to Shabat, Seacret's managing member and Chief Executive Officer, who announced Head's position with

---

[38] Pursuant to the Chapter 11 Cases, the Debtors intend to effectuate a sale of substantially all of their assets to the highest bidder. As such, on January 21, 2021, Debtors filed the *Motion for Entry of Order Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bigger and Bid Protections' and (C) Form and Manner of Notices' (II) Scheduling an Auction and Sale Hearing' (III) Approving the Sale of Substantially all the Assets of the Debtors, Free and Clear of All Liens, Claims, Encumbrances and Interests; (IV) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 92] (the "**Sale Motion**"), which is set for hearing on March 2, 2021 [Docket No. 99]. Through the Sale Motion, the Debtors seek an orderly sale of substantially all of their going-concern assets under section 363(b) of the Bankruptcy Code—namely, their travel-related sales business and platform. The proposed sale is the result of extensive, arms-length negotiations between Debtors and WV Holdings Co. LLC ("**WHC**") as the stalking-horse bidder.

[39] *See    Team    Synergy    Agents*, Youtube    (Jan    29,    2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc ("introducing Head as new President of Seacret); *Izhak 2021* Update, Vimeo (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

Seacret and a "partnership" to create a new membership-based travel business within Seacret. Shabat announced Seacret is "tak[ing] one of the most unique travel experiences in the world [i.e., Plaintiffs' travel experience] and implement[ing] the program over here at Seacret."[40]

48.    Similarly, a Seacret agent appears in a YouTube video explaining that at WorldVentures: "The two pieces . . . were the most valuable . . . were Marc Accetta's leadership development and training program and these specific curated trips [upon information and belief, referring to DreamTrips]. . . Those are the two things that created the magic."[41] And another representative announced that "[Seacret is] selling a membership that gives people access to wholesale travel."[42]

49.    It is beyond refute that WorldVentures' former key employees and WV Marketing's former and/or current Sales Representatives are leading the planning, formulation, and implementation of Seacret's new travel platform and membership program. By way of example, internal e-mails at Seacret show Head's involvement with the development and launch of Club Seacret, including its travel program. Even Seacret's founder publicly commended "what Eddie [Head] has done putting together this [travel] program with [Seacret's] vendors."[43] And in reference to a travel promotional for Seacret, Shabat stated that "what we were able to do was to use the community leverage power that we have" to get "a deeply discounted price."[44] Such

---

[40] *See Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

[41] *Synergy Daily Huddle – Travel is Here! With Jesse Macpherson*, YOUTUBE (Feb. 3, 2021) https://www.youtube.com/watch?v=TCnE6oJ13P8 .

[42] *Team Synergy Agents M2W Friday Huddle*, YOUTUBE (Feb. 5, 2021), *https://www.youtube.com/watch?app=desktop&v=G0O5Kc40lto* .

[43] *See id.*

[44] *See id.*

community leverage power, upon in formation and belief, is through Plaintiffs' experience, connections and business relationships established and maintained for several years.

50.      Another recent promotional campaign video is telling. In it—alongside Seacret's founder—Head specifically admits; (a) "we have been grooming a global team, and we brought in some of the best talent we could;" (b) "we want to make sure that we partner with the very best suppliers and vendors around the planet;" (c) "we have a duty to uphold this brand and to protect this brand;" (d) "you are going to be able to take advantage of this membership all over the world; and (e) "we're taking the knowledge of all of our wins . . . and all of our victories at the same time" and will "apply everything we've learned" to provide a "membership experience and lifestyle company" for Seacret.[45] Upon information and belief, "this brand" is WorldVentures' DreamTrips brand including DreamBreaks and Anytime Escapes (or a knockoff), and the "global team" consists of former WorldVentures' employees and WV Marketing's Sales Representatives, recruited in part through Seacret's access to Plaintiffs' Confidential Information.

51.      Indeed, in a recent promotional video by one of Seacret's top sales representatives, Jesse Macpherson, he (on behalf of Seacret) promotes the upcoming launch of Seacret's membership-based travel program while displaying a PowerPoint presentation that specifically promotes Plaintiffs' trips and intellectual property, including WorldVentures' trademarked "DreamTrips" brand. Macpherson brazenly characterizes the key components to the travel program that Plaintiffs achieved, and he makes clear that Seacret is copying this travel program and implementing Plaintiffs' training programs.

---

[45]     *See    id.*;    *Team    Synergy    Agents*,    YOUTUBE    (Jan   29,   2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc ("introducing Head as new President of Seacret); *Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

52.    Other videos recently published that open with images of "Seacret™" followed by the promotion of DreamTrips™ mark and travel images from what may be past WorldVentures trips and, in some images, the DreamTrips™ mark appears side-by-side with the Seacret™ mark. Seacret has no valid license to promote travel using WorldVentures' marks.[46]

53.    Additional videos show WorldVentures' former director of training Marc Accetta now working for Seacret and implementing WorldVentures' training program at Seacret.[47] Accetta's contributions to Seacret have already been recognized. Specifically, Macpherson acknowledges that the "the two things that created the magic" at WorldVentures, the two "most valuable . . . were Marc Accetta's leadership development and training program and [the] specific curated trips."[48] These "trips" are specifically curated trip packages created by Rovia for WV Martketing's Members.

54.    Equally significant, emails show that Head encouraged Seacret to retain Acetta and disclosed certain information regarding the terms of Acetta's relationship with WorldVentures to Shabat in October 2020, despite Head's fiduciary obligations (e.g., loyalty, full disclosure) to Plaintiffs.

55.    The promotional campaigns also encourage WV Marketing's current Sales Representatives to cease selling Plaintiffs' travel products and services, ending their affiliation with WV Marketing, and, instead, sell Seacret's products and "newly acquired" travel services.

---

[46]    *See Pre-Launch-Seacret-DT-Pres-Jan-2021*, YOUTUBE (Jan. 8, 2021), https://www.youtube.com/watch?fbclid=IwAR1Vkm4QGhOmcFBjMDUV3gkXFq6_uSzzsTs7cTBxt6tcAoDJ9R489_ozKHs&v=1NnIPOIc8yk&feature=youtu.be ; *Secaret Lifestyle Club*, VIMEO (Feb. 10, 2021), https://vimeo.com/510913397 .

[47] *Syndergy Daily Huddle – New Director of Training for Seacret Marc Accetta,* Youtube (Jan. 13, 2021) https://www.youtube.com/watch?v=qamBvXSYi60; *Special Message from our New Director of Training to our Seacret Family*, Youtube (Jan. 10, 2021) https://www.youtube.com/watch?app=desktop&v=DpQ1Neu5Pfo

[48] *Syndergy Daily Huddle – New Director of Training for Seacret Marc Accetta,* YOUTUBE (Jan. 13, 2021) https://www.youtube.com/watch?v=qamBvXSYi60;

Seacret's campaign appears to be working, as other former WV Marketing Sales Representatives have also publicly appeared stating that "most" WV Marketing Sales Representatives have quit and "Seacret can move forward aggressively and very quickly on rolling out our own travel product [and] we are fast-tracking our own travel product, which will be very similar to what many of us are used to [meaning WV Marketing], [with] group trips, wholesale pricing, . . . [and] a wholesale booking engine."[49]

56.    One of Seacret's travel providers is Grouply Ventures, LLC ("**Grouply**"), a company owned by Virginia (Gini) Trask ("**Trask**"). Grouply appears to provide travel packages that are substantially similar to travel opportunities offered by Top Tier Travel, Inc. ("**Top Tier**") to Rovia pursuant an exclusivity agreement. Notably, Trask is also the President of Top Tier and signed the exclusivity agreement on Top Tier's behalf.  Texts between Trask and Head indicate that, in a transparent attempt to try to circumvent that exclusivity agreement, Head solicited Trask to provide "incentive trips" to Seacret. As a critical part of that recruitment effort, Head convinced Trask that, unlike Plaintiffs, Seacret did not offer a travel product through membership-based, direct sales despite knowing of its ongoing efforts to do so.

57.    In yet another promotional video, a Seacret agent admits that "one of the largest travel clubs in the entire world [will be] coming soon to a Seacret near you."[50] And that travel program is "being developed by some of the greatest minds that have put together programs that have the experience that have . . . done it for 10 years, done it for 15 years."[51] In other words, Seacret is using the "greatest minds" it poached from the Plaintiffs.

---

[49]    *See*    *Leadership*    *Zoom*,    VACATIONLEADER    (Jan.    26,    2021), https://vacationleader.wistia.com/medias/ztuypgg23g?wtime=0

[50]    *See*  *Team*  *Synergy*  *Agents*  *M2W*  *Friday*  *Huddle,*  Youtube  (Feb.  5,  2021), *https://www.youtube.com/watch?app=desktop&v=G0O5Kc40lto*

[51] *See id.*

58.    Given the timing of Plaintiffs' former employees and Sales Representatives resignations from Plaintiffs and their immediate affiliation with Seacret, it appears that Seacret, Head, and others orchestrated this effort while Head and other key employees and Sales Representatives were still working for and representing Plaintiffs, respectively. Indeed, within a few weeks of Head's announcement as its president, Seacret announced it was bringing its "unique travel experiences in the world" to market.[52] The Shabat video and audio communications show that this is exactly what Seacret intended to do all along to the detriment of and without Plaintiffs.

59.    Seacret has and continues to tortiously interfere with WorldVentures' contractual rights under the Employment Agreement and other of Plaintiffs' agreements, in addition to stealing Plaintiffs' intellectual property and orchestrating a fraudulent transfer of one of the bankruptcy estate's most valuable assets.

**E.      Seacret's Unlawful Use and Access of Plaintiffs' Confidential Information**

60.    Seacret also interfered with Plaintiffs' rights under other contracts. For example, as detailed above, Seacret surreptitiously engaged at least one of Rovia's vendors (*i.e.*, Top Tier) to support Seacret's venture into the travel services business.

61.    In connection with its effort to duplicate Plaintiffs' travel services business, Seacret also traded off of WorldVentures trademarks without any legal right or authorization. For example, to market its travel services program to its members and agents, Seacret, either directly or through proxies, used WorldVentures' trademarks, including DreamTrips™, Anytime Escapes™, You Should Be Here™, and Rovia™.

---

[52] *See Izhak 2021* Update, Vimeo (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

62.     Finally, Seacret exploited the Fraudulent Obligations by accessing and using far more Confidential Information than it was purportedly authorized to do, including as evidenced by Seacret's targeted solicitation of WorldVentures' employees and WV Marketing's Members and Sales Representatives. For example, Seacret has sent emails directly to WV Marketing's Members and Sales Representatives to advertise that "Seacret is expanding [its] global footprint" and to solicit their participation in Seacret's "plan to bring our Seacret lifestyle membership with WOW-inspiring travel benefits," while promoting a "best-in-class" membership experience "at an incomparable value."

## V.  CAUSES OF ACTION

### COUNT ONE

### Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 548(a)(1)(B)

63.     Plaintiffs re-allege and incorporate all allegations set forth herein.

64.     WV Marketing was (a) insolvent when the Fraudulent Obligations were incurred, or in the alternative, became insolvent as a result of the Fraudulent Obligations, (b) engaged in a business or a transaction, or were about to engage in a business or transaction, for which the property remaining with WV Marketing was unreasonably small capital when the Fraudulent Obligations were incurred, or alternatively, (c) at the time the Fraudulent Obligations were incurred, WV Marketing intended to incur, or believed that they would incur, debts that would be beyond WV Marketing's ability to pay as the debts matured.

65.     WV Marketing received less than reasonably equivalent value in exchange for the Fraudulent Obligations.

66.     WV Marketing had at least one creditor when each Fraudulent Obligation was incurred who could have avoided each Fraudulent Obligation under non-bankruptcy law.

67.     The Fraudulent Obligations are fraudulent obligations in violation of 11 U.S.C. § 548(a)(1)(B).

68.     Seacret is the initial transferee of the obligations incurred and the transfers made in connection with the LSA.  Seacret is also a person for whose benefit the transfers were made in connection with the LSA.

69.     The Fraudulent Obligations were incurred within 2 years before the date of the filing of the bankruptcy petition for WV Marketing.

70.     Seacret did not participate in and/or receive the obligations incurred and transfers made under the LSA in good faith and without knowledge of the voidability of such obligations and transfers.

71.     As a result of the foregoing, pursuant to 11 U.S.C. § 548(a)(1)(B), WV Marketing is entitled to judgment (a) avoiding the Fraudulent Obligations, (b) directing that the LSA, including the Fraudulent Obligations, be set aside, and (c) awarding WV Marketing all such other and further relief that is just and proper.

72.     Additionally, WV Marketing has suffered irreparable harm as a result of Seacret's actions, and WV Marketing is entitled to injunctive relief. Indeed, the Fraudulent Obligations and Seacret's actions described above are causing irreparable injury to WV Marketing, including devaluation of estate assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to its Members, employees, Sales Representatives, supplier/vendor relationships.

## COUNT TWO

**Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 544 and §§ 24.001 – 24.013 of the Texas Uniform Fraudulent Transfer Act ("TUFTA")**

73.     Plaintiffs re-allege and incorporate all allegations set forth herein.

74.     The LSA, including the Fraudulent Obligations, is a fraudulent transfer in violation of 11 U.S.C. § 544 and §§ 24.005(a)(2), 24.006 of the TUFTA.

75.     The Fraudulent Obligations constitute a transfer of an interest of WV Marketing's assets for purposes of the TUFTA.

76.     The Fraudulent Obligations were to or for the benefit of Seacret for purposes of the TUFTA.

77.     The Fraudulent Obligations occurred within the four (4) years prior to the Petition Date.

78.     WV Marketing was (a) insolvent when the Fraudulent Obligations were transferred, or in the alternative, became insolvent as a result of the Fraudulent Obligations, (b) engaged in a business or a transaction, or was about to engage in a business or transaction, for which the property remaining with WV Marketing was unreasonably small capital when the Fraudulent Obligations were transferred, or alternatively, (c) at the time the Fraudulent Obligations were transferred, WV Marketing intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

79.     Aside from the LSA, WV Marketing is not obligated to Seacret in any way.

80.     Seacret had no and has no claim against WV Marketing.

81.     WV Marketing does not owe any debt to Seacret.

82.     Seacret did not provide any immediate value to WV Marketing in exchange for the Fraudulent Obligations.

83.     WV Marketing received less than reasonably equivalent value in exchange for the Fraudulent Obligations.

84.     WV Marketing had at least one creditor when transfer of the Fraudulent Obligations occurred who could have avoided the Fraudulent Obligations under non-bankruptcy law.

85.     Seacret is the initial transferee of the Fraudulent Obligations.  Seacret is also a person for whose benefit the Fraudulent Obligations were made.

86.     Seacret did not participate in and/or receive the Fraudulent Obligations in good faith and without knowledge of the voidability of such transfer.

87.     As a result of the foregoing, pursuant to 11 U.S.C. § 544 and §§ 24.005(a)(2), 24.006 of the TUFTA, WV Marketing is entitled to judgment (a) avoiding the Fraudulent Obligations, (b) directing that the LSA, including the Fraudulent Obligations, be set aside, and (c) awarding WV Marketing such other and further relief that is just and proper.

88.     Additionally, WV Marketing has suffered irreparable harm as a result of Seacret's actions, and WV Marketing is entitled to injunctive relief. Indeed, the Fraudulent Obligations and Seacret's actions described above are causing irreparable injury to WV Marketing, including devaluation of estate assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to its Members, employees, Sales Representatives, supplier/vendor relationships.

## COUNT THREE

### Preservation, Recovery and Return of Avoided Conveyances — 11 U.S.C. §§ 550, 551

89.     Plaintiffs re-allege and incorporate all allegations set forth herein.

90.     WV Marketing is entitled to avoid the LSA, including the Fraudulent Obligations, under 11 U.S.C. § 544, 548 and §§ 24.005(a)(2), 24.006 of the TUFTA (collectively, the "Avoidable Transfers").

91.     Seacret was the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

92.     Pursuant to 11 U.S.C. § 550(a), WV Marketing is entitled to recover from Seacret the Confidential Information of WV Marketing and an amount not less than the total aggregate value Seacret received as a result of the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

93.     Additionally, WV Marketing has suffered irreparable harm as a result of Seacret's actions, and WV Marketing is entitled to injunctive relief. Indeed, the Avoidable Transfers and Seacret's actions described above are causing irreparable injury to WV Marketing, including devaluation of estate assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and damage to its Members, employees, Sales Representatives, supplier/vendor relationships.

94.     Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of Debtors' bankruptcy estates.

## COUNT FOUR

### Tortious Interference with Existing Contracts

95.     Plaintiffs re-allege and incorporate all allegations set forth herein.

96.     As detailed herein, Seacret's actions constitute tortious interference with WorldVentures, WV Marketing, and Rovia's existing contractual relationships. WorldVentures, WV Marketing, and Rovia have valid and enforceable contracts with their employees, vendors/suppliers, Sales Representatives, and/or Members/customers.

97.     Seacret knew of or had knowledge of facts that would lead a reasonable person to believe that WorldVentures, WV Marketing, and Rovia's contracts with their employees, Members, vendors, and/or Sales Representatives, including, but not limited to, Head's Employment Agreement with WorldVentures, WV Marketing's Membership Agreement and Policies, and Rovia's contract with Top Tier, along with the restrictive covenants and confidential obligations in the foregoing, existed. By way of example, Seacret specifically referenced non-compete provisions in the LOI and the LSA[53] and Head's emails (while at Seacret) indicate he was aware of the exclusivity clause with Rovia.  Seacret even requested and received a copy of Head's Employment Agreement and Rovia's contract with Top Tier. Seacret, therefore, willfully interfered with WorldVentures, WV Marketing, and Rovia's rights under the respective agreements. Likewise, Seacret interfered with contracts with WV Marketing's Members and WorldVentures' employees by sending solicitation emails regarding Seacret's expanding global business and new travel platform. Indeed, WV Marketing has recently lost Members and Sales Representatives due to Seacret's interference and solicitation efforts.

98.     Through former WorldVentures employees and WV Marketing Sales Representatives, Seacret is posting, both directly and through proxies, public announcements and videos, using Plaintiffs' Confidential Information, to promote Seacret's new travel platform. Further, Seacret has leveraged off of exclusive travel vendors of Rovia to promote its new Club Seacret travel benefits.

99.     By interfering with WorldVentures, WV Marketing, and Rovia's existing contractual relations with their employees, Members, Sales Representatives, and/or vendors, and by inducing and continuing to induce Head to violate his Employment Agreement by entering into

---

[53] *See, e.g.*, Ex. 6 at 1-2, 4; Ex. 7 ¶ 1.1.

(and helping to launch) a Competing Business, Seacret willfully and intentionally interfered with the foregoing Plaintiffs' existing contracts with the purpose of harming these Plaintiffs.

100.    Seacret's tortious interference with WorldVentures, WV Marketing, and Rovia's business and contractual relations proximately caused damage to them, including lost profits and the impairment of future earning capacity and goodwill, in an amount to be determined at trial. Moreover, because of its conduct, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from WorldVentures, WV Marketing, and Rovia.

101.    As a result of Seacret's interference, WorldVentures, WV Marketing, and Rovia's have suffered, and will continue to suffer, irreparable and permanent harm, incalculable devaluation of its assets, loss of goodwill, loss of trade secrets and confidential and proprietary information, and loss of Members, employees, Sales Representatives, and/or vendors. While damages may be calculated for a portion of the harm caused by Seacret, recovery of damages cannot provide WorldVentures, WV Marketing, and Rovia complete relief unless the Court enjoins Seacret's ongoing conduct as described herein. Thus, WorldVentures, WV Marketing, and Rovia have no adequate remedy at law and seek equitable and injunctive relief to enjoin Seacret's tortious interference with WorldVentures, WV Marketing, and Rovia's existing contractual relations.

102.    Further, as a result of Seacret's intentional and malicious interference with WorldVentures, WV Marketing, and Rovis's existing contractual relations, Seacret is also liable for exemplary damages in an amount to be ascertained at trial.

## COUNT FIVE

### Knowing Participation / Aiding and Abetting Fiduciary Breach

103.    Plaintiffs re-allege and incorporate all allegations set forth herein.

104.    Based on the nature of the transactions, circumstances of their relationship and course of dealing, Head (as an employee and officer) owed Plaintiffs fiduciary obligations, including, but not limited to, acting in the best interests of Plaintiffs, providing full disclosure about the transactions involving Seacret, putting Plaintiffs' interest above his own, and not usurping Plaintiffs' Confidential Information, business opportunities and relationships with Members, Sales Representatives, suppliers, and vendors.

105.    Upon information and belief, Seacret knew of and knowingly participated in, and benefitted from, each of Head's fiduciary breaches, respectively, as described above.  Because Seacret induced or aided Head in his breach of fiduciary duties to Plaintiffs, Seacret, as conspirator with Head, is liable as a joint tortfeasor.

106.    As a direct and proximate result of the Seacret's aforementioned knowing participation in Head's fiduciary breaches, Plaintiffs have been injured in an amount not less than $100,000,000.00 in damages.   Accordingly, Plaintiffs are entitled to recover compensatory damages against Seacret in an amount to be determined at trial.

107.    Moreover, Plaintiffs seek equitable relief in the form of forfeiture of compensation, forfeiture of contractual consideration, an accounting, a constructive trust of proceeds and property, and/or Seacret's disgorgement of all wrongfully obtained consideration, profits, charges, commissions, revenues, and other monies obtained by Seacret.

108.    In addition, because of its participation in Head's breach of fiduciary duties and responsibilities by Seacret were intentional, with the intent to gain an additional, unwarranted benefit, Plaintiffs are entitled to an award of punitive damages against the Seacret in an amount to be ascertained at trial.

## COUNT SIX

### Trademark Infringement

109.    Plaintiffs re-allege and incorporate all allegations set forth herein.

110.    Seacret's activities constitute infringement of WorldVentures' rights in federally registered trademarks in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114(1).

111.    Because WorldVentures advertises, markets, distributes, and licenses products under the trademarks described in this Complaint, these trademarks are the means by which WorldVentures' products are distinguished from the products and related items of others in the same or related fields.

112.    Because of WorldVentures long, continuous, and exclusive use of their respective trademarks, they have come to mean, and are understood by customers and the public to signify, products of WorldVentures.

113.    As detailed above, Seacret's wrongful conduct includes the use of WorldVentures' marks, name, and/or imitation visual designs, including displays, logos, and/or packaging design.

114.    Seacret's infringing materials are likely to cause confusion, mistake, or deception as to their source, origin, or authenticity.

115.    Upon information and belief, Seacret copied and produced infringing materials with the purpose of misleading the public for Seacret's financial gain.

116.    Upon information and belief, if Seacret is allowed to continue infringing upon WorldVentures' trademarks, Seacret will use the infringing materials with the purpose of misleading or confusing customers and the public as to the origin and authenticity of the infringing

materials. Thus, Plaintiffs seek injunctive relief to prevent Seacret from continuing to violate Plaintiffs' trademarks. 15 U.S.C. § 1116.

117.    In addition to injunctive relief, Seacret is liable to WorldVentures for direct, contributory, and/or vicarious trademark infringement. 15 U.S.C. § 1114(1).

118.    WorldVentures are also entitled to recover reasonable attorneys' fees and costs of the action. 15 U.S.C. § 1117.

**COUNT SEVEN**

**Harmful Access by Computer**

119.    Plaintiffs re-allege and incorporate all allegations set forth herein.

120.    The Texas Civil Practices and Remedies Code § 143.001(a) creates a civil cause of action for "a person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code . . . if the conduct constituting the violation was committed knowingly or intentionally." Pursuant to Section 33.02 of the Texas Penal Code, "[a] person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."

121.    Seacret knowingly—without WorldVentures and WV Marketing's effective consent—accessed, retrieved, and/or used non-copyrightable data, including Confidential Information, from WorldVentures and WV Marketing's computer, computer network, or computer system in violation of Section 33.02 of the Texas Penal Code. Specifically, Seacret accessed WorldVentures and WV Marketing's non-copyrightable data using unauthorized electronic media to copy the non-copyrightable information, including Confidential Information, without WorldVentures and WV Marketing's effective consent.

122.    As a result of Seacret's unlawful access of WorldVentures and WV Marketing's computer, computer network, or computer system, WorldVentures and WV Marketing have suffered damages. Pursuant to TEX. CIV. PRAC &. REM CODE § 143.002, WorldVentures and WV Marketing are entitled to recover actual damages resulting from Seacret's unlawful access of WorldVentures and WV Marketing's computer, computer network, or computer system as described above and, in addition to actual damages, reasonable attorney's fees and costs. While damages may be calculated for a portion of the harm caused by Seacret, recovery of damages cannot provide WorldVentures and WV Marketing's complete relief unless the Court enjoins Seacret's ongoing conduct as described herein. Thus, WorldVentures and WV Marketing have no adequate remedy at law and seek equitable and injunctive relief to enjoin Seacret's harmful access by computer.

## COUNT EIGHT

### Conversion

123.    Plaintiffs re-allege and incorporate all allegations set forth herein.

124.    As more fully described herein, Seacret has knowingly or intentionally, exercised unauthorized dominion and control over WorldVentures and WV Marketing's property, including non-copyrightable business information, customer relationships and lists, vendor/supplier relationships and lists, pricing data, financial information, and other confidential and proprietary information pertaining to the WV Travel Platform (defined ¶ 100 below) and business operations of WorldVentures and WV Marketing, and has thereby converted their property for Seacret's own use in launching its competing "lifestyle" travel platform.

125.    WorldVentures and WV Marketing have an immediate right to possession of such property to the exclusion of Seacret.

126.    As a proximate result of Seacret's wrongful conduct and conversion of WorldVentures and WV Marketing's confidential and proprietary information, WorldVentures and WV Marketing have suffered and will continue to suffer injury, including the value of the converted information, lost profits, loss of goodwill, loss of customers, employees, Sales Representatives, and vendors, and the impairment of future earning capacity, in an amount to be proved at trial.

127.    WorldVentures and WV Marketing have suffered irreparable harm as a result of Seacret's actions, and they are entitled to injunctive relief. Indeed, Seacret's conversion of WorldVentures and WV Marketing's property is causing irreparable injury to them including damage to their Members, employees, Sales Representatives, and supplier/vendor relationships.

128.    Seacret is liable for actual damages caused by its conversion of WorldVentures and WV Marketing's property in an amount to be determined at trial. Moreover, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from WorldVentures and WV Marketing.

129.    Seacret is also liable to WorldVentures and WV Marketing for exemplary damages in an amount to be determined at trial.

## COUNT NINE

### Misappropriation of Effort

130.    Plaintiffs re-allege and incorporate all allegations set forth herein.

131.    Through extensive time, labor, skill, and money, as described above, WorldVentures, WV Marketing and Rovia created and improved the Services, including the Confidential Information ("**WV Travel Platform**"). Seacret misappropriated WorldVentures, WV Marketing and Rovia's efforts and non-copyrightable products, materials, and information relating

to the WV Travel Platform. As a result, Seacret, in record time, created a virtually identical membership-based, direct sales travel services business to the WV Travel Platform. Seacret is by virtue of its unlawful conduct currently operating in a line of business that directly competes with WorldVentures, WV Marketing and Rovia in the membership-based, direct sales travel services industry using virtually identical non-copyrightable information, concepts, vendors, Members, Sales Representatives, and business processes. Seacret has gained a special advantage over WorldVentures, WV Marketing and Rovia because Seacret was burdened with little or none of the expenses incurred by WorldVentures, WV Marketing and Rovia.

132.    Seacret's misappropriation of effort proximately caused actual damages to WorldVentures, WV Marketing and Rovia, including the value of the misappropriated information, lost profits, and the impairment of future earning capacity and goodwill, in an amount to be proved at trial.

133.    Moreover, because of its conduct, Seacret must disgorge all consideration, commissions, charges, revenues, profits, or other monies wrongfully obtained from WorldVentures, WV Marketing and Rovia.

134.    Further, WorldVentures, WV Marketing and Rovia have suffered and continue to suffer irreparable harm as a result of Seacret's unlawful misappropriation, and thus, WorldVentures, WV Marketing and Rovia are entitled to injunctive relief to protect their Confidential Information.

### Injunctive Relief Requested

135.    Plaintiffs re-allege and incorporate all allegations set forth herein.

136.    Seacret has engaged in a systematic campaign to recruit and solicit Plaintiffs' customers, employees, Sales Representatives, and vendors/suppliers to use Plaintiffs' Confidential

Information and trade secrets to improperly compete with Plaintiffs by launching its new "lifestyle" membership-based travel program, which is merely a cut-and-paste of Plaintiffs' travel platform. The harm caused by Seacret's wrongful conduct is not only imminent, but ongoing and has caused, and will continue to cause irreparable damage to Plaintiffs' business. Seacret's unlawful actions continue to diminish the value of Plaintiffs' assets, including the loss of goodwill, damage to customer, employee, Sales Representative, and vendor/supplier relationships, and are endangering Plaintiffs' ongoing bankruptcy proceedings. Recovery of damages cannot provide Plaintiffs complete relief for the injuries caused by Seacret. Plaintiffs have no adequate remedy at law and thus are entitled to immediate equitable and injunctive relief.

137.     There is a substantial likelihood that Plaintiffs will succeed on the merits of the case. Most significantly, Seacret orchestrated the fraudulent transfer of WV Marketing's most valuable assets without providing reasonably equivalent value. Seacret has improperly and impermissibly converted over WorldVentures and WV Marketing's Confidential Information to create a competing travel program and brand. Moreover, Seacret is tortiously interfering with WorldVentures, WV Marketing, and Rovia's existing contractual relations contractual business relationships. Additionally, by promoting its travel programs using WorldVentures' DreamTrips™ and other trademarked brands, Seacret is guilty of trademark violations. Seacret also, whether directly or through proxies, has and continues to infringe and trade off of Plaintiffs' trademarks.

138.     The injury Plaintiffs face outweigh any purported injury that would be sustained by Seacret as a result of the injunctive relief. Public interest further supports Plaintiffs' request for injunctive relief.

139.     Therefore, pursuant to Federal Rule of Civil Procedure 65, Plaintiffs are entitled to injunctive relief as described herein.

140.    Without the requirement of posting a bond and from the date of the preliminary injunction order until trial and final order, Plaintiffs seek a preliminary injunction against Seacret, and those persons bound under Federal Rule of Civil Procedure 65(d), to include the parties, officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Seacret, who have actual notice of the preliminary injunction order, prohibiting, restraining, and enjoining Seacret from:

a)   Using any confidential information or trade secrets of Plaintiffs for any purpose;

b)   Offering for sale, either directly or through Sales Representatives, any membership-based travel business through direct sales to Members

c)   Interfering with Plaintiffs' existing and prospective business relationships with their respective customers, Members, employees, Sales Representatives, vendors, suppliers, business consultants, and/or all other persons or entities in privity with Plaintiffs;

d)   Recruiting or soliciting Plaintiffs' respective employees, customers, Members, Sales Representatives, vendors, and/or suppliers for any membership-based, direct sales of travel services and/or products; and

e)   Using any Plaintiff's trade names, trademarks, copyrighted material, designs, symbols, or any derivative thereof, for any purpose; and

f)   Engaging Head, in any capacity, to participate, either directly or indirectly, in a membership-based travel business marketed through direct sales.

**Attorneys' Fees**

141.    As a result of Seacret's wrongful conduct described above, Plaintiffs were forced to retain the undersigned counsel to enforce their legal rights against Seacret in relation to this action. Thus, pursuant to Texas Civil Practice & Remedies Code ¶¶ 38.001, 134A.005, and

143.002, 18 U.S.C. § 1836 (b)(3)(D), 17 U.S.C. § 505, and 15 U.S.C. § 1117, Plaintiffs seek an award of reasonable and necessary attorneys' fees and costs incurred through trial and appeal of this cause.

### Exemplary Damages

142.    Plaintiffs re-allege and incorporate all allegations set forth herein.

143.    Plaintiffs seek exemplary damages because Seacret's actions were willful, intentional, malicious, and in blatant disregard of Plaintiffs' rights. Specifically, among other things, by its conduct described herein, Seacret intended to gain benefits for itself at the expense of the Plaintiffs and engaged in acts of self-dealing that offended the public's sense of justice and propriety. Thus, Plaintiffs seek exemplary damages against Seacret to the full extent of law in an amount to be determined at trial.

### VI.  CONDITIONS PRECEDENT

144.    Plaintiffs have satisfied all conditions precedent to recovery sought herein.

### VII.  REQUEST FOR RELIEF

145.    For these reasons, Plaintiffs respectfully request that Defendant Seacret Direct LLC be cited to appear and answer, and that Plaintiffs be awarded a judgment against Defendant Seacret Direct LLC for the following:

(a)    A preliminary injunction;
(b)    A permanent injunction;
(c)    Actual damages;
(d)    Disgorgement;
(e)    Exemplary damages;
(f)    Attorneys' fees and expenses;
(g)    Court costs;
(h)    Pre- and post-judgment interest;
(i)    Rescission; and
(j)    All other relief, general or special, either at law or in equity, to which Plaintiffs may be justly entitled to receive.

DATED: April 14, 2021                    Respectfully submitted by:


                                         */s/ Steven C. Lockhart*
                                         Marcus A. Helt (TX 24052187)
                                         Robert T. Slovak (TX 24013523)
                                         Steven C. Lockhart (TX 24036981)
                                         Aaron E. Chibli (TX 24091222)
                                         Brandon C. Marx (TX 24098046)
                                         Emily F. Shanks (TX 24110350)
                                         **FOLEY & LARDNER LLP**
                                         2021 McKinney Avenue, Suite 1600
                                         Dallas, Texas 75201
                                         Telephone: (214) 999-3000
                                         Facsimile: (214) 999-4667
                                         mhelt@foley.com
                                         rslovak@foley.com
                                         slockhart@foley.com
                                         achibli@foley.com
                                         bmarx@foley.com
                                         eshanks@foley.com

                                         **COUNSEL FOR THE PLAINTIFFS
                                         SPHERATURE INVESTMENTS LLC,** *et al*
                                         **d/b/a WORLDVENTURES HOLDINGS, LLC**



## CERTIFICATE OF SERVICE

        I hereby certify that, on April 14, 2021, a true and correct copy of the foregoing document
was served electronically on all parties in interest to these cases by the Court's PACER system.

                                         */s/ Steven C. Lockhart*
                                         Steven C. Lockhart